**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**LYNCHBURG DIVISION**

MICHELE BLAIR, individually and as     )
Guardian and next friend of S.B, a minor;   )
                        Plaintiff.   )      Civil Action No. 6:23-cv-00047-NKM
                                  )      **Plaintiff's Brief In Opposition To**
   v.                             )     **Defendant Appomattox County School**
APPOMATTOX COUNTY SCHOOL     )      **Board's Motion To Dismiss**
BOARD, *et. al.*                    )
                     Defendants.    )

Plaintiff, Michele Blair, by and through her attorneys of record, submits this Brief In Opposition to Defendant Appomattox County School Board's ("ACSB" or "Board") Motion to Dismiss [Dkt.29].

## FACTUAL BACKGROUND

S.B. was adopted by her grandmother, Mrs. Blair, and her husband at age 2 after her father died and her mother was unable to care for her. She had suffered trauma before being adopted by the Blairs. (Cpt, ¶ 20). S.B. had a history of mental health issues arising from the early childhood trauma. As a long-time volunteer with CASA (Court Appointed Special Advocates), Mrs. Blair was trained and had experience in providing individualized support to victims of childhood trauma. (Cpt, ¶ 84). When the onset of puberty in 2019 led to S.B. experiencing distress about her body, depression, eating disorders, engaging in self-harm, and experiencing hallucinations, Mrs. Blair provided S.B. with the therapeutic help S.B. needed. (Cpt, ¶¶ 21-23). S.B. was enrolled in middle school in Appomattox County Public Schools during the 2020-2021 school year. (Cpt. ¶22). During the 2020-2021 school year, middle school staff regularly interacted with Mrs. Blair when they noticed that S.B. was having difficulties, including noticing evidence of self-harm. (Cpt. ¶23). As a result of that regular communication of important information regarding S.B.'s mental health,

Mrs. Blair was able to and work with S.B.'s private counselors to therapeutically address the issues. (Cpt. ¶23).

Following the 2020-2021 school year, S.B.'s symptoms grew worse, and she was admitted for in-patient psychiatric care at CMG Piedmont Psychiatric Center from June 1-8, 2021. (Cpt, ¶ 24). S.B. received diagnoses of "major depressive disorder, recurrent episode" and "intentional self-harm by sharp object." (Cpt, ¶ 25). Mrs. Blair provided Appomattox County High School ("ACHS") staff with information from S.B.'s mental health records, including the diagnoses and the very recent hospitalization for treatment of those diagnoses when she enrolled S.B. for her freshman year. (Cpt, ¶ 25). Just before school started, on August 5, 2021, S.B. underwent a psychiatric evaluation. (Cpt, ¶ 26). The evaluation included a diagnosis of gender dysphoria but the results were not provided to Mrs. Blair for many months. (Cpt, ¶27). Therefore, there was no known diagnosis of gender dysphoria at the time that S.B. attended ACHS. (Cpt, ¶ 28).

On August 11, 2021, Dena Olsen, one of S.B.'s school counselors, heard from S.B.'s science teacher that she overheard S.B. telling a friend that S.B. wanted to be referred to by a male name and pronouns. (Cpt, ¶ 31). Mrs. Olsen did not speak with Mrs. Blair or make any other inquiry regarding the double hearsay statement. (Cpt, ¶ 32). Instead, Mrs. Olsen just met S.B. in the hallway and asked S.B. if she identified as a boy or a girl. (Cpt, ¶ 32). S.B. indicated that she identified as a boy. (Cpt, ¶ 32). Without speaking with Mrs. Blair, Mrs. Olsen told S.B., a diminutive 14-year-old girl with mental health issues, that if she identified as a boy, she could use the male restroom at school. (Cpt, ¶ 32). A few days later, still not having informed Mrs. Blair, Mrs. Olsen told S.B. that her female classmates were uncomfortable with S.B. using the girls' bathroom so S.B. should only use the boys' bathroom. (Cpt, ¶ 32).

While the staff at the middle school regularly informed Mrs. Blair about issues related to S.B.'s mental health, when the issue was a purported discordant gender identity, high school staff did not inform Mrs. Blair, even when staff decided that S.B. should use the boys' restroom. (Cpt, ¶ 33). Despite S.B.'s known history of depression, self-harm and recent hospitalization, high school staff did not inform Mrs. Blair about the consequential decisions being made on behalf of her daughter when S.B. had stated that she identified as a boy. (Cpt, ¶ ¶ 33-34).

On August 12, 2021, S.B. met with Mrs. Olsen and told her that she (S.B.) identified as a boy and wanted to use a male name, "D," and he/him pronouns. Mrs. Olsen claims that S.B. told her that her parents were not supportive of her gender identity. (Cpt, ¶ 35). Again, despite S.B.'s known history of mental health issues, trauma and hospitalization, Mrs. Olsen simply accepted that statement as true and agreed to act on it as S.B. requested. (Cpt, ¶ 35).  As well as agreeing to use a male name and pronouns for S.B. at school, Mrs. Olsen also agreed to hide that information from Mrs. Blair by using S.B.'s given name and female pronouns when speaking with her. (Cpt, ¶¶ 35, 38). Instead of remaining engaged with Mrs. Blair regarding her daughter's ongoing mental health issues, as did middle school staff, Mrs. Olsen decided to withhold personal information critical to S.B.'s mental health, including use of the male restroom, when it involved affirming a male gender identity. (Cpt, ¶¶ 35, 38).

