**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Lynchburg Division**

**MICHELE BLAIR, INDIVIDUALLY AND**
**AS GUARDIAN AND NEXT FRIEND OF**
**S.B., A MINOR,**

        **Plaintiff,**

**v.**                                                           **Case No. 6:23cv00047**

**APPOMATTOX COUNTY SCHOOL**
**BOARD,** *et al.*,

        **Defendants.**

_____

## **AVERY VIA'S REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS**

COMES NOW Defendant Avery Via ("Via"), by and through his undersigned counsel, Kiernan Trebach LLP, pursuant to Rule 12(b)(6) and this Court's Standing Order for Civil Cases, and hereby submits this Reply Brief in support of his Motion to Dismiss the claims set forth in the Verified Complaint of Plaintiff Michele Blair ("Blair").

## **INTRODUCTION**

With few exceptions, Plaintiff's Opposition to Via's dismissal Motion makes the same general arguments that were set forth in her Oppositions to the dismissal Motions of co-Defendants Olsen, Bennett, and the School Board.  Moreover, those arguments are mainly generalizations about (1)  fundamental parental rights, which under settled precedents <u>do have</u> significant limits in the context of regulation services provided by public schools – and  (2)  family privacy rights, which <u>do not</u> include the right to force children to conform biologically or emotionally on the basis of religion or tribal customs that fail to recognize biological diversity and the potential adverse effects on the mental health and safety of students whose natal sex and personal gender are not

1

identical. Therefore, as highlighted in Via's dismissal Memorandum and in other Appomattox Defendants' dismissal Memoranda and Reply Briefs, governing law requires that assertedly violated parental and family privacy rights be articulated narrowly and precisely.

Another significant defect in a "general principles" approach – even in the relatively new context of gender-identity issues – is that there is already much on-point precedent to consider, such as the already cited *Littlejohn* case from Florida[1] and the *John & Jane Parent 1* case from Maryland.[2]  Significantly, Plaintiff's Oppositions (*passim*) to the Via dismissal Memorandum (*ECF No. 46 at* 12-13, 14 & 26) and the Olsen dismissal Motion (*ECF No. 13,* at 10-11 & 17-18) do not even mention the analysis presented in those two recent federal trial court opinions, and thus Plaintiff presumably lacks any cogent response.  Likewise, Plaintiff's Opposition omits any mention of at least four (4) recent precedents involving gender-identity rights and related school policies in which federal trial courts dismissed all claims in *Foote*, denied preliminary relief in

---

[1] *Littlejohn v. School Board of Leon County*, 2022 U.S. Dist. LEXIS 238141 (N.D. Fla. Dec. 22, 2022), *appeal filed as* No. 23-10385 (11th Cir. Feb. 6, 2023).

[2] *John and Jane Parent I v. Montgomery County Board of Education*, 622 F. Supp. 3d 118 (D. Md. 2022), *vacated & remanded for lack of standing*, 78 F.4th 622 (4th Cir. 2023).  In a dissent, Judge Niemeyer would have found standing and reached the merits, questioning whether the school's challenged parental notification policy adequately dealt with parental rights to participate in gender-transition decisions and related naming issues; however, that dissent errs in conflating or confusing gender identity issues with mental health issues.

Scientifically, an individual's gender-identity perceptions and choices are not regarded by any recognized health-related organization as a mental health issue, in contrast with the condition called "gender dysphoria," which is defined as a debilitating condition where gender-related issues have created anxiety, depression or other clinical manifestations of difficulty in dealing with them. *See Grimm v. Gloucester County School Board*, 972 F.3d 586, 594 (4th Cir. 2020) ("Being transgender is . . . not a psychiatric condition, and implies no impairment in judgment, stability, reliability, or general social or vocational capabilities."  In contrast, "gender dysphoria is a recognized mental health disorder."  As one court noted recently, "around one person in 200 identifies as transgender, while around one in 1,000 is in clinical care for gender dysphoria." *See Fain v. Crouch*, 618 F. Supp. 3d 313, 322 (S.D.W. Va. 2022).  Notably, the Complaint does not allege that Via actually knew about any such diagnosis, nor does it allege that Via himself ever diagnosed S.B. with gender dysphoria or treated her for it before she ran away.

*Regino*, and granted only limited preliminary relief in two cases (*Willey* and *Ricard*).[3] Specifically, those injunctions solely protected the right of teachers and counselors to communicate with parents about a student's gender-identity situation as they think best, leaving in place duly-adopted policies for school personnel to deal with student requests for acceptance and support on gender-identity issues. Plaintiff Blair shares representation with the plaintiffs in *Willey* and *Foote*, the Child & Parental Rights Campaign. However, Blair's reason for omitting mention of these cases makes sense; while similar to her case factually, the results in those cases run contrary to her position.

In an effort to supplement the constitutionally imprecise generalities of Plaintiff's "fundamental rights," "shocks the conscience" and "no qualified immunity" arguments herein, the Plaintiff's Opposition (ECF No. 56 at 9-10, 16-18 & 21) cites precedent involving very different factual situations, none of which have anything to do with gender issues,[4] in a presumed effort to dissuade the Court from resolving Defendants' fully ripe issues at the dismissal stage. However, under Fourth Circuit practice, Complaint deficiencies are ripe for dismissal now, both on the constitutional issues and on affirmative defenses including qualified immunity for the Appomattox incident and judicial immunity and collateral attack for the Maryland custody hearing incident.

Regarding the situation at the school, Plaintiff's Opposition (ECF No. 56 at 10, 17-18 &

---

[3] *See Willey v. Sweetwater County School District,* 2023 U.S. Dist. LEXIS 113818 (D. Wyo. June 30, 2023); *Regino v. Staley*, 2023 U.S. Dist. LEXIS 66676 (E.D. Cal. Mar. 9, 2023); *Foote v. Town of Ludlow*, 2022 U.S. Dist. LEXIS 236102 (D. Mass. Dec. 14, 2022), and *Ricard v. Unified School District 475 Geary County*, 2022 U.S. Dist. LEXIS 83742 (D. Kan. May 9, 2022).

[4] *See, e.g., Tobey v. Jones*, 706 F.3d 379, 392-95 (4th Cir. 2013) (affirming trial court's denial of dismissal motion by airport security officers accused of prematurely exercising the power of arrest against an individual who undressed inappropriately during the passenger and baggage screening process at Richmond International Airport as part of efforts to challenge the constitutionality of passenger screening procedures implemented in the wake of the 9/11 attacks); *Wilson v. Kittloe*, 337 F.3d 392 (4th Cir. 2003) (affirming trial court's denial of qualified immunity to police officer whose arrest of the plaintiff violated Virginia's settled rule that merely harassing or irritating a police officer is insufficient to justify arrest).

21) purports to rely on cases involving the so-called "State-created hazard" doctrine, which encompasses situations where school officials or other governmental officers would create – or fail to recognize and eliminate – intrinsically dangerous situations where students or other non-state actors would be allowed or even encouraged to violate the civil rights of others.[5]  Even for such undisputedly toxic situations, however, court decisions make it clear that school personnel and other public officers are not liable for dangerous conditions that they <u>did not</u> create or encourage.  Notably, Defendant Via is not alleged to have had anything to do with the switch-of-bathrooms decision and its consequences. As a result, such cases <u>are not</u> instructive here, and instead serve only to cloud the genuine issues presented herein and potentially to delay resolution of claims that properly can be held "dead on arrival."[6]

Plaintiff's Opposition also purports to rely on precedents involving the entirely separate

---

[5] *See id*. at 10, 17-18 & 21, citing *DJ v. School Board of Henrico County*, 488 F. Supp. 3d 307, 324-25, 329-31 (E.D. Va. 2020) (where football coach and other school officials failed to deal with racial tensions in the football team locker room, and failed to heed warnings of incipient violence, court refused to dismiss complaint, which alleged that such conduct amounted to a policy of "indifference" or even "hostility" towards black student athletes, which the court held to constitute "reckless or deliberate government action" sufficiently arbitrary and capricious to raise up a viable Due Process claim" under the rubric of "supervisory liability."  *Compare id. with B.R. v. F.C.S.B.*, 2023 U.S. Dist. LEXIS 40930, at *50-*57 (E.D. Va. Mar. 10, 2023).

However, as the *DJ* opinion noted in reliance on the Supreme Court's *DeShaney* case, a defendant <u>is not</u> liable for injury resulting from "dangers that [the child] faced in the free world," if the school and other defendants "played no part in their creation, nor did . . . anything to render [the student] more vulnerable to them."  *See DJ*, 488 F. Supp. 3d at 325.  That standard, as applied in the *DJ* case, cannot be met here, where Ms. Olsen perhaps was incautious, or at most ordinarily negligent, in encouraging S.B. to use the boys' bathrooms.

[6] Plaintiff's Opposition (at 18-19 & 21) also purports to rely on cases asserting First Amendment rights in various contexts.  Such issues are not present here, because Ms. Blair <u>is not</u> a teacher or other School Board employee and because she <u>is not</u> asserting any right to non-comply with or speak out against a school transgender policy or parental communication policy.  One such diversionary citation is to *Bhattacharya v. Murray*, 515 F. Supp. 3d 436, 459-60 & 464-65 (W.D. Va. 2021) (Moon, J.) (addressing dismissal motions where former medical student asserted that he was dismissed for not showing proper deference to faculty supervisors and guest speakers at events to which he was invited as part of his medical school training).

question of whether some federal statute, such as the Americans with Disabilities Act ("ADA"), requires public schools or other state agencies to comply with parent's wishes, in this case for notice and cooperation in what the Complaint alleges is facilitating mental health services for S.B. To illustrate the concept, the Opposition cites EMTALA, which Fourth Circuit precedents have held to require compliance with parents' requests for hospitals and other emergency medical providers to deliver emergency treatments and services for their child, regardless of a physician's advice to the contrary, whether or not the parents have the requisite ability to pay.  (ECF No. 56, at 15-17.)  If anything, the *Baby K* situation[7] should caution courts <u>not to</u> interfere with legitimate state statutes and the related policies of state educational departments and local school boards, especially in the absence of a directly relevant federal statute protecting the plaintiff, which clearly is the situation here.   Thus, the procedural context of the 2022 *Dobbs* decision is present here too.

Next, all this Court needs in order to find both ripeness and finality here on the qualified-immunity defenses asserted by Via and the other Appomattox Defendants is an objective reading of the six trial court opinions cited on pages 2-3, *supra*.  It is evident that some of these courts questioned whether the state or school board transgender-related policies at issue paid adequate attention to nuances needed to fairly balance  (a)  the student's statutory right to be free of gender-related discrimination and harassment with  (b)  the parents' right to participate in decisions and counseling on the student's gender-identity and gender-transition issues. However, no such opinion suggested that school boards, other governmental employees, and/or contract workers

---

[7] To illustrate the EMTALA situation, the Opposition (at 16) cites *Matter of Baby K*, 832 F. Supp. 1022, 1030-31 (E.D. Va. 1993), for the general proposition that federal legislation enacted to preserve access to certain facilities or services carries with it an endorsement of parents' rights to protect their children regardless of state-adopted procedures or contrary views of doctors or others with the responsibility for providing such circumstances.  According to Plaintiff, the Americans with Disabilities Act regards someone in S.B.'s situation as disabled, and therefore entitled to whatever services or lack thereof the child's parents deem appropriate.

addressing such student-initiated situations should lose qualified immunity if they made good faith efforts to comply with related policies and guidelines in an attempt to serve the needs of the students. Accordingly, even if the Court were to rule here that Appomattox County needs better balanced parent-consultation policies in this regard, there is no proper basis for exposing Via or any other Appomattox Defendant to damages claims.

Similarly, contrary to the Opposition's contentions (ECF No. at 20), the Complaint's allegations of conspiracy lack sufficient specificity to meet various pleading requirements, including requisite factual information reasonably suggesting that the defendants actually engaged in wrongful conduct or in collusive support thereof. In Virginia, cooperating with a public defender – or any other attorney representing parties in litigation – is strongly presumed to be good citizenship, rather than a tortious violation of an otherwise interested party's putative right to obtain a preferred outcome in court.[8] Furthermore, such conduct – including the attorney's representational activities and the witness's testimony and pre-hearing cooperation in a prior judicial proceeding – is not a permissible topic for collateral attack here, and presumably also is

---

[8] *See, e.g., Shelley v. Pyle*, 2020 U.S. Dist. LEXIS 203510, at *8-*10 & *11 (W.D. Va. Nov. 2, 2020) (Dillon, J.) ("dragging mental health professionals and guardians *ad litem* into court for their role in a custody and visitation case would be highly detrimental to the process;" "no cause of action for tortious interference with a parental or custodial relationship may be maintained" against such participants in family court proceedings "based upon his/her expert testimony and/or participation in a child custody and visitation proceeding;" it would be wrong to allow litigation against a guardian *ad litem* or other counselor of a minor "for responding to a concerned parent or providing advice in the best interest of the child;" "advis[ing] the child that she need not visit her father if she felt unsafe" . . . "is not outrageous conduct"); *Qiu v. Huang*, 77 Va. App. 304, 321-23 (2023) ("Virginia law counsels and we now hold that the father must also be barred from bringing a tortious interference claim against the mother *indirectly* – by suing a third party whom he alleges merely attempted to impact her decision-making or participated in a related custody matter" or suing any lawyer or witness in those proceedings; "[t]o the extent the father alleges that her actions constituted fabricating or hiding evidence rather than simply zealously representing her client, he had the ability to challenge those claims through discovery, cross-examination of adverse witnesses, and presentation of his own evidence in the custody litigation, and he received due process as a result.").

protected by judicial immunity – in this case, under governing law and procedure rules in Maryland.[9]  In this real world context, Plaintiff would have had to plead far more to make out proper claims for conspiracy, tortious interference and intentional infliction of emotional distress ("IIED").  As a result, the Complaint's allegations regarding a Via conspiracy with Defendants Khan and Olsen in connection with S.B.'s custody proceedings in Maryland appears to reflect lack of due diligence and sheer speculation about "alternative facts."

Finally, the Complaint fails to allege facts sufficient to support its claim for IIED.  The alleged facts here do not include any non-privileged, outrageous conduct by Via, do not provide any support for a claim that Via's conduct was malicious or otherwise ill-motivated, and lack any proximate causal connection to Via's alleged conduct as well as severe, maliciously intended emotional injury to Ms. Blair.  In *Almy*, the leading case the Opposition cites, the court affirmed dismissal of IIED claims against the two handwriting-specialist witnesses, who were not accused of having any plausible animus towards Ms. Almy and whose conduct in preparing to testify was at most negligent.  Similarly, the Opposition fails to cite the Virginia case most closely on point here – *Shelley v. Pyle* – which makes it clear that the conduct of parties to a custody proceeding – such as a guardian *ad litem* (the specific role at issue there), counsel for the guardian, or consulting therapists with no motive to harm the parent are not proper targets of an IIED claim.

Finally, the six recent federal court opinions addressing parental-right constitutional claims typically granted dismissal of all claims, finding  (a)  that similar alleged deficiencies in notifying parents in each case were not of constitutional magnitude and, in any event,  (b)  that the school-related personnel had qualified immunity.  In a few cases, the court recommended or required that school boards loosen certain restrictions on notifying parents, consistent with taking appropriate

---

[9] *See* note 32, *infra*.

contemporaneous steps to protect the student's privacy and safety before notifying parents of sensitive information that transgender students disclosed in confidence.  Plaintiff's claims against Defendants herein are not different from those in these precedents, and moreover Via cannot properly be held responsible for any lack of or deficiency in School Board policies.

## ARGUMENT[10]

### I.   The Documents Submitted to the Court with the Via Declaration Are Sufficiently Authenticated, and Were Not Offered Improperly, for Current Purposes.