The withholding of information also included information about bullying, threats and sexual harassment by students because S.B. looked like a boy. (Cpt, ¶¶ 35, 36). At the August 12, 2021 meeting, S.B. told Mrs. Olsen that on August 11, 2021, boys on the bus directed profane epithets at her because she looked like a boy, threatened to sodomize her until she "liked boys," threatened to hold her out of the window of the bus by her hair until she apologized, and made other similar threats. Other students reportedly threatened to shoot her and told her they knew

where she lived. (Cpt, ¶36). Mrs. Olsen claimed that she reviewed recordings from the bus on August 11, 2021, and allegedly viewed some some but not all of the threatening behavior or hear the threats reported by S.B. (Cpt, ¶ 37). However, other students who were on the bus at the time confirmed the events as relayed by S.B to Ms. Olsen. (Cpt, ¶ 37). This information was not shared with Mrs. Blair when Mrs. Olsen called her to pick up S.B. from school. Instead, Mrs. Blair was merely told that there was an "incident' on the bus and that S.B. was not in trouble. (Cpt, ¶ 38). Continuing to hide information regarding S.B.'s asserted male gender identity from Mrs. Blair, Mrs. Olsen said nothing about S.B. being treated as a boy with a male name and pronouns but referred to S.B. by her legal name and female pronouns.  (Cpt, ¶ 38). As well as concealing from Mrs. Blair the information regarding the sexual harassment, threats, and bullying that resulted at least in part from S.B.'s assertion of a male identity, Mrs. Olsen and other staff hid the information from the District's Title IX coordinator, which violates District Policy JFHA/GBA. (Cpt, ¶ 57).

S.B. continued to be subjected to harassment, threats, and assaults from male peers in the hallways and the male bathrooms at the high school between August 12 and August 25, 2021. (Cpt, ¶40). Boys were following behind her in a group, touching her, threatening her with knife violence and rape, and shoving her up against the hallway wall. Despite knowing that S.B. had already been subjected to such threats from the bus incident (which had not been reported to the Title IX coordinator or Mrs. Blair) and that at her direction S.B. was using the boys' restroom, Mrs. Olsen did not check on S.B.'s welfare despite meeting with her privately throughout that time to encourage S.B. to "embrace" her male identity and to discuss staff's efforts to affirm and promote that identity. (Cpt, ¶¶ 42). S.B. commented to Ms. Olsen that she had been called into the counseling office to discuss gender identity eight times during the 12 days school had been in session. (Cpt, ¶41).

A child's assertion of a discordant gender identity is a significant mental health concern. (Cpt, ¶ 43). As the Fourth Circuit said in *Grimm v. Gloucester County School Board*, 972 F.3d 586, 596 (4th Cir. 2020), affirming a child's assertion of a male identity and facilitating social transitioning through use of opposite sex names, pronouns, and opposite sex privacy facilities is an integral part of mental health intervention for gender dysphoria. (Cpt, ¶ 43). Therefore, in meeting and counseling with S.B. to affirm her discordant gender identity, Mrs. Olsen and Mr. Via were engaging in a form of psychotherapeutic intervention in violation of District policy regarding counseling services. District Policy I J provides:

> The guidance and counseling program does not include the use of counseling techniques which are beyond the scope of the professional certification or training of counselors, including hypnosis, or other psychotherapeutic techniques that are normally employed in medical or clinical settings and focus on mental illness or psychopathology. (Cpt, ¶ 44).

Contrary to the Policy, Mrs. Olsen was engaging in mental health interventions with S.B., as described by the *Grimm* Court, by counseling her about transgender identities, affirming her as a male, and permitting and encouraging the diminutive (less than 100 pound) teenage girl to use male restrooms despite knowing that S.B. had a history of trauma and mental illness and had already been threatened and sexually harassed on the bus for being gender non-conforming. (Cpt., ¶ 45).

On August 23, 2021, Ms. Olsen was informed that school and District administrators had received reports from parents about incidents in the boys' restrooms during the times S.B. was using them as directed by Ms. Olsen. (Cpt., ¶46). As the Superintendent of the District and thus the top administrator, Mrs. Blair is informed and believes that Dr. Bennett knew of these reports of sexual harassment and threats. (Cpt., ¶ 47). Mrs. Blair is also informed and believes that Dr. Bennett did not follow or direct Ms. Olsen or any other ACHS staff to follow District Policy JFHA/GBA related to reports of bullying and harassment. (Cpt., ¶47). Policy JFHA/GBA provides

that reports of sexual harassment, which includes, "unwelcome sexual physical contact, unwelcome ongoing or repeated sexual flirtation or propositions, or remarks sexual slurs, leering, epithets, threats, verbal abuse, derogatory comments or sexually degrading descriptions, and graphic comments about an individual's body," all of which were reported by S.B. to the bus driver, Ms. Olsen, Mr. Via and Officer Gunter, must be reported to the District's Title IX compliance officer and be investigated. (Cpt, ¶56).

On August 24, 2021, Mrs. Olsen met with S.B. and mentioned "concerns" raised about S.B. using the boys' bathroom. (Cpt, ¶48). S.B. reported that she was threatened, harassed, and sexually assaulted when she was using the restroom. (Cpt, ¶ 48). She made the statement that "all the boys are rapists," and explained that she defined "rape" as inappropriate touching. Mrs. Olsen and S.B. agreed that S.B. would begin using the nurse's restroom. (Cpt, ¶48). Even in light of new reports of S.B. being assaulted and threatened by male peers, Ms. Olsen still did not notify Mrs. Blair about S.B.'s assertion of a male identity, use of male names, pronouns, and restrooms at school, the counselors' affirmation of that identity, and the harassment, threats and assaults related to S.B.'s assertion of a male identity. (Cpt, ¶49). Instead of alerting the Title IX compliance officer for investigation as required under Policy JFHA/GBA, ACHS staff interrogated, intimidated and threatened S.B., who was the sexual harassment victim without her parent present. (Cpt., ¶ 57).