The procedural question presented by the pending dismissal Motions is whether the Complaint[11] fails to state any cause of action.  In this regard, Defendant Olsen already has alerted the Court to her belief that certain documents she previously provided to Plaintiff or her counsel, pursuant to FOIA requests or otherwise, are authentic sources of certain conversations or other communications reduced to or memorialized in writing.[12]

In a manner similar to her objection to Ms. Olsen's submittal of documents believed to be the source of factually specific allegations, the Opposition (at 6) takes umbrage at Via's submittal

---

[10] For the Court's convenience, the outline of this Reply Brief will generally track that of Plaintiff's Opposition, which has five main headings.  Issues raised and supported in Via's dismissal Memorandum to which Plaintiff did not respond should be deemed conceded (*Caner v. Autry*, 16 F. Supp. 3d 689, 704 (W.D. Va. 2014) (Moon, J.) ("Many district courts in this circuit and others, including on motions to dismiss, have recognized the general principle that a party who fails to address an issue has conceded the issue.'")).

[11] The Verified Complaint herein, which is modeled after similar Complaints filed elsewhere by Plaintiff's counsel, does not ask for any form of equitable relief and does not request relief under any statute that requires verified pleadings.  For that and other good and sufficient reasons, Via has filed a Motion to Strike the Verification.  In any event, however, Plaintiff's putative verification does not change the status of her allegations for purposes of the pending dismissal Motions, and neither Via nor other defendants are required to verify their Motions to Dismiss.

[12] Specifically, Ms. Olsen has submitted certain such documents under seal, in order to inform the Court that Plaintiff already has access to authentic source material against which non-conforming factual allegations should properly be considered now, either substantively in the case of contracts, such as the ACPS-PHCS Memorandum of Understanding under which Defendant Via worked at the High School, or for procedural purposes, such as determining whether certain factual information is being presented selectively to obtain an  inappropriate pleading advantage.

of certain file memorandum recording the occurrence and substance of certain communications with Ms. Blair and/or Defendant Khan, the Maryland public defender at S.B.'s custody hearings. (ECF No. at 5-6)  In one respect, Via's submittal of these documents constitutes a courtesy to Ms. Blair, who may have forgotten details of contacts with him that his notes purport to memorialize, and to notify her counsel that the Complaint <u>does not</u> accurately characterize certain events, such as Ms. Blair's consent for Via to share certain records with Defendant Khan.  Via's dismissal Memorandum also makes it clear – as did the Olsen dismissal Memorandum – that such documents <u>were not</u> offered for the purpose of provoking summary judgment procedures at this time. Furthermore, if there were to be immediate proceedings beyond the purview of Rule 12(b)(6), it likely would take the form of Rule 12(c) motions for judgment on the pleadings, and Via would be entitled to plead and document such factual information at that time.

In any event, such speculative allegations of conspiracy deserve to be challenged promptly, in the absence of documentary evidence supporting them, in order to test their implausibility and/or conclusory nature.  In this regard, as the author of the two office memoranda, Via <u>is not</u> merely asserting that they are "authentic,"[13] and <u>has not</u> offered them now for more than they are worth – which is as evidence of conversations that Ms. Blair ought to have recalled and described more accurately to her counsel before signing the Verification of the Complaint.

**II.    The Complaint Does Not Sufficiently Allege Any Substantive Due Process Violation.**

**A.    Plaintiff Has Failed to State Any Plausible Basis for Claiming Violation of a Constitutional Right to Direct Her Child's Upbringing.**

As set forth in Via's dismissal memorandum (ECF No. 46, at 9-32), and complemented by

---

[13] To be sure, some documents need authentication as "business records," and PHSC records custodian would be needed to do so; however, just as testimony by Rembrandt would be admissible on the issue of whether he created the painting in question, Via's Declaration that he created the submitted document under the circumstances it describes is *prima facie* sufficient here.

the dismissal memoranda and reply briefs of the other Appomattox Defendants, Plaintiff has failed to state any plausible basis for claiming that Via violated any constitutional right to direct her child's upbringing and thereby caused actionable injury meriting a damages award.

> **1.** **The Opposition Draws a False Dichotomy between a Right to Direct Her Child's Education and a Right to Direct Her Child's Upbringing.**

The Opposition (at 6) errs in purporting to describe a relevant bright line between  (a)  a right to direct her child's education generally and  (b)  a right to direct her child's upbringing while the child is attending public schools.  The obvious core issue in the Appomattox County aspect of this action is whether the alleged delay in Ms. Olsen's or Via's contacting Ms. Blair to inform her about S.B.'s initial efforts to try gender transition at school and related requests for support from school personnel interfered unduly with any cognizably specific constitutional right.[14]

---

[14] As highlighted in Via's dismissal Memorandum (*compare id.* at 9-26 with *id.* at 27-38), the Complaint attempts to conflate in one action what are essentially two distinct nuclei of common facts, separated by a regrettable choice that S.B. made to run away from home that no defendant could reasonably have been expected to anticipate, and which therefore is subject to a strong presumption that whatever happened as a result of that choice was beyond the control and responsibility of Via and the other Appomattox Defendants.

The first such common nucleus of operative facts involves whether Via and the other Appomattox Defendants handled S.B.'s surprise disclosure of her gender-transition desires and need for school acceptance and support in that regard in a manner that would have violated Ms. Blair's alleged right to control S.B.'s upbringing if the pertinent facts had become complete the night that she returned home to disclose that she was having school teachers, counselors and other personnel identify her and treat her with respect as a person of male gender, just as occurred in each of the other reported cases of this kind.

The second, distinctly separate common nucleus of operative facts is whether, after S.B. was rescued in Maryland under allegedly difficult circumstances and became a temporary ward of the family court system there, Defendant's Olsen and Via did something improper during their good-citizen cooperation with S.B.'s court-appointed public defender, Defendant Khan, in the official court proceedings there, which is cognizable in this tort action and not barred by a virtual handful of defenses ranging from  (a)  judicial privilege and related protections for witnesses and others asked to provide assistance in court proceedings to  (b)  *res judicata* here, because Ms. Blair was a party or at least in privity with a party in those proceedings, and waived her right to raise issues not that she failed to raise there.

Those two intrinsically separate issues should be addressed separately in the pending dismissal Motions, leaving aside for the moment the herculean task of convincing the Court that any

Also highlighted in the Complaint, is the related issue of whether Via and the other Appomattox Defendants bear any responsibility for the unfortunate initial reaction from some of S.B.'s natal male classmates.   While it is regrettable that S.B. had to endure such harassment, the country had already been going through the bathroom-transition aspect of transgender adjustment issues, and federal courts addressing claims arising from such issues have almost uniformly concluded that such issues did not have an actionable constitutional dimension.[15]  Furthermore, as highlighted in the Introduction (at 3-4), such situations are not within the "State-created hazard" doctrine, and the proper defendants for an action seeking damages or other redress are the students who harassed S.B., and perhaps their parents and any other persons who contributed to creating a hostile environment for transgender persons.

Furthermore, the Complaint admits that Ms. Blair was clearly aware that S.B. was having significant emotional problems that allegedly are related in some way to her mid-August 2021 request for school personnel to allow her to begin affirmance of her gender-transition desires. However, the Complaint either naively assumes – or improperly attempts to allege – that gender-identity issues are a "mental health" issue, when in fact there is no recognized transgender mental-health authority that regards "gender transition" as a mental health issue.  Instead, the often conflated "mental health" issue – called "gender dystopia" – involves situations where discord between gender identity and natal birth identity emotionally interferes with the individual's ability

---

proceedings on those two sets of claims can properly be combined with at least one common element, not the least of which is "proximate causation."

[15] *Compare Parents for Privacy v. Barr*, 949 F.3d 1210, 1222-25, 1227-29 & 1230-33 (9th Cir. 2020) (addressing rights including parental right to child's upbringing in the bathroom assignment context), *and Whitaker by Whitaker v. Kenosha Unified School District No. 1 Board of Educ.*, 858 F.3d 1034, 1040-42 & 1044-54 (7th Cir. 2017), *with* in *Adams ex rel. Kasper v. School Board of St. Johns County*, 57 F.4th 791 (11th Cir. 2022); *also see Grimm v. Gloucester County School Board*, 972 F.3d 586, 608-15 (4th Cir. 2020), *as amended* (Aug. 28, 2020) (addressing bathroom assignment issues).

to grow and function.  As a result, if there is a clear constitutional question here, it is simply whether parents have a constitutional right to put their pre-existing preferences for congruence of natal sex with gender identity ahead of their child's right to be themselves.  For that clear question, at least in our society, there is only one right answer – the child's right is decidedly more important. Indeed, any other answer would make whatever purported moral basis was offered for overturning *Roe v. Wade* sheer hypocrisy.  If there is a "right to life" at conception, there must be a "right to be yourself" from birth.  Any argument against that syllogism would be totalitarian.

In addition, but only secondarily, this case presents the questions of  (a)  whether, and to what extent, parents have a constitutional right to participate in helping their child deal with sex-gender incongruity issues that the parents are either unwilling or unable to acknowledge, and (b)  how public school teachers, counselors and other public officials are supposed to navigate between fulfilling their primary duty to students without trampling the parents' right to be substantially involved and, in the best circumstances, objectively in control of lawful choices.

Unfortunately, Plaintiff's Opposition (at 6-7) obstructs progress in this action by continuing to rely on clearly distinguishable precedents holding that sincerely moral parents have a right not to send their children to public school, at least  (a)  if they are willing to arrange private schooling and  (b)  if their religious or other traditional sect deserves some leeway in what kind of life they should raise their children to follow.  More specifically, the Opposition (at 7) relies on the rather vague, and therefore deceptively dichotomous assertion that, "so long as a parent <u>adequately</u> cares for his or her children (*i.e.*, is <u>fit</u>), there will <u>normally</u> be no reason for the State to inject itself in the <u>private</u> realm of the family to <u>further</u> question the <u>ability</u> of that parent to make the <u>best</u> decisions concerning the <u>rearing</u> of that parent's children."[16]  As the underline words

---

[16] Emphasis added herein unless otherwise noted.

in that traditional form of idealistic thinking should alert the Court:  "Ay, there's the rub!"

Similarly, the Opposition (at 7) contends that "[]those decisions include decisions regarding <u>mental health</u> care, even when the decisions are disagreeable to the children."  As courts have pointed out, the parents' decisional role regarding a child's mental health is subject to the control of the state through physicians at mental health facilities, as well as licensed private practitioners.  More importantly, however, there is no constitutional precedent for the proposition that parents have the right to change a child's sex, or gender, and the well-established consensus is that gender identity, like sexual-partner preference, <u>is not</u> a mental health issue.  Furthermore, it is not acceptable, as the Opposition (at 7) suggests, to generalize from the above-referenced faulty premise about mental health to a general right of parents to make totally unregulated decisions about the "upbringing" of their children.  Indeed, that sort of over-generalization is precisely what current precedents about fundamental rights forbid procedurally, by requiring that the asserted right be described with sufficient specificity to ensure that its assertion and evaluation are not the result of bias, and so can be tested before acknowledgment as a fundamental parental right.

The Opposition (at 7) nevertheless persists in offering false dichotomies, by throwing up the purported bright-line test of a parent's "fitness."  In this vein, the Opposition (*id.*) asserts: "However, when the state seeks to override the decision of <u>fit</u> parents [asserting smugly "as is the case here"], then there is a violation of substantive due process."  The existence of federal and state statutes now protecting the rights of transgender and gender-transitioning individuals, including children, refutes the assertion that parental "fitness" is anything more than a shorthand. Sandwiched between the Opposition's contentions in this regard is the concession that, in *White v. Chambliss*, 112 F.3 731, 733-34 (4th Cir. 1997), the court "upheld a law that permitted child protective services to exercise emergency protective custody over a child if there is probable cause

13

for [finding] an imminent danger to the child," and that apparently is good law <u>whether or not</u> the child has a "fit parent."  *See id*.  *White* thus is just one example of various circumstances where public officials at schools or elsewhere – especially where such personnel are acting *in loco parentis* – are called upon to deal with exigent circumstances in a minor's childhood or adolescence, and where immediately contacting parents is either not possible or not yet advisable.  Notably, as the Opposition (at 15-19) to the School Board's dismissal Motion tacitly admits, the only flaws that Plaintiff has identified in the Board's conduct as of 2021 was not having formal or informal policies in place and related staff training that favored prompt contact with parents <u>and</u>, where immediate parent contact was inadvisable or at least questionable, requiring notification of school or public health personnel capable of investigating the home situation.

As the Opposition (at 7-8) candidly concludes, "that is the substance of Ms. Blair's substantive due process claim in Count I."  The Opposition thus casts the dispute as a putatively vague choice between broad parental rights to make decisions regarding S.B.'s upbringing, and S.B.'s right to assert a discordant gender identity.  The Opposition fallaciously describes this as having "significant <u>mental health implications</u>," followed by the disputable contention that " Via's actions in withholding that information [about S.B.'s request for gender-transition assistance] and acting on the information [that S.B. conveyed] by using a male name and pronouns interfered with Mrs. Blair's right to make critical <u>mental health</u> decisions for her daughter."  That argument has long been rejected by courts including the Fourth Circuit's *Grimm* case, and Plaintiff's only hope of preserving this claim is to more realistically assess the facts and refine her goals accordingly.

 2. *Dobbs* **Has Rendered Parental Rights Very Unclear, and the Congress and the Virginia Legislature Now Have the Right to Regulate How Children Are Brought Up to at Least the Same Extent That They My Properly Regulate Whether and How They Are Brought into Being.**

Conveniently, the Plaintiff quotes Justice Alito's precatory statements in the *Dobbs*

14

plurality opinion that "our decision concerns the constitutional right to abortion and no other right," and that "[n]othing in this opinion should be understood to cast doubt on precedents that do not concern abortion." (ECF No. 56 at 8.)  There is no related discussion of parental rights in *Dobbs.* Instead, the axis of concern for Justice Alito involves rights to control reproduction, such as rights of married people to use contraceptives (*Griswold v. Connecticut*), the right to engage privately in consensual sex acts (*Lawrence v. Texas*), and the right to same-sex marriage (*Obergfell v. Hodges*). In another *Dobbs* opinion, however, Justice Thomas calls out Justice Alito's limit-suggesting statements as lacking in principle and expresses the belief that all such rights related to reproduction were actually on the firing line, ready for execution on the very same grounds used to overrule *Roe v. Wade*.  Thus, as set forth clearly in Via's dismissal Memorandum (ECF No. 46, at 10 n.8 & 16 n.14), the jurisprudence announced in *Dobbs* has opened the floodgates for elected representatives in state legislatures to regulate the lives of their residents as they see fit, only subject to  (a)  the few federal constitutional freedoms that remain – the right to interstate travel, for example – and  (b)  existing or future federal legislation that the Supreme Court chooses not to invalidate.  Therefore, fundamental rights of parents <u>should not</u> be taken for granted in situations where the state is involved, and their proper protection requires careful articulation and appropriately focused application.

**B.    Plaintiff Has Failed to Allege Violations of a Right to Familial Privacy.**

Following the same pattern, the Opposition's defense of Plaintiff's familial rights claim (*id*. at 9-10) attempts to get past the dismissal motion hurdle with platitudes, and generalities. Familial rights, as articulated by Plaintiffs, cannot be regarded as constitutionally secure, because the *Dobbs* plurality decision denigrates the concept of substantive due process generally.  Indeed, *Dobbs* suggests that traditional forms of prejudice are likely more entitled to respect than contrary values that are of more recent development, unless federal statutes protect them directly.

15

Therefore, this Court <u>is not</u> required to accept Plaintiff's contention that "Via's actions as alleged in the Complaint were a form of 'sabotage' that was "aimed directly at the parent-child relationship."  Indeed, as has noted above in the context of the parental rights claim, the fact that Via responded professionally to S.B.'s request for counseling during her gender-transition quest did not invade familial privacy at all.[17]  The standard goal of family counselors is to stabilize, inform, validate and otherwise improve the client's situation, which with understanding parents is more likely to improve or restore a good family relationship than forcing the transgender student to relinquish such feelings and submit to the otherwise unsupportive parent's express or implicit demand that the child pretend to be someone they are not.