Mrs. Olsen called S.B. into her office on August 25, 2021, where, along with School Resource Officer Daniel Gunter, she interrogated S.B. without her parents being notified or permitted to be present. (Cpt, ¶53). Mrs. Olsen implied that S.B. had fabricated the reports of threats of rape from males and pressured her to recant her story. Mrs. Olsen told S.B. that some of the information regarding the incidents was untrue, that S.B. should not falsify a report, that she could face defamation charges for calling boys rapists, and that S.B. cannot say things when she

is upset. (Cpt, ¶53). S.B., a 14-year-old with a history of mental health issues, including hospitalization just prior to starting school and who was subjected to two weeks of sexual harassment and assaults, was forced to defend her statements in front of authority figures without her mother present. (Cpt, ¶ 55). S.B. reminded Mrs. Olsen and Officer Gunter that they are supposed to keep students safe and should do something if they hear a report about a sexual assault. (Cpt, ¶ 55). Mrs. Olsen contacted Mrs. Blair but still did not inform her that S.B. said she identified as a boy, that school staff had been using a male name and pronouns for S.B. and had instructed S.B. to use the male restroom. (Cpt, ¶58). Neither did Mrs. Olsen notify Mrs. Blair that S.B. was the victim of persistent sexual harassment, threats, and assaults resulting from S.B. identifying as male. (Cpt, ¶58). Instead, Mrs. Olsen merely told Mrs. Blair that S.B. had been using the boys' restroom and that there were "safety concerns." (Cpt, ¶58).

ACHS staff's actions in concealing information regarding S.B.'s assertion of a discordant gender identity, concealment of their actions in affirming S.B.'s asserted gender identity with a male name and pronouns and use of the male restroom, were contrary to established practice that Mrs. Blair experienced with the middle school regarding non-gender identity mental health issues and to District policies regarding notifying parents regarding medications, sexual harassment, and other issues. (Cpt., ¶¶ 44, 50, 57). Mrs. Blair is informed and believes that the differential actions by ACHS staff is part of a District protocol or guideline of which Dr. Bennett and the Board were aware , created and /or sanctioned. (Cpt., ¶59). Mrs. Blair is informed and believes that protocol or guideline provides that staff is not to inform parents when their children express a discordant gender identity and asked to be treated as the opposite sex unless the minor child agrees to disclosing the information. (Cpt., ¶59). On information and belief, Superintendent Bennett as the chief executive officer of the District tasked with oversight and control of the schools, and

authorizing, executing, enforcing, and implementing the School Board's policies was aware of the protocol or guideline, adhered to, and implemented it. (Cpt., ¶¶ 16, 59).

After returning home on August 25, 2021, Mrs. Blair learned for the first time, from S.B., that S.B. had been identifying as a boy, using a male name and pronouns, using the boys' bathroom at Mrs. Olsen's direction, and was being sexually harassed and assaulted at school. (Cpt, ¶61). S.B. said that she was terrified of what the bullies would do to her and to the family. (Cpt, ¶61). S.B. also told her mother that she would not have been using the boys' bathroom except for the fact that Mrs. Olsen instructed her to do so. (Cpt, ¶61). Mrs. Blair reassured S.B. that she did not need to return to school and they would "figure it out in the morning." (Cpt, ¶62). However, S.B. was still frightened by the unaddressed threats. (Cpt, ¶63). She had a psychotic breakdown and ran away. (Cpt, ¶63). She was abducted and raped by an adult male stranger and subsequently taken to Washington DC and Maryland and raped and drugged by multiple men. (Cpt, ¶64).

**LEGAL ARGUMENT**

## I.      This Court Should Reject Defendant's Proposed Factual Embellishment.

This Court should reject the Board's request to look "beyond the four corners of the Complaint" and use Mrs. Olsen's purported counseling notes to contradict the verified allegations of the Complaint. (Board Brief In Support of Motion to Dismiss, pp. 7-8). As part of her Reply Brief, Mrs. Olsen submitted a declaration in which she purports to authenticate the "counseling notes" [Dkt. 43-1] in response to Plaintiff's citation of Fourth Circuit precedent requiring that exhibits to Motions to Dismiss be of "unquestioned authenticity." (Brief in Opposition to Olsen Motion, p. 7, [Dkt 36], citing *Goines v. Valley Community Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016)) The effort is unavailing and only serves to emphasize the lack of merit in Defendants' attempt to impermissibly embellish the factual record.

As did Mrs. Olsen and Dr. Bennett, the Board claims to know the source of the facts alleged in the Complaint. (Board Brief in Support, p. 7). There is one block quote and a few smaller quotes of conversations between S.B., Officer Gunter, Mr. Via, and Mrs. Olsen (Cpt, ¶¶35, 36, 41, 42, 48, 53, 55). According to the Board, the presence of those quotes within the 105 paragraphs of factual allegations necessarily means that the Complaint was built on Mrs. Olsen's counseling notes. "These quotations could only have been obtained from Mrs. Olsen's Counseling Notes. As such, Plaintiffs'[sic] 'quoted' and 'relied upon' Olsen's notes." (Board Brief in Support, p. 7). The Board does not explain how the quotes could have only come from a single source. The quotations reference conversations between two to four people. (Cpt, ¶¶35, 36, 41, 42, 48, 53, 55). Therefore, there are multiple people with personal memories of the conversation. Mrs. Olsen wasn't necessarily the only person who made notes of the conversations or who might have shared the conversations with others. The Board's (and Dr. Bennett's and Mrs. Olsen's) statement that "These quotations could only have been obtained from Mrs. Olsen's Counseling Notes" is blatantly false.

That being the case, there is no indication that the notes are "integral" to the Complaint. *Goines v. Valley Community Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016). "While a 12(b)(6) motion focuses on the allegations of the complaint, it is well established that a document attached to a motion to dismiss may be considered when evaluating a motion to dismiss if the document was integral to the complaint and authentic." *Id.* More specifically, a court may consider a document attached to a motion to dismiss if it was integral to **and explicitly relied on in the complaint and the plaintiffs do not challenge its authenticity**. *Am. Chiropractic v. Trigon Healthcare,* 367 F.3d 212, 234 (4th Cir. 2004) (citing *Phillips v. LCI International, Inc.,* 190 F.3d 609, 618 (4th Cir. 1999) (emphasis added). The rule encompasses documents quoted, relied on, or

incorporated by reference in the complaint and public records, so long as the documents are of unquestioned authenticity. *Gasner v. County of Dinwiddie*, 162 F.R.D. 280, 282 (E.D. Va. 1995).