Furthermore, as the Complaint implicitly admits, the real issue here is whether the Constitution allows Ms. Blair to wield essentially absolute power over her natal daughter's preference to identify as male.  Notably, the precedents Plaintiff cites involve instances of extreme misconduct, such as facilitating perjury from a bitter wife and suborned perjury from her daughter to facilitate the wife's efforts to get the father out of their life (*see Nelson v. Green*, 965 F. Supp. 2d 732, 737-39 & 743-48 (W.D. Va. 2013) (Moon, J.).  Even in that outrageous situation, however, the Court held that defendant officials were entitled to qualified immunity, because the right asserted there <u>was not</u> well established, and that is certainly the case here too.  *See id.* at 748-49. In contrast, in *Murphy v. Goff,* 2010 U.S. Dist. LEXIS 56119, at *24-*28, 2010 WL 2292130 (W.D. Va. Jun. 7, 2010), the Court explained that constitutional protection for familial privacy –

---

[17] The floor on the cognizable degree of interference is much higher than what the Complaint alleges here. *See Bohn v. Dakota County*, 772 F.2d 1433, 1436 & n.4 (8th Cir. 1985) (discussing state action that "drove a wedge into [a] family" in the context of an unsubstantiated finding by the state that a father was a "child abuser"); *Duchesne v. Sugarman*, 566 F.2d 817, 821-24 (2d Cir. 1977) (discussing the "coercive power of the state" in the context of a state's nonconsensual removal of two children from their mother's custody and subsequent retention of those children for over two years without a hearing or court order).

in the sense of protecting the relationship between parent and child – is triggered only when wrongful conduct by the defendant actually terminates or otherwise severs the parent-child relationship.  No such situation is alleged here, as Via and his colleagues <u>did not</u> take custody of S.B., <u>did not</u> interfere with her returning home every night, and <u>did not</u> play any cognizable part in her unfortunate decision to run away from home.[18]

Likewise, the fact that Via and Ms. Olsen were drawn into the role of witnesses in the Maryland custody proceedings – which they neither precipitated nor could have foreseen during their counseling efforts at the Appomattox County High School – <u>cannot</u> implicate them personally in any effort to tortuously interfere with Ms. Blair's right to maintain the relationship with S.B.

### C.    Plaintiff's Effort to Apply the "Shocks the Conscience" Test Is Unavailing.

#### 1.    Where Only Executive Action Is Directly at Issue, Courts Properly Following *Lewis* First Apply the "Shocks the Conscience" Test and, if But Only if that Test Is Met, the Court Then Looks to Whether a Fundamental Right Was Violated.

As addressed in Via's dismissal Memorandum (ECF No. 46 at 10-15), as well as in the Olsen dismissal Reply Brief (ECF No. 43 at 2-6), the Opposition's effort (ECF No. 56 at 10-13) to contort the nature of the constitutional-review process where the alleged misconduct is executive action, rather than legislative or administrative policy, is unavailing.  Via chooses to reply in this regard by quoting the relevant portions of the Massachusetts federal court's 2022 Order on

---

[18] As addressed in the Introduction (at 3-4), nothing alleged in the Complaint implicates the "State-created hazard" doctrine, at least from the standpoint of the School Board and its personnel.

To be blunt, if there was any State-created hazard at this High School, it was the long-term combined failure of society to bring up adolescents to respect the privacy of others attending the school, and to follow proper rules for bringing uncomfortable situations to the attention of school authorities, rather than resorting to self-help or cruelty, as in the reported bathroom incidents.

Likewise, if there was any State-created hazard in Appomattox County and the Commonwealth generally that resulted in S.B. allegedly being abducted, assaulted sexually and trafficked, that clearly was not created by the School Board or its personnel, including Via.

Defendants' Motion to Dismiss in *Foote v. Town of Ludlow*, Civ. No. 22-30041-MGM (at 17-28

(most case citations omitted)):

> "To be cognizable, a substantive due process claim under 42 U.S.C. § 1983 must
> allege facts so extreme and egregious as to shock the contemporary conscience." . . .
> ("[T]he shocks-the-conscience test . . . governs all substantive due process claims
> based on executive, as opposed to legislative, action."). "[C]onduct intended to
> injure in some way unjustifiable by any government interest is the sort of official
> action most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 849.

> At the motion to dismiss phase, substantive due process claims "must be carefully
> scrutinized to determine if the alleged facts support the conclusion that the state has
> violated an individual's constitutional rights." . . .  Courts in the First Circuit take a
> "two-tiered approach" to substantive due process claims based on the behavior of
> state actors. . . .  Under this approach, a plaintiff must establish both conscience-
> shocking behavior by the defendant and "that a protected right was offended" by the
> defendant's conduct. . . .  Generally, courts first determine whether the alleged
> conduct was sufficiently egregious because it is "[o]nly after 'show[ing]' a
> constitutionally significant level of culpability' [that] a plaintiff [may] 'turn to
> establishing that a protected right was offended'."[19] . . .

> During the hearing on Defendants' Motion to Dismiss, the court asked Plaintiffs to
> identify the specific allegations of conscience-shocking conduct supporting their
> claims.  Plaintiffs argued generally that Defendants' adoption and implementation of
> a policy of withholding information about a student's gender identity deprived
> Plaintiffs of their rights to make decisions about the upbringing of their children and
> intentionally undermined the parent/child relationship in a manner that shocks the
> conscience.  The court understands this conduct, as alleged, to be offered in support
> of Plaintiffs' claims in Counts I and III.

> There is no precise definition for conscience-shocking behavior that can be applied
> mechanistically to Plaintiffs' allegations. . . .  However, a "stunning" level of
> arbitrariness that goes beyond "[m]ere violations of state law" is required. . . .  Bad
> faith may help tip the scale, but "the contemporary conscience is much more likely"
> to be shocked by conduct that was "intended to injure in some way unjustifiable by
> any government interest." . . .  The nature of the right violated and the government's
> competing interests, if any, may inform the determination of whether particular
> behavior shocks the conscience. . . .  "Indeed, '[a] hallmark of successful challenges
> is an extreme lack of proportionality, as the test is primarily concerned with
> violations of personal rights so severe[,] so disproportionate to the need presented,
> and so inspired by malice or sadism rather than a merely careless or unwise excess

---

[19] As the *Foote* opinion (at 11, n.3) states, "as the Supreme Court explained in *Lewis*, courts do not need to determine whether "to recogniz[e] a substantive due process right to be free of [the alleged] executive action" unless they first determine the "necessary condition of egregious behavior" has been satisfied. *Id.*, 523 U.S. at 847 n.8.

of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience'." . . .

Often, "an exact analysis of circumstances" is needed "before any abuse of power [can be] condemned as conscience shocking." *Lewis*, 523 U.S. at 850. Here, the circumstances certainly include the facts Plaintiffs have alleged about the conduct of various defendants. These include: inviting students to provide their preferred pronouns as part of a personal biography project; sharing information about gender identity with B.F.; failing to respond to Silvestri's December 2020 email; engaging in supportive discussions with B.F. about gender identity; facilitating B.F.'s and G.F.'s use of their preferred names and pronouns while at school; deciding not to notify Plaintiffs when B.F. and G.F. began using different preferred names and pronouns; and publicly describing the views of individuals, including parents, who oppose Ludlow Public School policies for supporting transgender and gender nonconforming students, as intolerant and hateful. The relevant circumstances also include Massachusetts laws and regulations regarding gender identity, which establish a significant government interest in providing students with a school environment in which they may safely express their gender identities regardless of their ages or the preferences of their parents. Plaintiffs have not challenged the constitutionality of these laws.

Plaintiffs have framed their claims in the context of their rights as parents to make decisions for their children without state interference. Defendants have framed their actions in the context of obligations under Massachusetts law to provide a nondiscriminatory environment to all their students. At the hearing on Defendants' motion, Plaintiffs acknowledged that Defendants were not permitted to discriminate on the basis of gender identity, but asserted that Defendants' adoption and implementation of a policy of withholding information about their children's gender identity from parents went beyond what the law required and intentionally undermined the parent/child relationship in a manner that shocks the conscience.

On its face, the Massachusetts non-discrimination statute does not require such a policy and it is disconcerting that school administrators or a school committee adopted and implemented a policy requiring school staff to actively hide information from parents about something of importance regarding their child. Indeed, in an earlier case, this court recognized that deception by school officials could shock the conscience where the conduct obscured risks to a person's bodily integrity and was not justified by any government interest. . . . In that case, the plaintiff alleged school officials made deceptive statements about the safety of school drinking water that obscured the risks he faced when he drank water at the school and the deception violated his right to bodily integrity. . . . Here, the court must consider the specific facts of this case—including the government interest, if any, served by Defendants' conduct—to determine whether Plaintiffs have met their burden of identifying conscience-shocking conduct.

In December 2020, B.F. talked with a teacher about mental health concerns and possible same-sex attraction and expressed relief and gratitude when the teacher

19

offered to talk with Plaintiffs about those concerns. The teacher then contacted B.F.'s mother (Silvestri), who responded by sending an email to B.F.'s teachers, Monette, Gazda, and members of the School Committee, in which she stated that Plaintiffs were getting B.F. professional help and requested that school staff not have any further private conversations with B.F. related to the concerns the teacher and B.F. had discussed.  Two months later, B.F. identified as genderqueer, announced a new preferred name and list of preferred pronouns and, in contrast to December, did not ask for help talking with Plaintiffs.  Instead, B.F. asked school staff to wait to use the new name and pronouns with Plaintiffs until after B.F. told Plaintiffs about them. Despite B.F.'s request and the alleged policy, the same teacher who talked with Silvestri in December 2020 informed Silvestri about Plaintiff's gender identity.  This contact with B.F.'s parents was made in violation of school policy and without administrative approval.  Upon learning that B.F. was using a new name and pronouns at school, Plaintiffs met with Monette.  They asserted school staff were acting illegally by allowing their children to use preferred names and pronouns without parental permission.  Following that meeting, Defendants deferred to the preferences of B.F. and G.F. and did not share any information about their gender identities with Plaintiffs.

Massachusetts has identified a strong government interest in providing all students, regardless of age, with a school environment safe from discrimination based on gender identity.  Under Massachusetts law, a person may establish their gender identity with "any . . . evidence that the gender-related identity is sincerely held as part of [the] person's core identity," except that "gender-related identity shall not be asserted for any improper purpose."  Mass. Gen. Laws ch. 4, § 7; see also 603 C.M.R. § 26.01.  There is no statutory limitation on the age at which an individual may assert a gender identity "different from that traditionally associated with the person's physiology or assigned sex at birth," and no exception that would allow a parent's beliefs to supersede a minor's sincerely held beliefs.  *Id.*; *see also* Mass. Gen. Laws ch. 112, § 275 (barring gender conversion therapy for all minors).

Though non-binding, the DESE Guidance related to gender identity also provides relevant context for Defendants' actions.  The DESE Guidance emphasizes the importance of creating a safe and supportive environment for students and encourages schools to work with students to develop plans for use of preferred names and pronouns.  "[I]n the case of a younger student," DESE advises schools to create a plan with input from parents, but DESE has not defined younger students, other than by describing them as "not yet able to advocate for themselves." DESE Guidance, https://www.doe.mass. edu/sfs/lgbtq/genderidentity.html#5.  The DESE Guidance also encourages schools to consult with students who assert a different gender identity at school before disclosing information about a student's gender identity to the student's family.

Plaintiffs assert the Ludlow Public Schools adopted and implemented a policy that went beyond the DESE Guidance and rigidly prohibited any communication with parents about a student's gender identity unless the student consented and this policy shocked the conscience, at least when applied to students in middle school.  The court

agrees that the policy, as described by Plaintiffs, was based on a flawed interpretation of the DESE Guidance and ignored the plain language advising that parents be informed after the student is advised that such communication will occur. *See id.* ("School personnel should speak with the student first before discussing a student's gender nonconformity or transgender status with the student's parent or guardian."). Students and parents would almost certainly be better served by a more thoughtful policy that facilitated a supportive and safe disclosure by the student, with support and education available for students and parents, as needed and when accepted. Such a policy should also consider the many complicated and emotional issues and scenarios that may arise when this type of information is shared. Beliefs, understanding, and opinions surrounding this subject may evolve in a positive way with the benefit of information and honest dialogue. But, currently, the topic may also evoke negative or harmful reactions, which also must be considered. This is especially true when, as in this case, the students are old enough to independently assert their transgender or gender nonconforming identity, but still many years away from adulthood. Unlike the alleged Ludlow Public Schools policy, a policy that facilitates communication between students and parents would be consistent with the DESE Guidance and its recommendation to avoid surprising students when informing parents about the matter.

However, even if Defendants' policy was imperfect and contrary to the non-binding DESE Guidance, the alleged policy was consistent with Massachusetts law and the goal of providing transgender and gender nonconforming students with a safe school environment. This case involves a difficult and developing issue; schools, and society as a whole, are currently grappling with this issue, especially as it relates to children and parents. *See Martinez*, 608 F.3d at 66 ("[W]hether behavior is conscience-shocking may be informed . . . by the nature of the right violated."). While the court is apprehensive about the alleged policy and actions of the Ludlow Public Schools with regard to parental notification, it cannot conclude the decision to withhold information about B.F. and G.F. from Plaintiffs was "so extreme, egregious, or outrageously offensive as to shock the contemporary conscience," given the difficulties this issue presents and the competing interests involved. . . . As conscience-shocking conduct is a necessary element for a substantive due process claim, the court ends its analysis here, without assessing whether Plaintiffs have adequately identified their protected rights and established they were offended under these facts. *See Abdisamad*, 960 F.3d at 60.

The *Foote* opinion then commented on the qualified immunity defense (*id.* at 28-30):

Finally, having determined that Plaintiffs' Amended Complaint should be dismissed on substantive grounds, it is not necessary for the court to address Defendants' arguments regarding qualified immunity. However, the court briefly notes that had Plaintiffs' Amended Complaint survived the substantive analysis, qualified immunity would warrant dismissal of the claims asserted against all individual defendants. *See id.* ("Individual government officials may be sued 'for federal constitutional or statutory violations under § 1983,' though 'they are generally shielded from civil damages liability under the principle of qualified immunity.'").

> Qualified immunity shields individual government actors from liability unless the plaintiff can demonstrate both that the "the defendant violated the plaintiff's constitutional rights" and that "the right at issue was 'clearly established' at the time of the alleged violation." . . .
>
> To satisfy the "clearly established" prong, a "plaintiff must 'identify either controlling authority or a consensus of persuasive authority sufficient to put [a state actor] on notice that his conduct fell short of the constitutional norm'." . . . While "there need not be a case directly on point," a plaintiff must be able to identify "precedents existing at the time of the incident [that] establish[ed] the applicable legal rule with sufficient clarity and specificity" that the defendant was on notice that their conduct would violate the rule. . . . Here, Plaintiffs would have to identify authority addressing sufficiently similar facts occurring where similar state laws applied. That authority would either need to be binding in Massachusetts or demonstrate a consensus among persuasive authorities such that the individual defendants should have known their actions violated Plaintiffs' parental rights protected by substantive due process.
>
> Having reviewed all the cases cited by Plaintiffs, the court finds they do not meet this burden. First, the court observes that legal protections for gender identity are a recent development and a broad awareness of issues surrounding the topic of gender identity is still growing. Second, as discussed above, Defendants did not provide mental healthcare to Plaintiffs' children when supporting their use of preferred names and pronouns. Finally, consistent with principles established in *Meyer v. Nebraska*, 262 U.S. 390 (1923), and *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), Plaintiffs' right to direct the upbringing of their children allows them to "choose between public and private schools," but does not give them a right "to interfere with the general power of the state to regulate education." . . . Here, the individual defendants' respective decisions not to share information with Plaintiffs about their children's gender identities complied with a Ludlow Public Schools policy which, though not required by, was consistent with Massachusetts laws that have not been challenged by Plaintiffs.

Thus, as the *Foote* opinion illustrates, the kind of allegations set forth in the Blair Complaint do not "shock the conscience," especially in the context of a transgender student's rights to equal protection in a school's *in loco parentis* environment, and in any event the sort of facts at issue both here and in *Foote* do not seriously transgress against any cognizable right of parental control over child upbringing in general or mental health care in particular.