The "counseling notes" were not quoted, incorporated by reference or explicitly relied on in the complaint and are not official public records. Therefore, they are not "integral" to the Complaint. *Am. Chiropractic,* 367 F.3d at 234. Consequently, they cannot be considered even if their authenticity were unquestioned. *Id.* Plaintiff disputes their authenticity.

## II.     Plaintiff Has Sufficiently Alleged Substantive Due Process Violations.

When the actual factual allegations of Defendants' conduct are analyzed in the context of the actual substantive due process rights Plaintiff is asserting, it is clear that Plaintiff has stated a more than plausible claim for violations of her and S.B.'s substantive due process rights.

### A.     Plaintiff's Claims Are Based On Fundamental Rights.

The Board mischaracterizes the allegations of the Complaint and the nature of the rights alleged by Mrs. Blair to reach the erroneous conclusion that Mrs. Blair has failed to allege violation of a fundamental constitutional right. (Board Brief, pp. 11-15). In fact, Mrs. Blair has alleged violations of fundamental rights that have been recognized by the Supreme Court and Fourth Circuit for decades and memorialized in Virginia common and statutory law since 2012. The Board's attempt to escape strict scrutiny review of its actions by claiming that the rights asserted by Mrs. Blair are somehow amorphous or defined too broadly is unavailing.

#### 1.     *Plaintiff has alleged violation of the fundamental right to direct S.B.'s upbringing.*

The Board's argument that Mrs. Blair has failed to state violation of a fundamental parental right is fundamentally flawed by the Board's mischaracterization of the nature of the right asserted. Mrs. Blair alleges that Defendants have violated Mrs. Blair's fundamental right to direct, and necessarily make decisions, regarding the upbringing, care and custody of her daughter as

described in *Troxel v. Granville,* 530 U.S. 57 (2000), and *Parham v. J.R.,* 442 U.S. 584 (1979) **not** the right to "dictate the nature of [her daughter's] school environment," or direct what or how the district teaches her daughter, as described in *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197 (9th Cir. 2005), *Blau v. Fort Thomas Pub. Sch. Dist.,* 401 F.3d 381 (6th Cir. 2005), *Leebaert v. Harrington*, 332 F.3d 134, 141 (2d Cir. 2003) and *Bailey v. Va. High Sch. League*, Inc., 488 F. App'x 714 (4th Cir. 2012), cited by the Board. (Board Brief at pp. 13-14).

In *Bailey,* the Fourth Circuit said parents' "**right to control individual components of their son's education**, including his participation in interscholastic sports and other activities, is not constitutionally protected." 488 F. App'x at 718-19 (emphasis added). The cases from the Sixth, Second and Ninth circuits cited by the Board similarly held that parents do not have a fundamental right to direct how or what their child will be taught. *Blau,* 401 F.3d at 395-96, *Leebaert*, 332 F.3d at 141, *Fields,* 427 F.3d at 1200. However, contrary to the Board's conclusion, that is **NOT** the liberty interest Mrs. Blair is asserting. (Brief in Support, p. 13). Instead, "[t]he liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel*, 530 U.S. at 65; *See also, Wyatt v. McDermott,* 283 Va. 685, 692 (Va. 2012) (citing *id.*). After nearly 100 years of Supreme Court precedent, "it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to **make decisions** concerning the care, custody, and control of their children." *Id*. at 66. (emphasis added). "[O]ur constitutional system long ago rejected any notion that a child is the mere creature of the State." *Id*. at 68 (citing *Parham*, 442 U.S. at 602). "Accordingly, so long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the

best decisions concerning the rearing of that parent's children." *Id.* at 68-69. Those decisions include mental health care, even when the decisions are disagreeable to the children. *Parham*, 442 U.S. at 603. "Simply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Id.* Mrs. Blair is not challenging academic or other pedagogical issues, which would be governed by *Bailey, Blau, Fields,* and *Leebaert,* but personal decisions related to S.B.'s upbringing and mental health, which are governed by *Troxel* and *Parham*.

*D.B. v. Cardall*, 826 F.3d 721, 741 (4th Cir. 2016) and *White v. Chambliss*, 112 F.3d 731, 733-34 (4th Cir. 1997), do not, as the Board states, provide that "a parent's interest is 'subject to the child's interest in his personal health and safety'." (Brief in Support, pp 9-10, 12). Both *Cardall* and *White* addressed circumstances in which there were allegations that the parents were unfit so that the holdings in *Troxel* and *Parham* would not apply. *White* upheld a law that permitted child protective services to exercise emergency protective custody over a child if there is probable cause that there is an imminent danger to the child. 112 F.3d at 733-34. The *Cardall* Court specifically contrasted the circumstances of that case with the standard set forth in *Troxel*. The state does not contravene substantive due process when it interferes with parental control based on a determination that a parent is unfit. 826 F.3d at 741. However, when the state seeks to override the decision of fit parents, then there is a violation of substantive due process. *Id.*

That is what Mrs. Blair is alleging in Count I. Contrary to the Board's mischaracterization, Mrs. Blair has not alleged "a liberty interest at a broad level." (Board Brief at p. 12). Instead, in keeping with *Reno v. Flores,* 507 U.S. 292, 302 (1993), the right is carefully defined.  As the fit parent of S.B. she has the fundamental constitutional right to **make decisions** regarding S.B.'s

upbringing, care, and custody, including decisions regarding her mental health, *i.e.*, her assertion of a discordant gender identity. *Troxel*, 530 U.S. at 66 (emphasis added); *Parham,* 442 U.S. at 602; *See also, Cardall,* 826 F.3d at 741(when the state seeks to override the decision of fit parents, then there is a violation of substantive due process). That right to make decisions necessarily means the right to receive the information required to make them, *e.g.,* the fact that her daughter is being treated as a male and permitted to use male restrooms and that her assertion of a male identity and use of those restrooms has led to sexual harassment and threats (Cpt., ¶¶ 32, 35, 36, 40). Mrs. Blair retains that right even if the decision she would make, *e.g.,* support or non-support of S.B.'s assertion that she identifies as a boy, would be disagreeable to S.B. *Parham,* 442 U.S. at 603. Consequently, even if S.B. did claim that her parents were "not supportive" of her asserted gender identity, that would not justify concealing the information from Mrs. Blair. (Cpt., ¶35).