> **2.    Even if Allegations of "Reckless" Executive Action Could Satisfy the "Shocks the Conscience" Test, No Such Recklessness Is Alleged Here.**

Although the Opposition's introduction (ECF No. 56, at 12) to this part of its Argument

correctly refers to certain passages in the *Lewis* opinion, the Court's focus there was on the obligations of a prison warden or guard to avoid deliberate lapses in decent inmate care. *See id.*, 523 U.S. at 851.  While a High School staff does have some *in loco parentis* responsibilities, students are generally free to come and go absent extraordinary emergencies.  Moreover, the Defendant School Board <u>did not</u> have a specific written policy limiting the right of teachers or counselors to contact parents of newly-disclosed transgender student intentions without the student's prior consent.  Therefore, there is nothing "deliberative" – let alone "deliberately" injurious in the ordinary sense – about Via's alleged conduct in connection with his two interactions with S.B. before she ran away from home.  Accordingly, especially in the environment created by federal and state law obligations not to discriminate against transgender students, there is simply no  basis for regarding Via's alleged misconduct as involving "recklessness, gross negligence or deliberate indifference."  Notably, the Complaint does not allege that Via had any affirmative role in connection with the switch in bathroom assignments attributed to Ms. Olsen, and no reasonable finder of fact could find any sort of proximate cause between Via's private counseling contacts with S.B. and the separately ensuing bathroom incidents.  As noted *supra*, there are no allegations that Appomattox County High School had a recent history of sexual assaults generally or harassment of transgender students in particular, and so the State-created hazard doctrine could not have been triggered here.

        **D.**     **The Fact That Virginia's Model Transgender Policies Had Not Been Formally Adopted in Appomattox County Does Not Mean That They Lack Significance.**

           **1.**     **Via Does Not Contend That the VDOE Model Policies Superseded Mrs. Blair's Personal Rights as Such, But Rather That the Promulgation of Those Policies Is a Significant Factor for the Court to Consider, Especially in Deciding Whether Via and the Other Individual Appomattox Defendants Have Qualified Immunity.**

The Opposition (at 13) makes various arguments intended to sway the Court into ignoring the 2021 VDOE Model Transgender Policies, including a Supremacy Clause argument and an

"equal dignities" argument – that is, that the Policies only constituted recommended wording for local policies and related general guidance.  (ECF No. 56, at 13.)   However, those arguments are clearly of no consequence in assessing whether Via or the other Appomattox Defendants improperly disregarded Ms. Blair's asserted constitutional rights.  Furthermore, the fact that the current Virginia Administration earlier during 2023 chose to rescind the 2021 Policies and replaced them with a new set of Policies is not relevant here.  Indeed, as in *Grimm*, and as discussed further below, their introduction into evidence to address retrospective relief would violate various federal Constitutional previsions including the *ex post facto* clause.

The 2021 Model Transgender Policies – by their very terms – directed local school boards to formally adopt Local transgender Policies of their own, but as of August 2021 the defendant School Board presumably had not had the time to hold the requisite hearings and determine whether to adopt the 2021 Model Policies as is or to adopt a version of their own that met all the requirements of the Model Policies from a Title IX standpoint.  Therefore, if there had been time to adopt Local Transgender Guidelines in 2021, they presumably would have had to meet all the requirements of Title IX, even if the School Board took a different approach in some regards.  In any event, if the School Board, the Superintendent, and its personnel at the High School in August 2021 had looked for Commonwealth of Virginia guidance in this regard, what they would have found would have included the 2020 statute and the 2021 Model Transgender Guidelines.

The Opposition (at 13) errs, moreover, in contending that Model Guidelines or Model Policies have no force and effect of law, or should not have such effect.  A full explication of this point would be far beyond the needs of this action.  Suffice it to say, however, that the Fourth Circuit, in the course of reaching its decision in *Grimm v. Gloucester County School Board*, 822 F.3d 709 (4th Cir. Apr. 19, 2016) ("*Grimm I*"), considered an opinion letter dated January 7, 2015,

24

from the Department's Office for Civil Rights (OCR) that interpreted how this regulation should apply to transgender individuals:  "When a school elects to separate or treat students differently on the basis of sex . . . a school generally must treat transgender students consistent with their gender identity."  *See id*. at 715, 718 & 719.  During the Obama Administration, the United States filed amicus briefs in *Grimm* "supporting G.G.'s Title IX claim in order to defend the government's interpretation of Title IX as requiring schools to provide transgender students access to rest rooms congruent with their gender identity."[20]  *See id*. at 717.

In addressing the impact of then-current federal DOE regulations, and a related opinion letter from the Department, the Court concluded that the regulations were clear in certain regards, but ambiguous with regard to which bathrooms transgender students should use, especially given the various possible states of transgender status (name and identity change only, hormonal therapy in progress, and post-reassignment surgery, for example), and the DOE's opinion letter resolved the ambiguity.  *Id*. at 720-21.  The court duly noted that the Title IX regulations were adopted in 1975, and considered available evidence of what "sex" would have meant then, as used in the statute, and concluded that "sex" would have been understood to encompass

---

[20] The Fourth Circuit's opinion in *Grimm I*, 822 F.3d at 719, summarized the law regarding consideration of agency regulations as follows:

> G.G., and the United States as amicus curiae, ask us to give the Department's interpretation of its own regulation controlling weight pursuant to *Auer v. Robbins*, 519 U.S. 452 . . . (1997).  *Auer* requires that an agency's interpretation of its own ambiguous regulation be given controlling weight unless the interpretation is plainly erroneous or inconsistent with the regulation or statute.  Id. at 461.  Agency interpretations need not be well-settled or long-standing to be entitled to deference.  They must, however, "reflect the agency's fair and considered judgment on the matter in question."  *Id*. at 462.  An interpretation may not be the result of the agency's fair and considered judgment, and will not be accorded *Auer* deference, when the interpretation conflicts with a prior interpretation, when it appears that the interpretation is no more than a convenient litigating position, or when the interpretation is a post hoc rationalization.  *Christopher v. Smithkline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012) (citations omitted).

The dual significance of these principles will become apparent in text *infra*.

the varying "physical, psychological and social aspects" of humans, including "behavioral peculiarities." *Id*. at 721-22.  Furthermore, the court concluded that the DOE's recent interpretation of its governing regulation was "the result of the agency's fair and considered judgment," had been "consistently enforced since 2014," that it was not simply a *post hoc* rationalization, and that its issuance merely responded to the need for clarification for the benefit of school boards and others responsible for implementation in the community. *Id*. at 722-23.

On that basis, the Fourth Circuit reversed the dismissal below of G.G.'s Title IX claims and remanded for the court to reconsider whether to grant injunctive relief under appropriate, less stringent standards than the lower court's initial position had reflected. *Id*. at 724-26.

The Defendant school board, however, sought review in the Supreme Court, which, after the Trump Administration issued a new DOE letter rescinding the previous letter opinion, remanded the case for the Fourth Circuit to reconsider in light of the DOE's rescinding its previous opinion letter.  *See id.*, 580 U.S. 1168 (Mar. 6, 2017), where the high court's ruling was as follows: "Judgment vacated, and case remanded . . .  for further consideration in light of the guidance document issued by the [US DOE and DOJ] on Feb. 22 2017)."

As the court explained on remand, 869 F.3d 286, 289 (4th Cir. Aug. 2, 2017) (*Grimm I*):[21]

> After the Supreme Court calendared the case for argument, the new Administration issued a guidance document on February 22, 2017, that withdrew the prior Administration's guidance document regarding the treatment of transgender students, and the Court then vacated our April 2016 decision and remanded the case to us "for further consideration in light of the [new] guidance document issued by the Department of Education and Department of Justice." *137 S. Ct. 1239, 197 L. Ed.*

---

[21] As explained in *M.A.B. v. Board of Educ.*, 286 F. Supp. 3d 704, 712 & n.5 (D. Md. 2018):
> The Supreme Court vacated the Fourth Circuit's judgment in *Grimm I* in light of the United States Department of Education and United States Department of Justice issuing a letter withdrawing the guidance documents that the [underlying] judgment examined.  See *137 S. Ct. at 1239*; see also U.S. Dep't of Just. Civil Rights Div. & U.S. Dep't of Educ. Office for Civil Rights, Dear Colleague Letter (Feb. 22, 2017),
> https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.pdf.

2d 460 (2017) (mem.).   In turn, we vacated the district court's June 23, 2016 preliminary injunction. *853 F.3d 729 (4th Cir. 2017)* (mem.).

Because the Supreme Court vacated our April 2016 decision and we thereafter vacated the district court's June 2016 preliminary injunction, we now have before us on appeal the district court's original memorandum opinion and order dated September 17, 2015.

By then, however, the plaintiff G.G. by then was no longer attending the defendant's high school, so the Fourth Circuit remanded the matter for the trial court to consider whether the action was moot. *See Grimm II*, 869 F.3d at 290-91.   As a result, the Fourth Circuit concluded that it might not have immediate authority to assess whether the Trump Administration's rescinding the previous DOE opinion letter passed the *Auer* test.[22]

Back in the trial court, after negotiations between the parties, the court accepted a consent dismissal for that part of the case that would have addressed G.G.'s right to a final injunction, since G.G. was no longer a student there. *See Grimm v. Gloucester County School Board*, 2017 U.S. Dist. LEXIS 1221975, at *3, 2017 WL 9882602 (E.D. Va. Dec. 12, 2017).   The trial court then denied the defendants' lack-of-jurisdiction-for-mootness motions, holding that G.G.'s requests for retrospective relief, including a declaration of rights and a judgment for nominal damages, were not moot. *Id*. at *3-*7.   Concurrent with those proceedings, plaintiff G.G. had filed an Amended Complaint, and the trial court established a briefing schedule for such further proceedings. *See id*. at *7-*8.   The later court denied the motions to dismiss, holding that a plaintiff's claim of discrimination on the basis of transgender status constitutes a viable claim of sex discrimination under Title IX, and that his claims merited application of intermediate scrutiny to the defendants' conduct.[23] *See Grimm*, 400 F. Supp. 3d 444, 451-52 (2019).

---

[22] If this Court needs to address that issue, undersigned counsel are prepared to submit a supplemental brief limited to that issue.

[23] The court also ruled on various motions to strike exhibits, some of which are likely to be relevant herein. *See id*., 400 F. Supp. 3d at 453-56.   For example, the court held that various medical

After briefing of cross-motions for summary judgment, the court granted G.G. summary judgment and denied summary for the defendants. *See id.* at 456-64. The court held that the defendants effectively excluded G.G. from participation in an education program on the basis of sex, which included transgender identity, citing various recent opinions from other courts. *Id.* at 456-58. The court then found that the defendant Board's policy harmed G.G., in effect by contributing greatly to G.G.'s gender dysphoria. *Id.* at 458-59. Finally, the court held under intermediate scrutiny standards that the defendant Board's transgender policy violated G.G.'s equal protection rights. *Id.* at 459-61. The court therefore granted G.G. a declaratory judgment regarding the violation of his rights, awarded G.G. nominal damages in the amount of one dollar, and granted a permanent injunction requiring the high school to update his records to conform to the male gender status on his updated birth certificate. *Id.* at 464.

The defendants appealed, but the Fourth Circuit affirmed. *See id.*, 972 F.3d 586 (4th Cir. 2020) ("*Grimm III*"). As herein most pertinent, that court's opinion stated as follows about current scientific understanding of the transgender community:

- Transgender people "represent approximately 0.6 % of the United States adult population, or 1.4 million adults. . . .  Just like being cisgender, transgender is natural and is not a choice." *Id.* at 594.

- "Being transgender is not a psychiatric condition, and 'implies no impairment in judgment, stability, reliability or general social or vocational capabilities'." *Id.*

- "[M]any transgender people are clinically diagnosed with gender dysphoria, "a condition that is characterized by debilitating distress and anxiety resulting from the incongruence

---

records and "to whom it may concern" letters from treating physicians submitted by G.B. were not inadmissible for failure to qualify as expert testimony, because they were records of treating physicians, qualified as business records, and were not being offered for the truth of the matter, and instead only for the fact of G.G.'s diagnosis as gender dysphoric and his treatment for it. *See id.* at 453-55. Likewise, the court held that policy statements and amicus briefs of various medical and other organizations were admissible to show their positions on transgender issues. *Id.* at 455.

between an individual's gender identity and birth-assigned sex." *Id*. at 594-95.

- "[T]o be diagnosed with gender dysphoria, the incongruence [between gender identity and assigned sex] must have persisted for at least six months and be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning." *Id*. at 595.

- "Puberty is a particularly difficult time for transgender children, who "often experience intensified gender dysphoria and worsening mental health" as their bodies diverge further from their gender identity. . . .  Left untreated, gender dysphoria can cause, among other things, depression, substance use, self-mutilation, other self-harm, and suicide. . . .  Being subjected to prejudice and discrimination exacerbates these negative health outcomes." *Id*.

- "For many years, mental health practitioners attempted to convert transgender people's gender identity to conform with their sex assigned at birth, which did not alleviate dysphoria, but rather caused shame and psychological pain. . . .  Fortunately, we now have modern accepted treatment protocols for gender dysphoria.  [Citations to various standards omitted.]  "There are no other competing, evidence-based standards that are accepted by any nationally or internationally recognized medical professional groups." *Id*. at 595-96.

- "There is no question that there are students in our K-12 schools who are transgender.  For many of us, gender identity is established between the ages of three and four years old. . . .  Thus, some transgender students enter the K-12 school system as their gender; others, like Grimm, begin to live their gender when they are older.  By the time youth are teenagers, approximately 0.7% identify as transgender.  That means that there are about 150,000 transgender teens in the United States." *Id*. at 596.

- "Although some transgender individuals experience gender dysphoria, and that could cause some level of impairment, not all transgender persons have gender dysphoria, and gender dysphoria is treatable. . . .  Importantly, 'transgender' and 'impairment' are not synonymous." *Id*. at 612.

The 2020 *Grimm* opinion then summarized the courts' consideration of regulatory agency

guidelines and other governmental policy documents as follows:

- "In the first ruling in *Grimm*, the district court denied Grimm's motion for a preliminary injunction and dismissed his Title IX claim, holding that it would not defer to a Guidance Document issued by the Department of Education's Office for Civil Rights (OCR), which, at that time, directed in part that '[u]nder Title IX, a recipient must generally treat transgender students consistent with their gender identity' . . . ." *Id*. at 601-02.

- The Fourth Circuit "reversed, holding that the Guidance Document was entitled to deference." *Id*. at 602.

- "However, after that decision, the Department of Education and Department of Justice withdrew its prior Guidance Document, issuing a new one." *Id*.

- "Accordingly, the Supreme Court, which had granted the Board's petition for writ of certiorari and had scheduled oral arguments, summarily vacated this Court's decision and remanded for reconsideration in light of the shift in agency perspective." *Id*.

- "Because sex-based classifications are quasi-suspect, they are subject to a form of heightened scrutiny. . . .  Specifically, they are subject to intermediate scrutiny, meaning that they 'fail[] unless [they are] substantially related to a sufficiently important governmental interest.' . . .  To survive intermediate scrutiny, the state must provide an "exceedingly persuasive justification" for its classification." *Id*.at 608.

- "[T]he Supreme Court held that discrimination against a person for being transgender is discrimination 'on the basis of sex.' As the Supreme Court noted, 'it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex'." *Id*. at 616, citing *Bostock v. Clayton County*, 140 S. Ct. 1731, 1741 (2020).

Thus, in effect, the issuance of the more recent *Bostock* decision made it unnecessary for the Fourth Circuit to "reconsider" its original Title IX ruling on the basis of the Trump Administration's 2017 replacement transgender policy statement.

In concluding his plurality opinion, Judge Floyd wrote as follows, comparing the choices

of that defendant School Board in contrast with the collective experience of school boards and students around the country on the transgender bathroom issue (*id*. at 620):

> Perhaps unsurprisingly, those schools [elsewhere] also discovered that their biggest opponents were not students, but adults. . . .  One administrator noted:
>
>> As to the students, I am most impressed. They are very understanding and accepting of their classmates.  It feels like the adult community is struggling with it more.
>
> . . .  As another [administrator] explained, "Young people are pretty savvy and comfortable, and can understand and empathize with someone who just wants to use the bathroom." . . .
>
> The proudest moments of the federal judiciary have been when we affirm the burgeoning values of our bright youth, rather than preserve the prejudices of the past. . . .  How shallow a promise of equal protection that would not protect [G.G.] from the fantastical fears and unfounded prejudices of his adult community.
>
> It is time to move forward.  The district court's judgment is *AFFIRMED*.