Defendants' alleged actions in withholding information regarding S.B.'s asserted gender identity from Mrs. Blair, and acting on the information by using a male name and pronouns and instructing S.B. to use the boys' bathroom, interfered with Mrs. Blair's right to make critical mental health decisions for and to protect her daughter. (Cpt, ¶¶109-112). Mrs. Blair has stated a claim for violation of her fundamental right to "make decisions concerning the care, custody, and control of [her] child[]." *Troxel*, 530 U.S. at 66. That right is protected from deprivation by the government, such as the actions taken by Defendants, unless Defendants can satisfy strict scrutiny, *i.e.,* that their actions are narrowly tailored to serve a compelling state interest," *Chavez v. Martinez*, 538 U.S. 760, 775 (2003).

### 2.     *Plaintiff Alleges Violation of The Fundamental Right To Familial Privacy.*

Plaintiff has also sufficiently alleged that Defendants violated Mrs. Blair's and S.B.'s fundamental rights to familial privacy as set forth in *Hodge v. Jones*, 31 F.3d 157, 163 (4th Cir.

1994). "[T]he sanctity of the family unit is a fundamental precept firmly ensconced in the Constitution and shielded by the Due Process Clause of the Fourteenth Amendment." *Id.* The Supreme Court has limited the concept of familial privacy to (1) thwarting governmental attempts to interfere with particularly intimate family decisions, and (2) voiding government actions that sever, alter, or otherwise affect the parent/child relationship. *Id.* (*See also, Murphy v. Goff,* 2010 WL 2292130 at *12 (W.D. Va. Jun. 7, 2010)). Actionable violations of the familial privacy right occur where state officials' actions 1) were directly aimed at the parent-child relationship, 2) implicated the most essential and basic aspect of familial privacy — the right of the family to remain together without the coercive interference of the awesome power of the state,  3) drove a wedge into [a] family and threatened its very foundation, or 4) eroded the family's solidarity internally and impaired the family's ability to function. *Id.* The alleged actions of school staff under the supervision of the Board and Dr. Bennett fit these categories.

Examination of the full extent of Defendants' actions as alleged in the Complaint reveals conduct aimed directly at the parent-child relationship. Acting in accordance with an alleged protocol sanctioned by the School Board and Dr. Bennett, Mrs. Olsen and Mr. Via intentionally withheld from Mrs. Blair information critically important to S.B.'s mental health, *i.e.,* that she was identifying as a boy and that school staff were affirming that identity by using a male name and pronouns and instructing S.B. to use the boys' restroom. (Cpt, ¶¶32-38, 59). Acting in accordance with the policy, Mrs. Olsen intentionally deceived Mrs. Blair by referring to S.B. with her given name and female pronouns when speaking with Mrs. Blair but using only a male name and pronouns at school. (Cpt, ¶¶ 32-38). Mrs. Olsen and other district staff also failed to inform Mrs. Blair or the Title IX coordinator about the persistent and significant bullying and harassment reported by S.B. (Cpt, ¶¶ 32-38). Those failures violated District Policy JFHA/GBA. As policy-

maker for the District, the Board is tasked with enacting District policies that comport with constitutional rights and ensuring that they are properly implemented. Therefore, violations of the policies would reflect a failure to supervise or train District staff. (Cpt, ¶¶133-134, 150, 157). Unlike the actions in *Hodge,* these acts by District staff did not merely incidentally affect the relationship between Mrs. Blair and S.B. 31 F.3d at 164. Instead, as was true of the actions of Ms. Green in *Nelson v. Green*, 965 F.2d 732,745 (W.D. Va. 2013), the acts of concealment and deception taken pursuant to an alleged protocol were directed at the heart of the parent-child relationship. 965 F.2d at 745.Plaintiff has alleged more than a plausible claim for violation of her and S.B.'s fundamental rights to familial privacy. That right is protected from deprivation by the government, such as the actions taken by Defendants, unless Defendants can satisfy strict scrutiny, *i.e.,* that their actions are narrowly tailored to serve a compelling state interest," *Chavez v. Martinez*, 538 U.S. 760, 775 (2003).

**B.    Plaintiff Has Plausibly Alleged *Monell* Liability.**

As a municipality, the Board can be liable for constitutional deprivations resulting from its employees' conduct if that conduct was pursuant to an official municipal policy, custom or practice. *Monell v. Dep't of Soc. Serv. of New York,* 436 U.S. 658, 691 (1978)). A policy, custom or practice may be expressed in one of several forms: 1) [T]hrough an express policy, such as a written ordinance or regulation; 2) through the decisions of a person with final policymaking authority; 3) through an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens; or 4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law. *Howard v. City of Durham*, 68 F.4th 934, 952 (4th Cir. 2023). Mrs. Blair has plausibly alleged a policy, custom or practice under numbers 1 and 3.

It is critical that the Board's arguments regarding liability under *Monell* be analyzed in the context of the requirements for surviving a motion to dismiss, not in the context of the ultimate proof required to survive summary judgment or trial. The question at this stage of the litigation is not whether Mrs. Blair has affirmatively shown that the deprivation of her and S.B.'s rights were caused by an official municipal policy, custom or practice, but whether Mrs. Blair has alleged sufficient facts to "raise a right to relief above the speculative level." *Bell Atlantic v. Twombly*, 550 U.S.544, 555 (2007). The Board claims that Plaintiff cannot allege sufficient facts to meet the *Twombly* standard because of the presence of "information and belief" allegations. (Board Brief, pp. 10-11). However, "[a] plaintiff is generally permitted to plead facts based on 'information and belief' if such plaintiff is in a position of uncertainty because the necessary evidence is controlled by the defendant." *Ridenour v. Multi-Color Corp*., 147 F. Supp. 3d 452, 456 (E.D. Va. 2015). That is the situation in this case.