In his *Grimm III* dissent, Judge Niemeyer chose to mention the fact that the Supreme Court remanded *Grimm I* for reconsideration in light of the Trump Administration's rescinding in April 2017 of the previous guidance letter from the DOE.  *See id.* at 630-31.  Tellingly, however, the Niemeyer dissent <u>does not</u> further mention the replacement guidance from the new Administration, let alone rely on the revised guidance elsewhere in the dissent.  Judge Niemeyer would hardly have been afraid to take advantage of such new guidance if it were proper, but doing so would have required satisfying two conditions.  First, the revised guidance would have had to pass the *Auer* test, as described *supra*.  Second, the only remedies still sought by G.G. in *Grimm III* were retrospective, and it would have been inappropriate to evaluate G.G.'s retrospective rights in light of a transgender policy memorandum issued years after the pertinent events, let alone one that also rescinded a previous transgender policy memorandum that was in effect at the relevant time.  Thus, one way or the other, that dissent's silence regarding the contents of the new Administration's 2017 guideline memorandum should inform this Court's decision about whether to consider the

contents of the 2021 Model Transgender Policies and ignore the 2023 revised version here.

Apparently unaware of the role that agency policies and opinion letters played in *Grimm*, Plaintiff's Opposition quotes the recently adopted 2023 Model Policies of the VDOE, which contain the "after the fact" assertion that the "2021 Model Policies . . . disregarded the rights of parents and ignored other legal and constitutional principles that significantly impact how schools educate students, including transgender students." That may be the position of the new Governor of Virginia and his Attorney General, but their opinions are of less significance than those of the legislature that enacted the 2020 statute authorizing VDOE to issue guidelines, and to date the Legislature has not adopted any new statutory provisions in this regard.

Among other things, the new VDOE Policies <u>do not</u> "grant Ms. Blair the power to provide or withhold from S.B. any recognition of her gender identity and command the Commonwealth of Virginia to follow suit." Instead, to the extent that (a) they would pass the *Auer* test and (b) can be considered without an *ex post facto* violation, the new regulations appear to contain some – but not all – elements of a fairly balanced approach to protecting the civil rights of public-school students with gender-identity issues and needs while facilitating parent involvement as soon as possible consistent with competing interests including the student's safety and right to seek help if parents are unwilling to provide it.

    **2.**    **Virginia Code Section 54.1-2969 Governs Mental Health Services, and That Is What the Complaint Currently Alleges Were Provided to S.B.**

Because the Complaint technically alleges that Via and Ms. Olsen provided mental health services to S.B., and the allegations of the Complaint have to be evaluated for purposes of a dismissal Motion, Ms. Blair has opened the door to a potential Pandora's Box of contingent consequences, including impacts from Virginia's mental health statutes and regulations. She therefore should be estopped from complaining about legal provisions that would apply if her

allegations in question were proven or, in this case, accepted for purposes of argument.

More particularly, to the extent that  Ms. Blair contends that what Via and/or Ms. Olsen provided S.B. was medical treatment for a "mental health" condition, and therefore is asserting that she had the right to control such "treatment" for such a "condition," the Court properly may consider Va. Code section 54.1-2969(E) in deciding whether there was a problem with Via and Ms. Olsen honoring S.B.'s requests for gender-transition assistance at the High School, and S.B.'s pleaded consent becomes a material issue.  Conversely, to the extent that Ms. Blair concedes – or cannot fairly deny – that what Via and/or Ms. Olsen actually provided S.B. was not "mental health" services, such as treatment for "gender dysphoria" and its dysphoric symptoms, Ms. Blair cannot properly contend such services to S.B. interfered with a parental right to control S.B.'s mental health.  Therefore, the Opposition's contention (at 15) that the cited Virginia Code section has no bearing here is just trying to "have your cake and eat it too."

Furthermore, because Via's alleged services for S.B. occurred in person at the High School or over the internet, it would have constituted "outpatient treatment" for "mental illness" if in fact it were "mental health" treatment.  *See* Va. Code § 54.1-2060(E).   Plaintiff does not cite any Virginia Code or other Virginia  authority for the smug contention that section 54.1-2060(E) "does not [and constitutionally cannot] grant health care providers carte blanche to engage in mental health treatment of minors in every circumstance, particularly in public schools," and "to conceal the information from the minor's parents."  (ECF No. 56. at 16, top.)  Thus, in reviewing Plaintiff's constitutional argument (ECF No. 56, at 16-17), the Court should keep in mind that the reference to "mental health" treatment is just a conclusory allegation, and contrary to what the Fourth Circuit held in *Grimm III, supra*.  In other words, it is the uniformly accepted judgment in the medical community that transgender identity as such is not a mental health condition, in contrast with

persistent symptoms of emotional confusion and discomfort, or worse, that constitute the medical condition of "gender dysphoria."  *See id*., 972 F.3d at 594-96 & 612.

The remainder of the Opposition's discussion (at 16-17) is just legal argument, based on the faulty assumption that what Via and Ms. Olsen provided was medical treatment.  As Via's dismissal Memorandum explained, however, proof that such counseling involved "mental health" treatment does not mean that any fundamental constitutional right was violated.  (ECF No. 46, at 15-17.)  Likewise, case law linking a parent's right to make decisions for her child to their status as "medical health" or "mental health" decisions breaks down, or at least is attenuated, in situations where the accused school counselor or other service provider is in fact merely providing considerate attention and suggestions for obtaining information about gender identity, sexual preference, or any other one of myriad issues that teenagers encounter in daily life.

Helpfully, the Opposition (at 16) shifts to the more relevant, but far less specific argument about parents' "'primary role' in the 'nurture and upbringing of their children'."  For purposes of evaluating the potential merit of this new lawsuit, the Court will need to consider the consequences of the alternative fork in the road where "mental health" issues take one path away from the more general subject of "nurture and upbringing."  Unfortunately, this section of the Opposition persists in focusing on the "healthcare" path, and "mental health" in particular, using factually inapposite the *Baby K* litigation, where the court's strict construction of the EMTALA statute required doctors to continue treatment of a child born with just a brain stem.[24]

In her Oppositions to the Bennett and School Board dismissal Motions, Ms. Blair relies on paragraph 44 of the Complaint – and the opinion in *Grimm v. Gloucester County School Board*,

---

[24] This action has nothing to do with whether to keep an anencephalic baby alive on a ventilator, because EMTALA prevents hospitals and doctors from refusing emergency treatment if the family is unable to pay, in contrast with medical decisions cases not implicating EMTALA.

972 F.3d 586, 596 (4th Cir. 2020) – in arguing that an unattached document called District Policy

I J would have precluded school counselors from engaging in transgender-accommodating

activities in public schools, apparently on the theory that parental consent is a strict prerequisite

for mental health counseling:

> A child's assertion of a <u>discordant</u> gender identity is a significant mental health
> <u>concern</u>. (Cpt, ¶ 43). As the Fourth Circuit said in *Grimm v. Gloucester County
> School Board*, 972 F.3d 586, 596 (4th Cir. 2020), <u>affirming a child's assertion of a
> male identity and facilitating social transitioning through use of opposite sex names,
> pronouns, and opposite sex privacy facilities is an integral part of mental health
> intervention</u> for **gender dysphoria**. (Cpt, ¶ 43). Therefore, in meeting and
> counseling with S.B.to affirm her discordant gender identity, Mrs. Olsen and Mr. Via
> were engaging in a form of psychotherapeutic intervention in violation of District
> policy regarding counseling services. District Policy I J provides:
>
>> The guidance and counseling program does not include the use of counseling
>> techniques <u>which are beyond the scope of the professional certification or
>> training of counselors</u>, including hypnosis, or other psychotherapeutic
>> techniques that are normally employed in medical or clinical settings and focus
>> on mental illness or psychopathology. (Cpt, ¶ 44).
>
> Contrary to the Policy, Mrs. Olsen [allegedly] was engaging in mental health
> interventions with S.B., as described by the *Grimm* Court, by counseling her about
> transgender identities, affirming her as a male, and permitting and encouraging the
> diminutive (less than 100 pound) teenage girl to use male restrooms despite knowing
> that S.B. had a history of trauma and mental illness and had already been threatened
> and sexually harassed on the bus for being gender non-conforming. (Cpt., ¶ 45).

Notably, Plaintiff's above-quoted argument <u>does not</u> appear anywhere in Plaintiff's Opposition to

Via's dismissal Motion, and properly so, because <u>Via's credentials are different from and broader</u>

than those of school counselors like Ms. Olsen. In any event, however, there is no evidence that

Via engaged in any "mental health interventions" for which he was not qualified by training,

licensure and experience. Furthermore, as the Complaint makes evident, Via had just begun

getting acquainted professionally with S.B. when she unfortunately ran away from home.

Furthermore, what the *Grimm* opinion does in this regard is identify various forms of

intervention, each of which may require some special training and experience (*see id*., 972 F.3d at

595-96 (legal citations omitted):

> The WPATH Standards of Care outline <u>appropriate treatments</u> for persons with gender dysphoria, including "[c]hanges in gender expression and role (which may involve <u>living part time or full time in another gender role, consistent with one's gender identity</u>)," <u>hormone treatment therapy</u>, <u>sex reassignment surgery</u>, "[s]urgery to change primary and/or secondary sex characteristics," and **psychotherapy "for purposes such as exploring gender identity, role, and expression**; **addressing the negative impact of gender dysphoria and stigma on mental health; alleviating internalized transphobia; enhancing social and peer support; improving body image; or promoting resilience**." *See* J.A. 200-01 (WPATH Standards of Care 9-10). "The number and type of interventions applied and the order in which these take place may differ from person to person," J.A. 200 (WPATH Standards of Care 9), and special considerations are taken before adolescents are provided with physical transition treatments such as hormone therapy, J.A. 209-212 (WPATH Standards of Care 18-21).

Notably, the *Grimm* opinion's expert source states that these are all "appropriate treatments." *Id.*

In this context, the preference for counseling with parents involvement presumes that they will be sufficiently open-minded to be rationally objective about the situation to take advice that includes properly discussing with their child all the key issues, "such as exploring gender identity, role, and expression; addressing the negative impact of gender dysphoria and stigma on mental health; alleviating internalized transphobia; enhancing social and peer support; improving body image; or promoting resilience." *See id.*

Significantly, the *Grimm* opinion's list of "recommended treatments" <u>does not</u> include efforts with the predetermined goal of suppressing the individual's need for gender exploration and affirmance, regardless of the nature and extent of proffered training and accumulated mental-health wisdom. Therefore, the obvious conclusion is that no court in a jurisdiction recognizing the Equal Protection rights of transgender individuals could rationally conclude that Ms. Blair had either a moral or a medical basis for asserting that her parental rights were any greater than S.B.'s human rights as an individual, and not merely as a natal female.

Fortunately, the instant action is merely about a physically healthy, mentally competent

14-year-old natal female who had come to recognize that "she" perceived herself as an individual of male gender, a personal situation that federal law expressly protects from undue discrimination or harassment, and therefore deserves equal status under law and in the eyes of all forms of government.  As result, the Opposition's quotation from the *Baby K* opinion is literally a poison pill accompanying Plaintiff's proffered position.  That is, just as the *Baby K* court's reading of EMTALA required doctors' sound medical opinion about life prospects for a baby without a forebrain to yield to concerns about equality in emergency treatment, federal law prohibiting discrimination against transgender persons – which includes their particular set of relationship, sexual and identity issues – puts any *a priori* notion of constitutional law in an entirely different light.  Here, specifically, if federal law regarding equal treatment of transgender persons is constitutional – and surely it is – that places S.B.'s right to explore and adopt transgender status ahead of Ms. Blair's right to participate in her treatment for "mental illness."

The effect of the federal Constitution's Supremacy Clause is to regulate and determine the relative roles of federal, state and local statutes in dealing properly with disputed issues.  What Ms. Blair is petitioning for here is an express ruling that her asserted "substantive due process" right to participate in S.B.'s "nurture and upbringing" is superior to S.B.'s rights under Title IX, as well as an implicit ruling that Ms. Blair has the right to interdict and suppress S.B.'s transgender individuality, at least until S.B. is legally emancipated.  As explained elsewhere herein, at least six prior federal court rulings have said "No" to any such monstrous result, and some have even said that the alleged withholding of notification to Ms. Blair by school counselors about her child's emergent transgender identity and conduct did not rise to the level of a constitutional violation.

### E.      As Explained in the *Foote* Order, Via Is Entitled to Qualified Immunity.

It is clear that, as of August 2021, there was not any "clear" legal principle to the effect

that high school counselors or supporting personal counselors could not lawfully provide services to transgender students with gender-identity or gender-transition issues without first notifying parents.  Indeed, as of the date of the Complaint herein, there were at least six (6) reported decisions around the country – from California (*Regino*), Florida (*Littlejohn*), Kansas (*Ricard*), Maryland (*John and Jane Parents*), Massachusetts (*Foote*), and Wyoming (*Willey*) – holding that there was no constitutional right to such notice and/or that the defendant school-related personnel would have qualified immunity from such a claim.  (*See* pages 17-22, *supra*.)

To be clear, such courts – including the above-quoted *Foote* opinion – expressed varying degrees of concern about the adequacy of parental notice policies in effect at the time the putative cause of action arose.  Typically, however, the opinions recognized that providing gender-identity and other transgender services in the wake of transgender status getting protection under federal anti-discrimination laws was a relatively new thing, and that state and local governments were still working out the kinks in regulations or guidelines addressing such issues.  One court specifically entered a preliminary injunction against any policy prohibiting teachers or counselors from notifying parents when a gender-identity issue surfaced at school, provided that school personnel had told the student that they were going to notify the parents and that the school or related social services personnel had determined that parental notification would not endanger the child, in which alternative family court proceedings ought to be considered promptly.  In short, there is nothing sufficiently fact intensive here – given the extensive nature of the factual pleadings – for the Court to need fruits of discovery before reaching this easy-to-resolve issue.  *See* cases cited at 2-3, *supra*.

Notwithstanding such concerns, however, no court that addressed the qualified immunity issue in this gender-identity context has held that its resolution should be put off until summary judgment.  The main reason is obvious:  then-existing law regarding a parent's right to get notice

more promptly than actually occurred <u>was not</u> at all clear, and several of these recent court decisions held that there was no constitutional right for parents to receive notice before commencement of such school counseling.[25]  In contrast, the early history of judicial protection for parental rights – especially that branch about parents not having to send their children to public schools – has no bearing here.  *See id*.  Moreover, the more recent history of judicial protection for parental rights of children in public schools in no way supports the view that mistakes or lapses about parental notice should vitiate qualified immunity.[26]

The sole exception from the "police misconduct" lineup of cases cited in this section of the Opposition (ECF No. 56, at 17-19) is *Bhattacharya v. Murray*, 515 F. Supp. 436 (W.D. Va. 2023) (Moon, J.).  There, this Court was required to determine whether an official of the UVA Medical School had violated a second-year medical student's First Amendment rights by instituting or otherwise having significant involvement in proceedings that resulted in his expulsion from school, on the grounds that his aggressive, defensive or otherwise reportedly bizarre conduct as a member in the audience of a faculty research seminar was seriously inappropriate.  In the portion of that opinion addressing qualified immunity for individual defendants, this Court applied the following test (*see id*. at 449-50):    "A right is clearly established if it is 'sufficiently clear that **every** <u>reasonable</u> **official** would have understood that what he is doing violates that right'."    In *Bhattacharya*, in addressing defendants' dismissal motions, the Court decided that it was

---

[25] *See Littlejohn v. School Board of Leon County*, 2022 U.S. Dist. LEXIS 238141, at *11 n.1 & 16 (N.D. Fla. Dec. 22, 2022) (situation presented there made qualified immunity defense ripe for resolution at the dismissal motion stage); *Foote v. Town of Ludlow*, 2022 U.S. Dist. LEXIS 236102, at *28-*30 (D. Mass. Dec. 14, 2022) (if plaintiff's substantive claims had survived dismissal, individual defendants would have been entitled to qualified immunity).