### 1. Mrs. Blair has plausibly alleged the existence of a policy, custom or practice.

To hold the Board liable for a constitutional violation under *Monell*, Mrs. Blair must plead "the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of [her] rights." *Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994). "'[O]fficial policy' often refers to formal rules or understandings—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." *Pembaur v. Cincinnati*, 475 U.S. 469, 480 (1986)). However, municipal liability may also be imposed for "a single decision by municipal policymakers under appropriate circumstances." *Id.* at 481. "[E]ven a single decision by such a body unquestionably constitutes an act of official government policy." *Id.*

At the motion to dismiss stage, Mrs. Blair must satisfy only the usual requirements of notice pleading under FED. R. CIV. P. 8(a)(2) to provide nothing more than "a short and plain statement

of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Jordan,* 15 F.3d at 339. She is not required to detail the facts underlying her claims, or "plead the multiple incidents of constitutional violations that may be necessary at later stages to establish the existence of an official policy or custom and causation." *Id.* She has satisfied that standard. Since much of the information regarding the alleged protocol or guidance is controlled by Defendants, Mrs. Blair has included allegations based on "information and belief" as permitted by *Ridenour*, 147 F. Supp. 3d at 456.

Mrs. Blair alleges changes in District staff's conduct regarding disclosing information about S.B.'s health, safety and well-being from when S.B. was in middle school to her freshman year at ACHS. In 2020-2021 District staff regularly shared information regarding S.B.'s mental health issues. (Cpt., ¶ 23). However, in 2021-2022 when S.B. said she identified as a boy and staff affirmed that identity with a male name and pronouns and access to the boys' restroom, District staff concealed the information. (Cpt., ¶ 34). The District required Mrs. Blair's consent to provide medication to S.B. but did not even inform her that S.B. was being treated as a boy and using the boys' bathroom. (Cpt., ¶ 50).  Mrs. Blair then alleges:

> Plaintiff is informed and believes and based thereon alleges that Defendants Olsen's and Via's concealment of information from Mrs. Blair was part of a District protocol or guideline that directed staff to not inform parents when their children expressed a discordant gender identity and asked to be treated as the opposite sex, using opposite sex names and pronouns and use opposite sex privacy facilities, unless the minor child agrees to disclosing the information. Plaintiff is informed and believes that Superintendent Bennett and members of the School Board were aware of the protocol or guideline, adhered to, and implemented it. (Cpt., ¶ 59).

*See also,* Complaint, ¶¶ 115, 131, 147. Based on the changes in District staff's conduct regarding parental notification, Mrs. Blair alleges that the Board and Dr. Bennett made a decision or reached an understanding that District staff would not inform parents about gender identity issues with their children.  This provides Defendants with "a short and plain statement of the claim" that gives

Defendants fair notice of the policy Mrs. Blair alleges has been implemented. *Jordan,* 15 F.3d at 339.  That is all that is required at this stage in the litigation.

### 2.  *Mrs. Blair has alleged a plausible claim for failure to train.*

A "policy or custom" for purposes of liability based on official capacity can include a local government's failure to train certain employees about their legal duty to avoid violating citizens' rights. *Connick v. Thompson*, 563 U.S. 51, 60 (2011). To impose liability for the failure to train, a plaintiff must plead and prove that: (1) the subordinates actually violated the plaintiff's constitutional or statutory rights; (2) the supervisor failed to train properly the subordinates thus illustrating a 'deliberate indifference' to the rights of the persons with whom the subordinates come into contact; and (3) this failure to train actually caused the subordinates to violate the plaintiff's rights. *Scarborough v. Frederick County Sch. Bd.* 517 F. Supp. 3d 569, 584-85 (W.D. Va. 2021). As demonstrated *supra¸* Mrs. Blair has alleged violations of her and S.B.'s constitutional rights, which in the case of the fundamental right to make decisions regarding the upbringing of her child, also violates Virginia statutory law, Virginia Code § 1-240.1. This satisfies the first element.

Plaintiff can allege the second deliberate indifference element in two ways: 1) policymakers were aware of, and acquiesced in, a pattern of constitutional violations, or 2) a supervisory power failed to train its employees concerning an obvious constitutional duty that the particular employees are certain to face.'" *Moody v. City of Newport News*, 93 F. Supp. 3d 516, 538 (E.D. Va. 2015), To impose liability under the second method, the Plaintiff must establish that "the underlying constitutional right is quite clear and is one that the subordinates reasonably can be expected to confront with some regularity." *Id.*

Here, the constitutional rights asserted by Mrs. Blair, as explained *supra,* have been established for decades and in particular have been memorialized by the Virginia Supreme Court and Legislature. School district staff can reasonably be expected to regularly confront issues

regarding parental notice and decision-making related to their children's health, safety, and well-being, perhaps on a daily basis. This is illustrated by School Board policies regarding psychotherapeutic intervention (Policy IJ) (Cpt., ¶44), reporting and investigating sexual harassment/bullying (Policy JFHA/GBA) (Cpt, ¶57), and requiring parental consent for medications (Cpt., ¶50), which address communicating with parents to address issues related to children's health, safety and well-being. A child's assertion that she identifies as and wants to be treated as the opposite sex, as is the case here, similarly involves critical issues regarding the child's health, safety, and well-being, which implicates the fundamental constitutional right of parents to make decisions regarding their children's upbringing and mental health. *Troxel,* 530 U.S. at 65, *Parham,* 442 U.S. at 602. Just as parental notice is critical in the contexts of sexual harassment, mental health intervention and administering medication, so too it is critical in the context of a child's assertion that she identifies as and wants to be treated as the opposite sex.