[26] *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) ("Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted.").

premature to conclude that the Defendant's asserted right to cross-examine the professor giving the lecture and interrupt the moderator of the discussion to express views that intimated both (a) questions about the reliability of the researcher's methodology and description and (b) whether the very subject of the research – so-called micro-aggressions – was part of an ulterior agenda, perhaps one directed at creating an academic environment where both honest research efforts and proffered criticism of conduct might be stifled on the grounds that it involved inflicting micro-aggressions. On such very different facts, the court ruled: 'Here, the ultimate question whether Individual Defendants in fact violated Bhattacharya's First Amendment rights by retaliating against him because of his protected speech – and accordingly, whether the First Amendment right violated was clearly established – requires a more developed record." *Id.*

The instant action <u>does not</u> involve First Amendment rights, however, and – in contrast with the seemingly extreme and thus disturbing action the faculty took in *Bhattacharya* – Via and his colleague Ms. Olsen at most unduly delayed in notifying Ms. Blair that her natal daughter had requested assistance in gender-transitioning as a male, at least in part because S.B. asked Defendants not to notify her mother. As Via has previously argued, there was case law in August 2021 regarding a public-school's parental-notice obligations in the gender-identity context specifically, and the Opposition <u>does not</u> cite any such precedent in a parental notice context. Accordingly, this Court's decision in *Bhattacharya* that a ruling on the qualified immunity issue would be premature is certainly not dispositive here.

Furthermore, the Court should be mindful that qualified immunity had its origins under circumstances where the work of important public officials could be seriously hampered by the mere pendency of litigation challenging past discretionary conduct, and the very recent gender-identity cases cited and quoted from *supra* should make it clear that, especially as of August 2021,

no reasonable court could have concluded that "**every** <u>reasonable</u> high school **official** in Virginia – and elsewhere – where State law and State officials recognize and protect the equal protection rights of transgender individuals would have understood that what Via did" by assisting S.B. with VDOE-recommended gender-transition activities while respecting her request not to notify Ms. Blair "violates a parent's right" to prior notice, if not to a veto of giving any such assistance. Furthermore, every cited precedent on gender-identity issues to date seriously undermines any asserting that Ms. Blair has more than a qualified right, the extent of which states may regulate.

Therefore, consideration of Via's qualified immunity defense at the dismissal motion stage is clearly appropriate, and every pertinent judicial opinion on gender-identity issues to date further undermines any contention that it should be "'sufficiently clear that **every** <u>reasonable</u> **official** would have understood that what he is doing violates [Ms. Blair's asserted] right'."[27]

---

[27] The Opposition responds (*id.* at 18 n.6) to the Via dismissal Memorandum's citation (at 27) to the *Grimm* case regarding transgender students' equal protection rights in the bathroom-access context by asserting correctly that *Grimm* did not address gender-identity and gender-transition issues as such. However, the Opposition's footnote appears to discuss <u>an issue not pleaded in the Complaint</u>, namely whether Via had a duty to exercise "professional judgment" about two different subjects: (1) "what is appropriate for an individual student based on her circumstances" and (2) "honoring Mrs. Blair's fundamental parental right to be notified and participate in [the] decision" to use the boy's restroom."

In the first regard, the quoted topic (1) is far too general to constitute the subject of any single legal or professional duty, and not surprisingly the contention <u>is not</u> supported by citation to any precedent. Furthermore, to the extent that Via or anyone else working as a counselor in a public school is responsible for warning a student that doing anything out of the ordinary, traditional range of behaviors implies that complying with the rights of civil rights laws should not be undertaken without thinking of and warning about all possible adverse consequences, including being attacked by vicious juvenile or street criminals or called out by a politician. If Ms. Blair seriously intends to take this case in that direction, she needs to join the Commonwealth of Virginia, the Commissioners of Appomattox County, and every other law enforcement public safety as negligent *parens patriae* defendants, as well as add and then seriously pursue every Jimmy Doe student who threated S.B. and every John Doe street criminal who abducted, trafficked or assaulted her as necessary parties herein.

In the second regard, while the Complaint alleges that Via attended the August 12, 2021 meeting Ms. Olsen that had with S.B., it <u>does not</u> allege that Via was involved in recommending or giving permission for S.B. to use the boys' restroom. As alleged, his cognizable role was limited to

The Opposition misses the mark in relying on police arrest and other criminal law contexts to illustrate current application of qualified immunity law.  (ECF No. 56, at 17-19).  That area of the law does provide guidance about one end of the "visible spectrum," because police officers making snap decisions on the streets are properly given the benefit of every reasonable doubt, even though their decisions result in arrests, jail detention, and even bodily injury or death.  Therefore, to give one example, any statistics about the ratio of qualified immunity cases resolved at summary judgment to those resolved on the pleadings is not going to be a reliable indicator for the separate subset of qualified immunity cases involving administrative or social-service executive action.

### III.   Plaintiff's Federal-Law Conspiracy Claim Must Be Dismissed.

The Opposition's defense of Plaintiff's federal-law conspiracy claim is clearly presented, the generic elements are properly listed, and there is apparently tacit agreement about the issues: **(A)** sufficiency of the pleadings;  **(B)** any right to discovery;  **(C)** whether the allegations reveal any specific, class-based, invidiously discrimination animus;  **(D)** whether the allegations reveal a cognizable deprivation of equal enjoyment of legal rights; and  **(E)** whether the allegations allege any cognizable overt act; and  **(F)** whether the alleged overt act caused any cognizable injury. (ECF No. 56, at 17-19.)  The parties strongly disagree, however, about proper resolution of each such issue.  In addition, the Opposition fails to anticipate or otherwise address the obvious defenses of judicial privilege and other related privileges enjoyed by participants in litigation, as well as the *res judicata* or estoppel consequences of failure to timely and otherwise properly raise issues concerning the Maryland custody proceedings during those proceedings, and any necessary appeal therefrom, rather than just filling a gunny sack with grudges to use in later, retaliatory tort

---

offering and providing S.B. certain private counseling that he contends was consistent with regulations and policies of the School Board and the Virginia DOE at the time, as well as Title IX.

42

litigation.  For convenience, this last issue is addressed in detail on pages 55-61, *infra*, while each other conspiracy issue is addressed in this section below.

> A.      **Sufficiency of the Pleadings**

The Opposition's basic position is a candid admission that "the need for factual development is particularly pronounced for Mrs. Blair's conspiracy claim," thus that putatively many material allegations are based on information and belief.  (ECF No. 56, at 19.)   Plaintiff then asserts as a general proposition that the Court should defer a decision on the civil-rights conspiracy claim pending completion of relevant discovery is appropriate, but there are numerous reasons why no such generalization is appropriate.

In this regard, it is uniquely significant that the putative object of the conspiracy alleged in the Complaint (ECF No. 1,  ¶¶ 166-168) is the alleged subversion of the Maryland family court proceedings instituted there after S.B. was rescued from alleged sex traffickers.  According to the Complaint, this resulted from the generally alleged use of false evidence or dishonest opinions about the circumstances of S.B.'s special transgender situation and its handling by Ms. Blair.  On information and belief, as S.B.'s grandmother, adoptive mother and guardian, Ms. Blair was a *de facto* party to the Maryland custody proceedings; furthermore, there is no Complaint allegation that she was prevented from appearing with counsel or *pro se* therein to defend her parental conduct, as well to advocate for S.B.'s immediate or eventual return to her custody.  Thus, as a party to those proceedings, it was the responsibility of Ms. Blair and her counsel to present all the allegations she now purports to levy against Via and the other conspiracy-count defendants there, to ensure fair resolution of material and deterrence of any misrepresentation, misstatement, or illegitimate opinion, expert or otherwise.  Moreover, nothing in the Complaint suggests that Ms. Blair or her counsel have made any recent factual discoveries – *e.g.*, of facts or circumstances of

43

which they were aware during proceedings in the Maryland family court.  Instead, the Complaint's allegations aimed at showing a factual basis for the conspiracy claims are essentially speculative.

As explained in Via's dismissal Memorandum (ECF No. 46, at 27-31), the Complaint's conspiracy allegations are also inappropriate because, while they purport to mention by name each element of a cognizable civil-rights conspiracy, the truly material allegations are merely conclusory in form.  They <u>do not</u> reveal sufficient information for an objective judge to determine whether the specifics of the claim are actually plausible or, instead are at best speculative and at worst defamatory.  There is no need to repeat Via's above referenced Memorandum contentions here, but we respectfully ask this Court to evaluate the sufficiency of Plaintiff's conspiracy Count in light of the obligation to plead sufficient actual facts to make the claim plausible.  Via submits that such plausibility <u>does not</u> exist in the words of the Complaint herein.

###    B.    No Special Right to Discovery

With very limited exceptions, such as depositions to preserve testimony and FOIA requests to government agencies, there is no general right to discovery for curing plausibility defects in a Complaint or some of its claims, and the Opposition's principal authority (ECF No. 56, at 19) does not support Plaintiff's position.  *See A Society Without a Name v. Commonwealth of Virginia*, 655 F.3d 342, 346 (4th Cir. 2011).  As the Fourth Circuit stated there):  "Facts [pleaded]that are 'merely consistent with' liability are not sufficient. . . .  'Threadbare recitals of the elements of a causation, supported by mere conclusory statements, [similarly] do not suffice' . . . ."  Furthermore, the court explained:  "[W]here a conspiracy is alleged, the plaintiff must plead facts amounting to more than 'parallel conduct and a bare assertion of conspiracy . . . .  Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."  *Id.* (citations omitted).  In other words, "[t]he factual

allegations must plausible suggest agreement, rather than being merely consistent with agreement." *Id*. Furthermore, as explained further below, the uphill climb for Ms. Blair would be futile, because she literally has to allege and prove that the Maryland juvenile court lacked jurisdiction over the proceeding, because that is the only exception to holdings of absolute judicial immunity and freedom from collateral attack here.

### C.    Specific, Class-Based, Invidiously Discrimination Animus

Incredibly, the Opposition (ECF No. 56, at 20-21) takes the position that she personally, the original legal guardian of S.B., is a "disabled person," or alternatively that S.B. is a "disabled person" for whom Ms. Blair serves as legal guardian, and that the allegedly collusive actions of Ms. Khan and her two witnesses from Appomattox County were intended to deprive Ms. Blair and/or her ward S.B. – and/or their class – of the equal protection of the law:

> Mrs. Blair is alleging that S.B. is a member of a class that possesses "discrete, insular and immutable characteristics comparable to those characterizing classes such as race, national origin and sex'." . . . That class, disabled people, is protected by a federal statute comparable to the statutes protecting race, sex, and national origin, i.e. the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq.

The rationale behind this imaginative contention is as follows (Opposition, at 21-22):

> As S.B.'s legal guardian, Mrs. Blair is making decisions regarding S.B.'s upbringing (such as how to respond to S.B.'s assertion of a male gender identity) based on S.B.'s disability. In taking action to disrupt Mrs. Blair's decision-making regarding S.B.'s mental health care, including response to an assertion of a male gender identity, Defendants are exhibiting discriminatory animus against a disabled young girl. According to Defendants, S.B. is permitted to benefit from her mother's decisions regarding medications (Cpt. ¶ 50) and similar interventions[,] but must be protected from her mother's decisions regarding how to intervene regarding assertion of a male gender identity (Brief in Support, p. 22) in the context of S.B.'s disabilities.

That is tantamount to Ms. Blair admitting that she views S.B. as <u>legally disabled</u> for not following the family tradition that natal girls think and act like gender girls, despite the fact that the Congress and president of the United States have enacted legislation requiring that everyone – even a person's parents – treat them fairly and equally even if they turn out to be significantly different

from either parent in some way.  It is therefore no surprise that parents and guardians of transgender children are not specially – let alone expressly – protected by equal protection principles.

The Court should therefore conclude without further ado that the Complaint fails to allege any proper, class-based case for improper discrimination.

### D.     Intended Deprivation of Equal Enjoyment of Legal Rights

The Plaintiff generically admits that these requirements must be met, stating that "[I]t simply must be shown that there was a single plan, the essential nature and general scope of which was known to each person who is to be held responsible for its consequences."  (ECF No. 56, at 20).  When getting down to alleging real facts, however, the Complaint (¶¶ 166-167) only alleges that S.B.'s court appointed public defender, Ms. Khan, called Ms. Olsen and Via as witnesses with personal knowledge and/or professional opinions to convince the Maryland judge not to return S.B. to Ms. Blair's custody immediately:

> Mrs. Blair alleges that Mrs. Olsen and Mr. Via communicated with Ms. Khan and agreed that: 1) Mrs. Blair was not sufficiently supportive, in their view, of S.B.'s assertion of a male gender, 2) that Mrs. Blair was guilty of abuse and neglect for not being sufficiently supportive of S.B.'s assertion of a male gender identity, and 3) that they should act to deprive Mrs. Blair of custody of her daughter.  (Cpt ¶ 166).  Mrs. Blair also alleges that the Defendants agreed "to provide evidence to the Maryland juvenile court to demonstrate that Mrs. Blair was guilty of neglect and abuse of S.B. because of their perception that Mrs. Blair had an unfavorable viewpoint regarding S.B.'s assertion of a male gender identity."  (Cpt, ¶ 167).

The Complaint (¶ 188) further alleges generally that the factual evidence introduced by Ms. Khan at the Maryland court hearing was false, and that the opinions were not genuine. However, that is not enough to prove a conspiracy, since otherwise every single prosecution and other lawsuit in the United States potentially would be followed by a conspiracy action brought by the losing side against the opponents, their lawyers, the witnesses they called, and even authors of documents they offered into evidence.

More specifically, the contentions mentioned in Plaintiff's Complaint primarily imply that

Ms. Khan, in her role as independent counsel for S.B., and Via and Ms. Olsen, in their roles as witnesses, <u>should not</u> have done whatever they did to oppose the case that Ms. Khan represented to the Maryland court despite whatever S.B. wanted or needed to have presented.  It pains Via and undersigned counsel to have to make such contentions, which all of us would rather S.B. <u>did not</u> have to read or hear, but any moral fault now belongs to Ms. Blair, who has engaged in "risky business" by using her conspiracy count in a belated, and otherwise improper effort merely to mount a collateral attack on the Maryland court proceedings.

### E.     No Cognizable Overt Acts in Furtherance of Conspiracy

Beyond the above-quoted allegations about supposedly improper objectives on S.B.'s behalf at the Maryland custody hearing that might be the subject of a "cooperative" agreement, the Complaint fails to allege any cognizable overt acts in furtherance of the conspiracy.  There is no allegation that any particular piece of testimony was false, that any documentary evidence was forged or altered, that any specific professional opinion was suborned perjury, or that anything else which occurred at the Maryland hearing was fabricated or fraudulently presented.  *See Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245-51 (1944) (granting severe sanctions against party whose counsel arranged for potential witness to create publications that could later be cited as evidence).[28]  If there were actually anything incriminating evidence to present in the transcript of that proceeding, Ms. Blair – who was a party there – or her current counsel surely could have obtained a transcript, attached a copy thereof to the Complaint, and pointed out each

---

[28] The *Hazel-Atlas* court purported to rely on inherent equitable powers to vacate a  prior judgment up discovery of fraud on the court or, as in that case, on an administrative agency or its tribunals as well, but now such relief is strictly limited to remedies afforded by Fed. R. Civ. P. 60.  Helpfully, cases since *Hazel-Atlas* have explained how and where litigants in federal court may properly use Rule 60(b)(2), 60(b)(3) and 60(b)(6) motions to seek post-judgment relief from frauds perpetrated in earlier proceedings.  *See Bethel v. McAllister Bros.*, 1994 U.S. Dist. LEXIS 9177, at *34-*39 & *62-*64 (E.D. Pa. July 11, 1994).

material misrepresentation or improper legal argument that the Maryland court received and heard, as well as a copy of any resulting opinions or orders relating to the conclusions at the hearing.[29]

Notably, as addressed in the *Shelley* and *Qui* cases, which are the subject of discussion on pages 55-61, *infra*, Virginia law does not allow such collateral attacks on the *bona fides* of a former legal proceedings, and Maryland law forbids it as well.[30]

## F.      No Cognizable Injury to Civil Rights

Despite the above-referenced wild goose chase in search of membership in some class

---

[29] However, that would not properly have been presented to this federal court in Virginia.  Instead, any such plea should have been presented in the Maryland family court – e.g., during the hearing, in a motion for rehearing, or a motion to reopen any judgment – or by an appeal in Maryland.