Consequently, the School Board was aware that District staff would confront the gender identity issues that would implicate parental decision-making and the familial privacy right and that staff needed to be trained in a manner that would not violate those constitutionally protected rights. The alleged actions of the School Board in sanctioning an alleged District protocol that intentionally conceals information regarding a child's gender identity and District efforts to affirm it, if proven, would show acquiescence in a pattern of constitutional violations, or an intentional failure to train staff to act in a way that comports with parents' fundamental rights. *Moody,* 93 F. Supp. 3d at 538. Also, Defendants' actions in excluding Mrs. Blair from meetings and an interrogation of her daughter, deceiving her regarding her daughter's name and pronouns and failing to inform her that her daughter was being threatened , sexually harassed, and bullied show

an utter failure to train staff regarding existing District policies. (Cpt., ¶¶ 57, 118, 124, 134, 140, 150, 158).

Finally, as to the third element, a plaintiff must allege a "causal nexus between the failure to train and the complained of injury." *Scarborough,* 517 F. Supp. 3d at 585. The failure to train must have made the specific violations almost bound to happen, sooner or later, rather than merely likely to happen in the long run. *Moody,* 93 F. Supp. 3d at 538. Mrs. Blair has alleged that the Board's failure to train District staff violated her constitutional rights, including by depriving her of information necessary to make decisions to address her daughter's mental health issues and the injuries S. B. suffered as a result of the sexual harassment, threats, bullying, and interference with the parent child relationship. (Cpt., ¶¶ 114-120, 129-134, 147-152).

### III.   Mrs. Blair Has Alleged A More Than Plausible Claim For Violation Of Title IX.

The Board's argument not only fails to rebut Plaintiff's Title IX claims, but actually makes Plaintiff's case. Indeed, the very authority the Board relies on demands denial of Defendant's motion. The allegations of the Complaint, accepted as true and viewed in the light most favorable to Plaintiff, demonstrate that Mrs. Blair has alleged a more than plausible claim for violation of Title IX.  The Board's own analysis reveals that Mrs. Blair has alleged facts which meet the  criteria cited by the Board: 1) S.B. was a student in the Appomattox County School District at the time of the harassment and abuse; 2) Defendant was and is a recipient of federal funds; 3) The harassment, assault and abuse exacted on S.B. was clearly and unequivocally based on sex; 4) The harassment exacted upon and suffered by S.B. is the quintessence of severe and pervasive abuse, so much so that it unquestionably created a hostile environment that denied S.B. access to her right to safe educational programming, services and activities; 5) There is a clear basis for Board liability in that the employees it is responsible for were advised of, and ***knew*** about, the ongoing harassment and abuse and failed to take appropriate and effective action to address it.  *See Davis Next Friend*

*LaShonda D v. Monroe County Bd. of Educ.*, 526 U.S. 629, 648 (1999); *Jennings v. University of N.C.*  482 F.3d 686 (4th Cir. 2007) (en banc). The Board has only addressed the issues of notice and deliberate indifference.

### A.  Mrs. Blair Sufficiently Alleges Actual Notice.

Mrs. Blair has sufficiently alleged that the Board, through its employees, had actual notice and knowledge of sexual harassment under title IX. In *Doe v. Fairfax County School Board*, the Fourth Circuit reversed a jury verdict in favor of the school district, finding that receipt of a report that can objectively be taken to allege sexual harassment is sufficient to establish actual notice and knowledge under Title IX regardless of the school official's understanding or belief that the harassment took place. 1 F. 4th 257, 265 (4th Cir. 2021). "[A]ctual notice means being 'alerted' to the 'possibility' of sexual harassment occurring, a report alleging such harassment surely is sufficient to establish it." *Id.* at 266 (internal quotations in original).

Here, the Complaint alleges that S.B. reported to Mrs. Olsen "that boys on the bus directed profane epithets at her because she looked like a boy, threatened to sodomize her until she "liked boys," threatened to hold her out of the window of the bus by her hair until she apologized, and made other similar threats. Other students reportedly threatened to shoot her and told her they knew where she lived." (Cpt., ¶36). That certainly "alerted" Defendants to at least the "possibility" of sexual harassment occurring, which is sufficient to establish actual notice. *Fairfax County,* 1 F. 4th at 266.

### B.  Mrs. Blair Has Sufficiently Alleged Deliberate Indifference.

Under *Davis* school boards are deemed deliberately indifferent to acts of student-on-student harassment where, as here, the school district's response to *known* harassment is clearly unreasonable. 526 U.S. at 648. Responses are considered unreasonable and therefore deliberately indifferent if they are effectively "an official decision by [the school] not to remedy" student-on-

student harassment." *S.B. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 77 (4th Cir. 2016) (citing

*Davis,* 526 U.S. at 642). *See also*, *Gebser v. Lago Vista Independent School Dist.,* 524 U.S. 274,

290 (1998) ("The administrative enforcement scheme presupposes that an official who is advised

of a Title IX violation refuses to take action to bring the recipient into compliance."). "That is not

to say, of course, that only a complete failure to act can constitute deliberate indifference, or that

any half-hearted investigation or remedial action will suffice to shield a school from liability."

*S.B.,* 819 F.3d at 77.

Incredibly, the Board argues that its response to the report of harassment was sufficient and

therefore reasonable because its employees viewed a video and interviewed two students. (Board

Brief at 19). However, the Board's statement belies that claim, as it acknowledges that the video

review and student interviews "did not substantiate ***all*** of S.B.'s report." (Board Brief at 19,

emphasis added). That necessarily means that the video review and student interviews

substantiated **some** of S.B.'s allegations. The Board therefore concedes that its officials observed

and confirmed evidence of harassment. Contrary to the Board's arguments, District employees did

not respond reasonably and appropriately to the reported harassment.

The Board attempts to place blame on S.B., the victim of the harassment with a history of

trauma and mental illness, for not telling Mrs. Olsen about subsequent harassment during Mrs.