[30] *See Klein v. Whitehead*, 40 Md. App. 1, 20-24, 389 A.2d 374, 385-87 (1978) (*res judicata* and the principle barring collateral attack on prior court judgments precluded judgment debtors, who became the subjects of an involuntary bankruptcy proceeding, were barred from suing the original creditors and their attorney for damages, even though the new suit alleged conspiracy, breach of fiduciary duties, fraud and deceit, misappropriate and legal malpractice).

  This defense has repeatedly been used in Maryland proceedings related to divorce proceedings and custody disputes.  *See Ghazzaoui v. Taylor*, 2015 Md. App. LEXIS 424, at *4-*8 (2015) (unreported opinion) (following a divorce and custody decree, which included an award of attorney's fees for the child's court-appointed guardian *ad litem* against the losing husband, he filed several follow-on suits against the GAL and others, the last of which alleged unjust enrichment, intentional interference with custody and visitation, and detrimental reliance; citing *Klein*, the trial court dismissed the case as an "impermissible collateral attack").  *Also see R.R. v. D.F.*, 2019 Md. App. LEXIS 586, at *8-*12, 2019 WL 3074038 (July 15, 2019) (unreported opinion) (grandparents and other parties to original child custody proceedings are barred from filing later litigation involving custody of the same child in a different court (that is, forum shopping), unless the new case was a separate, independent dispute that merely would "overlap" the original proceedings; even a new custody proceeding alone is "a blatant collateral attack in the CINA proceedings pending in Juvenile Court")).

  As the *Klein* opinion explains:  "The theory that is appropriate, and that does serve to preclude this action, is that known as "collateral attack". A collateral attack is "an attempt to impeach the judgment by matters dehors the record, before a court other than the one in which it was rendered, in an action other than that in which it was rendered; and attempt to avoid, defeat, or evade it, or deny its force and effect, in some incidental proceeding not provided by law for the express purpose of attacking it . . . ." 49 C.J.S. *Judgments,* § 408. In simple terms, C.J.S. notes (also § 408): "In other words, if the action or proceeding has an independent purpose and contemplates some other relief or result, although the overturning of the judgment may be important or even necessary to its success, then the attack on the judgment is collateral."

protected from unlawful discrimination, the Opposition finally comes clean in contending the objective of the alleged conspiracy was "to deprive Mrs. Blair of custody of her daughter and her fundamental parental rights because of a perceived disfavored decision regarding affirming her disabled daughter's assertion of a male identity" and that the resulting injury was depriving Ms. Blair "of custody of her daughter for more than five months" along with "diminution of her parental relationship with S.B.," as well as severe emotional distress. (ECF Doc. 56, at 22.) All those contentions were material to the issues before the Maryland family court, and by the time the Maryland hearings took place Ms. Blair had – or could easily have obtained – all the information on which she now relies for her Title IX conspiracy count.

Unfortunately for Ms. Blair's conspiracy allegation, every custody hearing may result in a change in custody, with attendant perceptions of loss and distress by the party who previously had custody. However, the Plaintiff fails to cite any precedent for transmuting such circumstances into a collateral tort suit, and accordingly the Court should dismiss Plaintiff's conspiracy Count.

**IV.    Plaintiff's Tortious Interference and Intentional Infliction of Emotional Distress Claims Should Be Dismissed.**

      **A.    Plaintiff's Cited Precedents Do Not Justify Her Tortious Interference Claim.**

Plaintiff's Opposition seeks to justify Count VIII, which alleges tortious interference, by simply enumerating the elements of the tort in the specific context of interfering with parental rights. (ECF No. 56, at 22-23.) She also cites Complaint allegations that Via, while briefly serving as S.B.'s personal counselor at the high school, interfered with Ms. Blair's claimed sole right to determine when and how S.B. should explore or express her gender identity. This putative interference occurred through Via's alleged failure to promptly report S.B.'s disclosure of a "discordant" gender-identity preference and related request for school support, as well as through providing S.B. with information about gender-related websites. *See id.* The Complaint also

alleges that Via unlawfully cooperated with Ms. Khan and Ms. Olsen in providing allegedly "false" evidence to the Maryland court, and asserts that such evidence led the Maryland court to the separate S.B. from her parents for many months.  (ECF No. 56, at 22-23.)  As shown below, however, Plaintiff's tortious interference claim is meritless, and would be barred by the common law defense of "justification" as well as judicial privilege and various other equitable doctrines.

To support the tortious interference claims, the Opposition cites *Wyatt v. McDermott*, 283 Va. 685 (2012), where Virginia's Supreme Court responded to certified questions of law from the Eastern District of Virginia federal court.  The certified questions involved two key issues:  (1)  the extent of parental rights for the natural father of a child born out of wedlock, concerning the birth mother's intention to place the baby up for adoption; and  (2)  whether the actions taken by the birth mother, the prospective adoptive parents, and other individuals involved in the adoption process in excluding the natural father from consideration as a custodial parent constituted actionable conduct under Virginia law, specifically as it pertains to tortious interference with parental rights and conspiracy.  *See id*. at 689-91.  In response, the Virginia Supreme court held that Virginia common law should recognize a cause of action for tortious interference there, just as the federal court had recognized a potential claim for conspiracy at the pleadings stage.  *See id*. at 691-701 & n.1.

Nothing in the *Wyatt* case even remotely suggests, however, that there is a cause of action for tortious interference brought against lawyers, public officials, social service providers and other witnesses who merely took part in judicial proceedings addressing child custody issues in which the subsequently complaining parent – like Ms. Blair here – fully participated.  *See id*. Foreshadowing current events, the Virginia Supreme Court noted that there should be carefully drawn limitations on the newly recognized cause of action, to ensure that tort law "does not provide

a means of escalating intra-familial warfare," where other parts of the judicial system are available to deal with custody issues.  *See id*. at 701-03.  Further, "in the interest of the child," the court "noted with approval the affirmative defense of justification as set forth in *Kessel*,"[31] wherein the court held that a party <u>should not</u> be held liable "if he or she [had] a reasonable, good faith belief [1]  that interference with the parent's parental or custodial relationship was necessary to protect the child from . . . harm or  [2]  that the interference was [otherwise] proper . . . ."  *See id*. at 702.

Accordingly, *Wyatt* <u>does not</u> provide support for the tortious interference claim herein.

**B.     Plaintiff's Cited Precedents Do Not Justify Her Intentional Infliction of Emotional Distress Claim.**

The Opposition likewise attempts to justify her Count IX, Intentional Infliction of Emotional Distress ("IIED") claim, merely by listing the tort's elements and quoting allegations in the Complaint that the Appomattox Defendants withheld information from Ms. Blair about S.B.'s request to adopt a male name and request the use of male pronouns at school.  That conduct was consistent the VDOE's 2021 Model Transgender Policies at the time and, as a result, was at worst just ordinary negligence.  Such conduct under the hectic conditions usually prevailing in high school counseling offices cannot properly be labeled in retrospect as "outrageous or intolerable" under an IIED rubric.  Likewise, as noted *supra*, in an ordered society where respect for the court system is expected of all citizens, the proper way to deal with allegedly improper treatment or other misconduct in connection with court proceedings is to raise a timely objection in court, and if necessary to pursue those issues via appeal.  For this reason, it <u>is not</u> proper for a party to litigation in one court to sleep on his or her rights or, even worse, to lie in wait behind a

---

[31] *See Kessel v. Leavitt*, 204 W. Va. 95, 109-14 & 138-43, 511 S.E.2d 720, 735-39 & 763-68 (W. Va. 1998) (upholding a finding of tortious custodial interference against maternal grandparents, uncle, and mother's attorney, but not against the child's mother, due to her equal parental rights, and noting related affirmative defenses including "justification" and "privilege").

proverbial sandbag and only later sue a participating attorney in the first proceeding – in this case a public defender obligated to represent S.B.'s interests – and the two witnesses that S.B.'s attorney called to testify therein.   In Maryland, the actions of counsel and witnesses during judicial proceedings take place under the protection of absolute judicial immunity and there is at least qualified immunity for actions outside the courthouse that take place in preparation for such proceedings.[32]

In an effort to provide a generic basis for this claim, the Opposition relies on two factually

---

[32] *See, e.g., Smith v. Danielczyk*, 400 Md. 98, 120-21 (2007), *quoting Kennedy v. Cannon*, 229 Md. 921, 96-97, 182 A.2d 54, 57 (1962) ("This absolute immunity extends to the judge as well as witnesses and parties to the litigation, for defamatory statements uttered in the course of a trial or contained in the pleadings, affidavits, depositions and other documents directly related to the case."); *id*., 400 Md. at 121, *citing Adams v. Peck*, 288 Md. 1, 7-9, 415 A.2d 292, 295-96  (1980) (absolute judicial privilege extended to reports prepared for use in judicial proceedings); *see id*., 400 Md. at 3 & n.1, *citing Korb v. Kowaleviocz*, 285 Md. 699, 702-03, 402 A.2d 897, 898-99 (1979); *Hunckel v. Voneiff*, 69 Md. 179, 199, 17 A. 1056, 1057 (1889) ("Defamatory statements made by judges, parties and witnesses are absolutely privileged even though they have no relation to the judicial proceeding. However, an attorney's defamatory statement is absolutely privileged only if it has some relation to the judicial proceeding."  In 2013, these privileges were held to apply regardless of the cause of action allegedly based on participation in judicial proceedings.  *See O'Brien & Gere Engineers, Inc. v. City of Salisbury*, 222 Md. App. 492, 501-02, 113 A.3d 1129, 1140 (2012), *citing Mixter v. Farmer*, 215 Md. App. 536, 545-47, 81 A.3d 631, 636-37 (2013); *accord, Brice v. Nkaru*, 220 F.3d 233, 239 & n.6 (4th Cir. 2000) (federal law as applied in Maryland law); *Mangold v. Analytic Services, Inc.*, 77 F.3d 1442, 1448-49 (4th Cir. 1996) (federal law as interpreted by federal court) ("Because ANSER and its employees provided information only as requested by the government agency officially investigating Col. Mangold's dealings with ANSER, we hold that ANSER and its employees are absolutely immune from state tort liability based on any statements made and information given in response to queries made in the course of the Air Force's investigation.")  Under that principle, Via and Ms. Olsen should be immune from any claim relating to the Maryland court proceedings.

Virginia law principles of judicial immunity are similar.  *See, e.g., Phatisis v. Clark*, 2013 U.S. Dist. LEXIS 114267, at *10 (E.D. Va. Aug. 13, 2013), *citing Imbler v. Pachtman*, 424 U.S. 409, 430 n.32 (1976) ("out of court "effort to control the presentation of his witness' testimony" was entitled to absolute immunity because it was "fairly within [the prosecutor's] function as an advocate); *Murphy v. Goff*, 2010 U.S. Dist. LEXIS 56119, at *8-*14 (W.D. Va. June 7, 2010) (Moon, J.) (judges as well as other court functionaries – including guardians *ad litem* for minor children and social service officials acting in a quasi-prosecutorial capacity – have absolute judicial immunity in Virginia).

inapposite Virginia cases, which merely supply the elements of an IIED claim and contain some phrases expressing the extreme nature of the circumstances required to support such a claim.  First, in *Almy v. Grisham*, 273 Va. 68 (2007), the plaintiff sued various defendants – including a teacher and his wife, a school board member, a handwriting analyst and a handwriting expert – alleging IIED and a related conspiracy claim.  On appeal from the sustaining of demurrers, Virginia's Supreme Court affirmed dismissal of the conspiracy claim as to all defendants and affirmed dismissal of the IIED claim against the handwriting analyst and the handwriting expert.  Referring to the other Virginia case the Opposition cites, *Womack v. Eldridge*, 215 Va. 338 (1974), the *Almy* court recited the elements of an IIED claim as "conduct" that "was intentional or reckless" and "was outrageous or intolerable" – noting that this tort is not "favored" in the law.  *Almy*, 273 Va. at 77.  Tellingly, the facts at issue in *Almy* bear no resemblance to the issues herein.[33]

On appeal, the *Almy* court first addressed her IIED claim, holding that the facts there provided support for a finding of the requisite elements:  (a)  intent to cause severe emotional distress, including a quoted malicious statement by the recipient of the anonymous letters; (b)  outrageous conduct including evidence that Grisham influenced the two experts to write a

---

[33] In brief, the defendants in *Almy* included the recipient of several anonymous letters that, among other things, accuse her husband of infidelity.  She and Grisham, the recipient of another anonymous letter, who suspected that Ms. Almy was the author of the letters, mounted an investigation of the circumstances that included retention of a handwriting examiner and another handwriting expert, during which the letter recipient's husband and Grisham used their positions in the school system to obtain purported samples of Ms. Almy's handwriting, and which resulted in opinions that Ms. Almy might be the letter writer.  The defendants brought the results of their investigation to the attention of the local police, one of whose detectives visited the Almy residence to confront her with the defendants' claims, concluding with a statement that she was not under arrest but he "want[ed] the letters to stop."  *See id*. at 273 Va. at 72-74.  Ms. Almy eventually filed suit, alleging that she suffered severe emotional distress as a result of the accusations and the intrusive investigation of school records that precipitated them, including the fact that her distress resulted in her seeking treatment for what her treating provider concluded was a "major depressive disorder."  *Id*. at 74-75.

biased report, and provoking the police detective to confront Ms. Almy with what she alleges was false evidence;  (c)  sufficient evidence to show a causal connection between alleged misconduct and resulting emotional distress; and   (d)   arguably severe emotional distress with clinical manifestations and resulting medical treatment.  *Id*. at 77-80.

As this Court should immediately recognize, the alleged facts here <u>do not</u> include any non-privileged, outrageous conduct by Via, <u>do not</u> provide any support for a claim that Via's conduct was malicious or otherwise ill-motivated; and lack any proximate causal connection with Via's alleged conduct as well as any sufficiently severe emotional injury to Ms. Blair.  Notably, the *Almy* court affirmed dismissal of the IIED claims against the two handwriting specialists, who were not accused of having any plausible animus towards Ms. Almy and whose conduct in allegedly allowing Mr. Grisham to influence the content and presentation of their opinions was at most negligent.[34]  *Id.* at 81-82.

---

[34] The Opposition (at 24) cites *Womack v. Eldridge*, 215 Va. 338, 342 (1974), for the expansive proposition that a "plaintiff can satisfy the intentional <u>or reckless</u> conduct element by alleging that the defendant had the specific purpose of inflicting emotional distress or where he <u>intended his specific conduct and knew, or should have known, that emotional distress would likely result</u>."

However, that definition now would be regarded as subsuming the related tort of negligent infliction of emotional distress ("NIED"), one element of which is a special relationship between the defendant and the plaintiff.  In the instant case, the only person with whom Via had a special relationship with is S.B., his client, who was having undisputed difficulties with her mother over the gender-identity issue and who wanted and sought outside help and support.  In this action, S.B. herself <u>does not</u> allege any claim against Via – let alone one for IIED or NIED.