Olsen's meetings to discuss gender identity. (Board Brief, p. 20). Setting aside the questionable

ethics in blaming the victim, the Board's statements ignore or misrepresent the allegations of the

Complaint. On August 12, 2021, S.B. told Mrs. Olsen about the bullying, harassment and threats

on the bus on August 11th. (Cpt., ¶35). Mrs. Olsen did not submit the report to the Title IX

Coordinator as required under District Policy, did not reconsider the directive to have S.B. use the

male restroom, and did not tell Mrs. Blair about the harassment and bullying. (Cpt. ¶¶ 39, 56).

Contrary to the Board's argument, Mrs. Olsen did not describe the events on the bus to Mrs. Blair, but merely said there had been an incident.[1] (Cpt. ¶ 39). Since nothing was done to prevent further harassment, S.B. was subjected to continuing pervasive and severe harassment for another two weeks. (Cpt. ¶40). From her perspective, it was futile to report on the harassment, as she expressed to Mrs. Olsen and Officer Gunter on August 25, 2021. (Cpt. ¶55). Even after the August 25, 2021 meeting, neither Mrs. Olsen nor any other Board employee made the required report to the Title IX Coordinator so that an investigation could be initiated. (Cpt. ¶56). Instead, Mrs. Olsen and Officer Gunter interrogated the victim, S.B., without her mother present and tried to intimidate her into recanting her reports (accused her of lying and threatened civil and criminal liability). (Cpt. ¶¶53-54). Far from being reasonable, the Board's actions were not even "half-hearted" *S.B.,* 819 F.3d at 77. The allegations in the Complaint, sufficiently raise the issue of deliberate indifference above the speculative level. The Complaint satisfactorily alleges that the Defendants (Board and its employees), despite prior notice and knowledge of the ongoing pervasive harassment, assault and abuse, failed to respond in any way close to a responsible and reasonable manner.

### C.  The Complaint Alleges And Plaintiff Is Entitled To Recover Damages

The Board seeks to obfuscate, conflate and confuse this court's consideration by couching Plaintiff's right to sue for monetary damages as seeking punitive damages and damages for emotional distress. (Board Brief at 20). Plaintiff's prayer is for compensatory damages, which are clearly recoverable under Title IX. As the Fourth Circuit said in *Panazides v. Va. Bd. of Educ.,* 13 F. 3d 823, 830 (4th Cir. 1994), a "full panoply of legal remedies are available" for violations of Title IX. *Id.* at 830 (citing *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60 (1992)). The

---

[1]  The Board is relying on extraneous statements in the unauthenticated Exhibit 1 that is not integral to the Complaint. (Board Brief, p. 20 n.11). As discussed *supra,* this Court should not consider the document.

Court found that given the Supreme Court's finding of a "broad availability of damages" in *Franklin,* "a private right of action under Title IX provides a full spectrum of remedies to a successful plaintiff." *Panazides,* at 831(quoting *Franklin* 503 U.S. at 76).

In *Doe v. Fairfax Cnty. Sch. Bd.,* 10 F.4th 406, 411 (4th Cir. 2021) (Wynn, J. concurring in denial of rehearing en banc), the court described a scenario nearly identical to the facts here:

> Surely a student is subjected to discrimination on the basis of sex when they report a sexual assault by a fellow student on school property and are met with nothing more than a collective shrug of the shoulders—or, worse still, with accusatory questions or flat-out blame.

The Court went on to say that where, as here, the school district knows about recurring peer-on-peer sexual harassment and fails to act responsibly and reasonably to protect a vulnerable student it may be held liable when it makes a student vulnerable to sexual harassment by their peers, such as by failing to respond appropriately after learning of the initial incident of sexual assault. In other words, schools do not get "one free rape." *Id.*, (citing Department of Justice Statement of Interest and quoting *Spencer v. Univ. of N.M. Bd. of Regents*, No. 15-CV-141-MCA-SCY, 2016 WL 10592223 at *6 (D.N.M Jan. 11 2016)). Applying the ruling in *Doe* at this stage – a motion to dismiss– this Court should find that: "a reasonable jury could find such indifference… when a student experiences sexual assault at the hands of a peer on a school bus - an assault that was so severe, pervasive, and objectively offensive that it deprived them of equal access to the educational opportunities or benefits provided by their school-and reports it to their school, their school must not respond with indifference so as to leave the student vulnerable to further attacks." *Id.*at 413.

Plaintiffs have plainly and satisfactorily alleged all elements necessary that, when as required are taken as true, establish all necessary elements to establish a claim for violation of Title IX and attendant liability on the part of the Board.

**CONCLUSION**

Mrs. Blair has alleged sufficient facts to sustain the causes of action and the motion to dismiss should be denied.

Dated: October 16, 2023.

> */s/Mary E. McAlister*
> Mary E. McAlister (VA Bar No.76057)
> CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
> P.O. Box 637
> Monroe, VA 24574
> 770.448.4525
> mmcalister@childparentrights.org
>
> Vernadette R. Broyles (GA Bar No. 593026)*
> Ernest G. Trakas (MO Bar 33813)*
> CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
> 5805 State Bridge Rd., Suite G310
> Johns Creek, GA 30097
> 770.448.4525
> vbroyles@childparentrights.org
> etrakas@childparentrights.org
> *Admitted pro hac vice
>
> Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of October, 2023, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send notification of such filing

to the following:

Jeremy D. Capps (VSB No. 43909)
Melissa Y. York (VSB No. 77493)
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia 23255
804-747-5200 - Phone
804-747-6085 - Fax
jcapps@hccw.com
myork@hccw.com

Andrew Butz, Esq. (VSB No. 16280)
Brandi R. Howell, Esq. (VSB No. 74110)
Kiernan Trebach LLP
1233 20th Street, NW, Eighth Floor
Washington, D.C. 20036
Tel: (202)712-7000
Fax: (202)712-7100
 abutz@kiernantrebach.com
bhowell@kiernantrebach.com


*/s/Mary E. McAlister*
Mary E. McAlister (VA Bar No.76057)