Furthermore, as quoted in her Opposition (at 24), Plaintiff's emotional-distress claim against Via is based on allegations  (a)  "that that *Mr. Via intentionally concealed information regarding S.B.'s assertion of a male gender identity* and [about] persistent and severe bullying and sexual harassment <u>when Mr. Via knew, or should have known [from medical records that Ms. Blair left with some school official]</u>, that S.B. was a victim of [childhood] trauma with multiple mental health diagnoses who had been hospitalized for her mental health issues only two months before the start of school," and  (b)  that, "[b]ecause of S.B.'s history and vulnerability, <u>Mr. Via knew or should have known that taking these actions would result in emotional distress for Mrs. Blair</u> and S.B."  However, as addressed *supra* and in his dismissal Memorandum, Via's undisputed respect for S.B.'s own privacy under the short and limited circumstances under which he had contact with S.B. was not wrongful, and indeed not only was permitted under then-current Virginia law but also was

The *Almy* court then turned to the plaintiff's common-law conspiracy claim, which although not necessarily identical to Plaintiff's 28 U.S.C. section 1985 conspiracy claim here is worth examining.  As that court explained, common-law conspiracy is actionable only if the underlying tort actually was committed.  *See id*. at 80-81.  Thus, in Virginia, proving a conspiracy claim based on a specific underlying tort would have to include proving all the elements of that tort.  *Id.* at 81.  Furthermore, because of IIED's disfavored status and the difficulties of determining when it occurs, Virginia's Supreme Court ruled that plaintiffs may not assert a cause of action for civil conspiracy to intentionally inflict sever emotional distress.  *Id*.  In other words, each defendant's alleged IIED liability would effectively be independent.  *See id*.  Therefore, the *Almy* court affirmed dismissal of the conspiracy claims.  Accordingly, Plaintiff correctly did not allege any such conspiracy here.

### C.   The Opposition Neither Mentions Nor Rebuts Cases Directly on Point That Are Adverse to Her Tortious Interference and IIED Claims, and Those Cases Also Demonstrate the Insufficiency of Plaintiff's Conspiracy Allegations.[35]

Plaintiff's counsel either failed to complete their due-diligence investigation in this regard or deliberately withheld citation to Virginia cases so closely on point that they require the Court's careful consideration in this regard.

### 1.   The *Shelley* Case in This Court

In *Shelley v. Pyle*, 2020 U.S. Dist. LEXIS 203510 (W.D. Va. Nov. 10, 2020) (Dillon, J.),

---

expressly encouraged by the recently promulgated 2021 VDOE Model Transgender Policies. Therefore, the italicized portion of Plaintiff's above-quoted allegations was not an "intentional" wrong, unlike entering someone else's property without permission and cutting down their trees. *See Argonaut Southwest Ins. Co. v. Maupin*, 500 S.W.2d 633, 635-36 (Tex. 1973).

Via had "permission" from S.B. to protect her confidences, and indeed she requested confidentiality, so his conduct should be considered qualifiedly privileged under federal law.  That is not a proper basis for IIED claims.

[35] In the latter regard, Via respectfully asks the Court to consider the arguments in this Section IV.C, in support of his Motion to Dismiss the Count VII, for Conspiracy.  (*See* **pages 41-47**, *supra*.)

the court was asked to resolve the sufficiency of tortious interference claims wherein Ms. Pyle, a recently excused guardian *ad litem* ("GAL") in a partially resolved child custody case, allegedly responded to an e-mail from the mother having custody of the child with advice that resulted in her "writ[ing the father] to cancel [the child's] coming up to PA [for a visit] . . . under the advice of [the mother's] attorney and the GAL." *See id.* at *3. In subsequent court proceedings, the court "re-appointed Pyle as guardian *ad litem* and put strict limitations on the other parent's right to see the child." *Id.* at 5. In a hearing on whether to loosen limitations on the father's visitation rights in light of an updated evaluation of his parental capacity, the court granted the mother full legal custody without visitation rights for the father. The Circuit Court affirmed, with a proviso that the "minor child"[36] may "initiate any contact with [the father] as she sees fit." *See id.* at 5-6.

Thereafter, the father sued Ms. Pyle for "tortious interference with his parental rights when she responded to [the mother's] email and advised the child not to visit her father if she felt unsafe," further asserting that the GAL's advice to the child's mother amounted to negligence and intentional infliction of emotional distress." *Id.* at *6. In addition, the father sued the law firm where Ms. Pyle worked, asserting vicarious liability. *Id.*

In this context, the *Shelly* opinion cited *Padua-Wilson v. Landry*, 298 Va. 565, 574-75, 841 S.E.2d 864, 869 (2020), for the following definition of tortious interference with parental rights: "Tortious interference refers to '[o]ne who, with knowledge that the parent does not consent, <u>abducts</u> or otherwise compels or induces a minor child to leave a parent legally entitled to its custody or not to return to the parent after it has been left him . . . .'" As quoted in *Shelly*, the *Padua-Wilson* opinion stated (*id.* at *8-*11 (internal citations to *Padua-Wilson*) (court's italics)):

---

[36] The opinion does not reveal the child's age, leaving the impression that even a pre-pubescent child has a right to request visitation with the non-custodial parent.

In *Padula-Wilson*, the court denied a tortious interference claim brought by a mother involved in custody and visitation proceedings who alleged that "various professionals who participated in those proceedings, including the children's guardian ad litem . . . conspired, lied, and acted maliciously . . . to deprive [her] of the rightful custody of her children . . . ." . . . Specifically, the mother argued that the guardian ad litem interfered with her parental rights by "conspiring to prevent her from seeing her children, in violation of a court order which granted her supervised contact." . . . The court explained that even if there were a violation of a visitation order the appropriate remedy was not a collateral claim for tortious interference, but rather to "alert[] the court that its order was being violated and ask[] for that violation to be remedied." . . . The court expressly "decline[d] to expand the scope of the tort of interference with parental rights by opening a new front for disappointed, angry, frustrated, or vindictive parents to renew battle." . . . The court explained that "dragging mental health professionals and guardians ad litem into court for their role in a custody and visitation case would be highly detrimental to the process." . . . "[N]o cause of action for tortious interference with a parental or custodial relationship may be maintained against a guardian ad litem . . . based upon his/her expert testimony and/or participation in a child custody and visitation proceeding."

Here, *Padula-Wilson* applies even though Pyle was no longer the child's guardian ad litem at the time of the alleged tortious interference. The appropriate remedy for [the mother's] violation of the visitation order was for Shelley [the father] to alert the juvenile court of the violation. Shelley did alert the juvenile court of the violation, and the court held a hearing in which Shelley received full due process. Thus, there is no need for Shelley to relitigate this issue through a collateral tortious interference claim.

In addition, Pyle did not tortiously interfere with Shelley's parental rights. Pyle did not abduct the child, nor did she compel or induce the child not to visit her father. Rather, Pyle responded to an unsolicited email from [the mother] and advised the child not to visit her father *if she felt unsafe*. Such a statement does not rise to the level of tortious interference.

Moreover, Shelley's claim against Pyle is exactly the type of tortious interference claim that *Padula-Wilson* rejected. Shelley has dragged Pyle into court for her role in the custody and visitation proceedings. Although Pyle provided the child with advice after her guardian appointment expired, she provided this advice based on her knowledge and participation in the prior custody proceedings. To allow litigation against a former guardian ad litem for responding to a concerned parent or providing advice in the best in interest of the child would frustrate the custody and visitation process. . . .

On this basis, the *Shelley* court granted summary judgment for Ms. Pyle on Ms. Shelley's tortious

interference claim, and further held that Shelley's claim for negligence was likewise defective. *Id*.

at *11-*12.  Via respectfully submits that the same conclusions in his favor are required here.[37]

After correctly setting forth the elements of an IIED claim and emphasizing that the claim is appropriate only when the alleged misconduct goes "beyond all possible bounds of decency," the *Shelley* court similarly dealt with the claims against Ms. Pyle (*id*. at *12-*13):

> Here, Pyle's conduct <u>was far from</u> outrageous or intolerable.  Pyle responded to [the mother's] email that expressed concern over her daughter's safety.  Pyle advised the child that she need not visit her father if she felt unsafe.  This <u>is not</u> outrageous conduct, regardless of whether Pyle's appointment as guardian had expired.  It is <u>far from atrocious or intolerable</u> for Pyle to act out of concern for the child's safety.  On the contrary, one may expect a former guardian ad litem to respond to a parent's plea for assistance and to advise a child to act with concern for her own safety.

On that basis, the *Shelley* court granted the defendants summary judgment on the IIED claim.  *Id*. at *13.  Via respectfully submits that the same conclusion in his favor is required here.

## 2.    The *Qui* Case in the Virginia Court of Appeals

In reliance on *Padula-Wilson*, the court in *Qui v. Huang*, 77 Va. App. 304 (2023), held that, because one parent could not bring a tortious interference directly against another parent with essentially equal rights, an aggrieved parent likewise could not sue the other parent <u>indirectly</u>, by suing a third party who allegedly attempted to influence that other parent's decision-making or otherwise participate in a related custody matter.  The alleged role of Defendants Via and Olsen in this regard in connection with child-custody proceedings for S.B. in Maryland courts is congruent with the facts in *Qui* that resulted in the above-referenced holdings, and the discussion by the Court of Appeals is fully applicable here, even though the State of Maryland was the party allegedly adverse to Ms. Blair there.  The *Qui* court summarized the facts as follows (*id*. at 313):

> In 2016, while the divorce and custody proceedings were ongoing, the father filed the *pro se* tort complaint that is the subject of this appeal.  In that complaint, he alleged that two of the mother's acquaintances and one of her attorneys were

---

[37] Maryland law is in accord.  *See Ghazzaoui v. Taylor*, 2015 Md. App. LEXIS 425, at *7-*10 (May 28, 2015) (claim for tortious interference with custody must allege that defendant physically removed or withheld the child from the custody of plaintiff).

> tortuously involved in the custody dispute.  For purposes of this appeal, the three
> relevant defendants were Chaoyu Huang, the mother's friend; Anna Ouspenskaya,
> M.Q.'s piano teacher and someone with whom the mother had a 'deep friendship and
> intimate relationship'; and Arlene Starace, the mother's attorney during the first part
> of the divorce and custody proceedings . . . .  The complaint also named Arnold
> Small, Ph.D., a therapist who treated both M.Q. and the father. . . .

After the courts resolved the divorce and custody proceedings, the father retained counsel in the

tort suit and obtained service of the complaint on the defendants, who challenged it with demurrers.

*Id.* at 313-14.  The first three counts of the amended Complaint alleged that Huang, Ouspenskaya,

and Starace tortuously interfered with the father's parental and custodial rights intentionally and

without his consent.  As the *Qui* court explained (*id.* at 314):

> With regard to Huang and Ouspenskaya, the complaint alleged that they encouraged
> the mother to leave the father, helping her formulate and implement a departure plan
> that included taking M.Q. with her.  The father further alleged that Ouspenskaya
> encouraged M.Q. to view her as a "substitute" parental figure.  With regard to
> Starace, the complaint alleged that she, too, intentionally interfered in the father's
> parental and custodial relationship with M.Q. [the minor child] in various ways.
> Additional facts pleaded made clear that none of the three women physically took
> M.Q. from the father or the mother.  Instead, they merely encouraged and aided the
> mother in leaving the father and in obtaining a divorce and award of shared custody.
> The complaint also averred that the women "played a role in physically, mentally
> and emotionally alienating M.Q." from her father without his consent, "severely
> damaging the [parent-child] relationship." . . .

In evaluating the trial court's decision to grant the defendants' joint demurrer, the Court of

Appeals ruled that the holding in *Padula-Wilson* was "sufficiently analogous to this case to control

the outcome here" (*id*. at 320-22):

> Preliminarily, to the extent the father's allegations constitute a claim that third parties
> Huang and Ouspenskaya attempted to convince M.Q. that her father abused her in
> order to deprive him of her love and companionship, those allegations, standing
> alone, do not implicate the tort of interference with parental rights but only of
> alienation of affection, which is not recognized by Virginia law.
>
>          *               *             *
>
> Virginia law counsels and <u>we now hold that the father must also be barred from
> bringing a tortious interference claim against the mother *indirectly*—by suing a third
> party whom he alleges merely attempted to impact her decision-making or
> participated in a related custody matter</u>.  To hold otherwise would improperly permit

the complaining parent to do indirectly that which he cannot do directly.  Further, it would run afoul of the holding in *Padula-Wilson*, which provides that the tort is available against a third party only where that person removes or detains a child from the complaining parent or prevents that parent from exercising his parental or custodial rights.

> \*                         \*                         \*

However, *Padula-Wilson* makes clear that third party action directed merely at depriving one parent of his parental and custodial rights vis-à-vis the other parent is distinguishable because it is readily addressable within the framework of custody law. . . .  <u>That decision also does not limit its restrictions only to third parties who serve as witnesses in a custody matter.</u>  *See id.* at 577 (observing that <u>third party behavior outside the courtroom is protected</u>).  As a result, this Court holds that the complaint failed to state a claim for tortious interference against the defendants . . . .

Furthermore, again citing *Padula-Wilson*, the *Qui* court held broadly that such tortious interference claims are barred where the complaining parent had the opportunity to raise issues of improper influence, perjury or other misconduct in the custody proceedings (*id*. at 512):

> With regard to the father's tortious interference claim against Starace, the mother's original divorce attorney, he alleges that she knew or should have known that Ouspenskaya was not a neutral third-party piano teacher.  He further claims that Starace withheld that information from Dr. Small and also helped hide the true nature of the women's relationship from a court-ordered custody evaluator.  The father also alleges that Starace colluded with Ouspenskaya and Dr. Small to paint him in a negative light and alienate M.Q. from him.  Finally, he avers that Starace knowingly included false allegations of cruelty and abuse in the divorce complaint to interfere with his parental and custodial relationship with the child.  <u>To the extent the father alleges that her actions constituted fabricating or hiding evidence rather than simply zealously representing her client, he had the ability to challenge those claims through discovery, cross-examination of adverse witnesses, and presentation of his own evidence in the custody litigation, and he received due process as a result.</u>

Thus, the *Qui* court affirmed the decision below sustaining demurrers as to the first three causes of action.  (*Id.*)  Furthermore, because the Complaint failed to state a claim for any tort, the Court of Appeals affirmed the trial court's sustaining the demurrer as to civil conspiracy.  *Id*. at 326-27.  Via respectfully submits that the same conclusion in his favor is required here.

In summary, with respect to its second nucleus of operative facts, the Complaint fails to allege any basis – constitutionally or at common law – for substantive tort claims or conspiracy

allegations against Via and Ms. Olsen.  Furthermore, under both Maryland and Virginia law, any such claims against Via and Ms. Olsen are precluded by various preemptive defenses, including the bar against collateral attack, the justification doctrine, and *res judicata*.

## CONCLUSION

For all of the foregoing reasons, as well as those set forth in Defendant Via's Dismissal Motion and supporting Memorandum, the Court should grant Via's Motion to Dismiss and thereupon dismiss the Verified Complaint against him in its entirety and with prejudice.

Dated:  November 10, 2023

Respectfully submitted,


*/s/ Andrew Butz*_____
Heather S. Deane (VSB No. 41895)
Andrew Butz (VSB No. 16280)
Charles Y. Sipe (VSB No. 31598)
Brandi R. Howell, Esq. (VSB No. 74110)
Kiernan Trebach LLP
1233 20th Street, NW, Eighth Floor
Washington, D.C. 20036
Tel: (202)712-7000
Fax: (202)712-7100
hdeane@kiernantrebach.com
abutz@kiernantrebach.com
csipe@kiernantrebach.com
bhowell@kiernantrebach.com

*Counsel to Defendant Avery Via*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 10, 2023, a copy of the foregoing Reply Brief

was served via the Court's CM/ECF system, upon:

Mary E. McAlister (VA Bar No. 76057)
Child & Parental Rights Campaign, Inc.
P.O. Box 637
Monroe, VA 24574
Email: mmcalister@childparentrights.org
*Attorney for Plaintiff*

Vernadette R. Broyles (GA Bar No. 593026)*
Ernest G. Trakas (MO Bar 33813)*
Child & Parental Rights Campaign, Inc.
5805 State Bridge Road, Suite G310
Johns Creek, GA 30097
vbroyles@childparentrights.org
etrakas@childparentrights.org
*Admitted pro hac vice
*Attorneys for Plaintiff*

Jeremy D. Capps (VSB No. 43909)
Melissa Y. York (VSB No. 77493)
Brian Peter Ettari (VSB No. 98800)
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, VA 23255
jcapps@hccw.com
myork@hccw.com
bettari@hccw.com
*Attorneys for Appomattox County School Board,*
*Dr. Annette A. Bennett, and Dena Olsen*

/s/ Andrew Butz
_____

Andrew Butz