**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Lynchburg Division**

**MICHELE BLAIR, INDIVIDUALLY AND**
**AS GUARDIAN AND NEXT FRIEND OF**
**S.B., A MINOR,**

        **Plaintiff,**

**v.**                         **Case No. 6:23cv00047**

**APPOMATTOX COUNTY SCHOOL**
**BOARD, _et al._,**

        **Defendants.**

_____

## AVERY VIA'S REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS

COMES NOW Defendant Avery Via ("Via"), by and through his undersigned counsel, Kiernan Trebach LLP, pursuant to Rule 12(b)(6), this Court's Standing Order for Civil Cases, and this Court's 11/14/2023 Order (ECF No. 66), and hereby submits this Reply Brief in support of his Motion to Dismiss the Verified Complaint of Plaintiff Michele Blair ("Blair").

## INTRODUCTION

Plaintiff's Opposition mainly repeats generic arguments set forth in her Oppositions to the other dismissal Motions regarding (1) fundamental parental rights, which under settled precedents <u>do have</u> significant limits in the context of regulation services provided by public schools – and (2) family privacy rights, and cites factually unrelated cases[1] that <u>do not</u> include the right to force their children to conform biologically or emotionally on the basis of religion or tribal customs that

---

[1] For example, the Opposition (ECF No. 56 at 9-10, 16-18 & 21) cites false arrest cases (_see Tobey v. Jones_, 706 F.3d 379, 392-95 (4th Cir. 2013), and _Wilson v. Kittloe_, 337 F.3d 392 (4th Cir. 2003), in a presumed effort to dissuade the Court from resolving Defendants' fully ripe issues at the dismissal stage. However, the Complaint deficiencies here are ripe for dismissal now.

fail to respect the rights of those whose natal sex and personal gender are not identical.  Principles of constitutional law require that assertedly violated parental and family privacy rights be articulated narrowly and precisely, and the Opposition fails in this regard.

The most significant shortcoming of Plaintiff's "general principles" approach is the presence of precedents regarding gender-identity situations like the one here, such as *Littlejohn* from Florida[2] and *John & Jane Parents 1* from Maryland.[3]  Significantly, Plaintiff's Via-motion Opposition (*see* ECF No. 46 at 12-13, 14 & 26) and the Olsen dismissal Motion (ECF No. 13, at 10-11 & 17-18) <u>do not</u> attempt to distinguish the holdings and analysis in those recent opinions. The Opposition also omits any mention of four (4) other recent school-related gender-identity precedents, which dismissed all claims in *Foote*, denied any preliminary injunction in *Regino*, and granted only narrow such relief in two cases (*Willey* and *Ricard*).[4]  Such relief solely protected the right of teachers and counselors to decide when <u>to communicate</u> with parents about a student's gender-identity situation, leaving in place duly-adopted policies for school personnel to deal with student requests for acceptance and support on gender-identity issues.  The Oppositions' silence about these cases makes sense; while factually similar, the holdings run contrary to her position.

Plaintiff's Opposition (ECF No. 56 at 10, 17-18 & 21) also cites cases involving the "State-created hazard" doctrine, which deals with situations where school officials or other governmental

---

[2] *Littlejohn v. School Board of Leon County*, 2022 U.S. Dist. LEXIS 238141 (N.D. Fla. Dec. 22, 2022), *appeal filed as* No. 23-10385 (11th Cir. Feb. 6, 2023).

[3] *John and Jane Parent I v. Montgomery County Board of Education*, 622 F. Supp. 3d 118 (D. Md. 2022), *vacated & remanded for lack of standing*, 78 F.4th 622 (4th Cir. 2023).  In a dissent, Judge Niemeyer would have found standing and reached the merits.

[4] *See Willey v. Sweetwater County School District,* 2023 U.S. Dist. LEXIS 113818 (D. Wyo. June 30, 2023); *Regino v. Staley*, 2023 U.S. Dist. LEXIS 66676 (E.D. Cal. Mar. 9, 2023); *Foote v. Town of Ludlow*, 2022 U.S. Dist. LEXIS 236102 (D. Mass. Dec. 14, 2022), and *Ricard v. Unified School District 475 Geary County*, 2022 U.S. Dist. LEXIS 83742 (D. Kan. May 9, 2022).  Ms. Blair's counsel also represented the plaintiffs in *Willey* and *Foote*.

officers would create – or fail to recognize and eliminate – intrinsically dangerous situations where students or other non-state actors would be allowed or even encouraged to violate the civil rights of others.[5]  Even for such undisputedly toxic situations, however, court decisions make it clear that school personnel and other public officers are not liable for dangerous conditions that they did not create or encourage.  Moreover, Via is not alleged to have influenced the switch-of-bathrooms decision and its consequences, so such cases are not relevant especially against him."[6]

Plaintiff's Opposition also relies on precedents involving whether a federal statute, such as the Americans with Disabilities Act ("ADA"), requires public schools or other state agencies to comply with parent's wishes, in this case for notice and cooperation in what the Complaint alleges is facilitating "mental health" services for S.B.[7]  To illustrate the concept, the Opposition cites

---

[5] *See id*. at 10, 17-18 & 21, citing *DJ v. School Board of Henrico County*, 488 F. Supp. 3d 307, 324-25, 329-31 (E.D. Va. 2020) (conduct of football coaches and other school personnel amounting to "indifference" or even "hostility" towards black student athletes constituted "reckless or deliberate government action" so arbitrary and capricious as to engender viable Due Process claims under the rubric of "supervisory liability").  *Compare id. with B.R. v. F.C.S.B.*, 2023 U.S. Dist. LEXIS 40930, at *50-*57 (E.D. Va. Mar. 10, 2023).

In particular, as the *DJ* opinion explained, school personnel are not liable for injury resulting from "dangers that [the child] faced in the free world," if the school and other defendants "played no part in their creation, nor did . . . anything to render [the student] more vulnerable to them." *See DJ*, 488 F. Supp. 3d at 325.  As applied here, Ms. Olsen perhaps was incautious, or at most ordinarily negligent, in encouraging S.B. to use the boys' bathrooms, but Via was not involved.

[6] The Opposition (at 18-19 & 21) also purports to rely on cases asserting First Amendment rights.  Such issues are not present here, because Ms. Blair is not a teacher or other School Board employee and she is not asserting any right to speak out.  Thus, *Bhattacharya v. Murray*, 515 F. Supp. 3d 436, 459-60 & 464-65 (W.D. Va. 2021) (Moon, J.), is also inapposite here.

[7] Scientifically, an individual's gender-identity perceptions and choices are not regarded by any recognized health-related organization as a mental health issue, in contrast with the condition called "gender dysphoria," which is defined as a debilitating condition where gender-related issues have created anxiety, depression or other clinical manifestations of difficulty in dealing with them. *See Grimm v. Gloucester County School Board*, 972 F.3d 586, 594 (4th Cir. 2020) ("Being transgender is . . . not a psychiatric condition, and implies no impairment in judgment, stability, reliability, or general social or vocational capabilities."  In contrast, "gender dysphoria is a recognized mental health disorder."  As one court noted recently, "around one person in 200 identifies as transgender, while around one in 1,000 is in clinical care for gender dysphoria."  *See Fain v. Crouch*, 618 F. Supp. 3d 313, 322 (S.D.W. Va. 2022).  Notably, the Complaint does not

EMTALA, which Fourth Circuit precedents have held to require compliance with parents' requests for hospitals and other emergency medical providers to deliver emergency treatments and services for their child, regardless of a physician's advice to the contrary, whether or not the parents have the requisite ability to pay.  (ECF No. 56, at 15-17.)  If anything, the *Baby K* situation[8] should caution courts <u>not to</u> interfere with legitimate state statutes and the related policies of state education agencies and local school boards, because the only directly relevant federal statute here is Title IX, which favors transgender rights.

Likewise, the qualified-immunity defenses asserted here are both ripe and clear, as the Court will glean from six cases[9] cited on pages 2-3, *supra*.  Significantly, no such opinion suggests that school boards, other governmental employees, and/or contract workers addressing such student-initiated situations should lose qualified immunity if they made good faith efforts to comply with related policies and guidelines in an attempt to serve the needs of the students, and no such opinion suggests that any contrary legal rights have become clear.  Thus, even if the Court were to rule that the School Board needs better parent-consultation policies, that is not a proper basis for exposing Via or any other defendant to a damages claim.

Next, the Opposition (ECF No. 56, at 20) fails to show that Plaintiff's conspiracy

---

allege that Via actually knew about any such diagnosis, nor does it allege that Via himself ever diagnosed S.B. with or treated her for gender dysphoria before she ran away.

[8] To illustrate the EMTALA situation, the Opposition (at 16) cites *Matter of Baby K*, 832 F. Supp. 1022, 1030-31 (E.D. Va. 1993), for the general proposition that federal legislation enacted to preserve access to certain facilities or services carries with it an endorsement of parents' rights to protect their children regardless of state-adopted procedures or contrary views of doctors or others with the responsibility for providing such circumstances.  According to Plaintiff, the Americans with Disabilities Act regards someone in S.B.'s situation as disabled, and therefore entitled to whatever services or lack thereof the child's parents deem appropriate.

[9] Some of those cited opinions suggest or direct states and school boards to improve their official gender-identity policies to fairly balance  (a)  students' statutory right to be free of gender-related discrimination and harassment with  (b)  the parents' right to participate in decisions and counseling on the gender-identity and gender-transition issues, but that <u>is not</u> at issue here.

allegations have sufficient specificity, including specific facts reasonably suggesting that Defendants actually conspired or colluded.  In Virginia, cooperating with a public defender – or any other attorney representing parties in litigation – constitutes good citizenship, rather than a tortious violation of some party's asserted right win in court.[10]  Furthermore, such conduct in a prior judicial proceeding – including attorney advocacy and witness testimony and cooperation – is not a permissible topic for collateral attack here, and presumably it is protected by judicial immunity under governing Maryland law.[11]  In this context, Plaintiff simply failed to plead enough to make plausible her claims of conspiracy and the related claims of tortious interference and intentional infliction of emotional distress ("IIED").[12]

---

[10] *See, e.g., Shelley v. Pyle*, 2020 U.S. Dist. LEXIS 203510, at *8-*10 & *11 (W.D. Va. Nov. 2, 2020) (Dillon, J.) ("dragging mental health professionals and guardians *ad litem* into court for their role in a custody and visitation case would be highly detrimental to the process;" "no cause of action for tortious interference with a parental or custodial relationship may be maintained" against such participants in family court proceedings "based upon his/her expert testimony and/or participation in a child custody and visitation proceeding;" it would be wrong to allow litigation against a guardian *ad litem* or other counselor of a minor "for responding to a concerned parent or providing advice in the best interest of the child;" "advis[ing] the child that she need not visit her father if she felt unsafe" . . . "is not outrageous conduct"); *Qiu v. Huang*, 77 Va. App. 304, 321-23 (2023) ("Virginia law counsels . . . that the father must also be barred from bringing a tortious interference claim against the mother *indirectly* – by suing a third party whom he alleges merely attempted to impact her decision-making or participated in a related custody matter" or suing any lawyer or witness in those proceedings; "[t]o the extent the father alleges that her actions constituted fabricating or hiding evidence rather than simply zealously representing her client, he had the ability to challenge those claims . . . in the custody litigation").

[11] *See* **note 36**, *infra*.

[12] The alleged facts here do not include any non-privileged, outrageous conduct by Via, do not provide any support for a claim that Via's conduct was malicious or otherwise ill-motivated, and lack any proximate causal connection to Via's alleged conduct as well as severe, maliciously intended emotional injury to Ms. Blair.  In *Almy*, the Opposition's leading case, the court affirmed dismissal of IIED claims against the two handwriting-specialist witnesses, who had no plausible animus towards Ms. Almy and whose testimony-related conduct was at most negligent.  Similarly, the Opposition fails to cite the Virginia case most closely on point here – *Shelley v. Pyle* – which makes it clear that the conduct of parties to a custody proceeding – such as a guardian *ad litem* (the specific role at issue there), counsel for the guardian, or consulting therapists with no motive to harm the parent are not proper targets of an IIED claim.

## ARGUMENT[13]

I.   **The Documents Submitted to the Court with the Via Declaration Are Sufficiently Authenticated, and Were Not Offered Improperly, for Current Purposes.**

The procedural question presented by the pending dismissal Motions is whether the Complaint[14] fails to state any cause of action.  In a manner similar to Ms. Blair's objection to Ms. Olsen's submittal of documents believed to be the source of factually specific allegations,[15] the Opposition (at 6) takes umbrage at Via's submittal of certain file memorandum recording the occurrence and substance of certain communications with Ms. Blair and/or Defendant Khan, the Maryland public defender at S.B.'s custody hearings.  (ECF No. at 5-6.)  Via's submittal constitutes a courtesy  (a)  to Ms. Blair, who may have forgotten details of contacts with Via that his notes purport to memorialize, and  (b)  to her counsel, whose Complaint does not fairly characterize certain events, including Ms. Blair's consent for Via to share records with Ms. Khan.  Via's dismissal Memorandum also makes it clear – as did the Olsen dismissal Memorandum – that such documents were not offered for the purpose of provoking summary judgment procedures at this time.  Indeed, if there were to be further proceedings now, it likely would take the form of motions for judgment on the pleadings after filing an Answer and Affirmative Defenses, and Via

---

[13] For the Court's convenience, the outline of this Reply Brief will generally track that of Plaintiff's Opposition, which has five main headings.  Issues raised and supported in Via's dismissal Memorandum to which Plaintiff did not respond should be deemed conceded.  *See Caner v. Autry*, 16 F. Supp. 3d 689, 704 (W.D. Va. 2014) (Moon, J.).

[14] The Verified Complaint herein in similar to Complaints filed elsewhere by Plaintiff's counsel, but it does not ask for any form of equitable relief and does not request relief under any statute that requires verified pleadings.  For that and other reasons, Via as moved to strike the Verification.

[15] Specifically, Ms. Olsen has submitted certain such documents under seal, in order to inform the Court that Plaintiff already has access to authentic source material against which non-conforming factual allegations should properly be considered now, either substantively in the case of contracts, such as the ACPS-PHCS Memorandum of Understanding under which Defendant Via worked at the High School, or for procedural purposes, such as determining whether certain factual information is being presented selectively to obtain an  inappropriate pleading advantage.

would be entitled to plead and document such factual information at that time.

In any event, speculative conspiracy allegations merit prompt challenge, in the absence of documentary evidence supporting them.  In this regard, as the author of the two office memoranda, Via <u>is not</u> merely asserting that they are "authentic," but <u>has not</u> offered them now for more than they are worth – as evidence of conversations that Ms. Blair ought to have recalled and described more accurately to her counsel before signing the Verification of the Complaint.

## II.   The Complaint Does Not Sufficiently Allege Any Substantive Due Process Violation.

### A.   Plaintiff Has Failed to State Any Plausible Basis for Claiming Violation of a Constitutional Right to Direct Her Child's Upbringing.

As set forth in Via's dismissal Memorandum (ECF No. 46, at 9-32), Plaintiff has failed to state any plausible basis for claiming that Via violated any constitutional right to direct her child's upbringing and that Via thereby caused actionable injury meriting a damages award.

#### 1.   The Opposition Draws a False Dichotomy between a Right to Direct Her Child's Education and a Right to Direct Her Child's Upbringing.

The Opposition (at 6) errs in purporting to perceive any bright line between  (a)  a right to direct her child's education generally and  (b)  a right to direct her child's upbringing while the child is attending public schools.  The core issue in the Appomattox aspect here is whether the alleged delay in Ms. Olsen's or Via's contacting Ms. Blair to inform her about S.B.'s initial efforts to try gender transition at school and related requests for support from school personnel interfered unduly with any cognizably specific constitutional right.[16]

The Complaint also suggests that Via and other Appomattox Defendants are responsible

---

[16] As highlighted in Via's dismissal Memorandum (*compare id.* at 9-26 with *id*. at 27-38), the Complaint attempts to conflate in one action what are essentially two distinct nuclei of common facts, barely connected by a regrettable choice that S.B. made to run away from home, which no defendant could reasonably have been expected to anticipate.  Those two intrinsically different scenarios should be addressed separately in resolving the pending dismissal Motions.

for the boorish initial reaction from some of S.B.'s natal male classmates.  It is regrettable that S.B. had to endure such harassment, but the country had been going through the bathroom-transition aspect of transgender adjustment issues for almost 10 years, and federal courts addressing claims arising from such issues have almost uniformly concluded that such issues <u>did not</u> have an actionable constitutional dimension.[17]  Such situations <u>are not</u> within the "State-created hazard" doctrine, and the proper defendants for an action seeking damages or other redress are the students who harassed S.B., and perhaps their parents and any other members of the local or national community who contributed to creating a hostile environment for transgender persons.

Furthermore, to the extent that Ms. Blair chooses to label the concerns that S.B. was trying to deal with as "mental health" issues,[18] the Complaint admits that Ms. Blair already knew that S.B. was having significant emotional problems that in retrospect she contends were related in some way to S.B.'s request for school personnel to allow her to implement her gender-transition

---

[17] *See Grimm v. Gloucester County School Board*, 972 F.3d 586, 608-15 (4th Cir. 2020), *as amended* (Aug. 28, 2020) (addressing bathroom assignment issues); *compare Parents for Privacy v. Barr*, 949 F.3d 1210, 1222-25, 1227-29 & 1230-33 (9th Cir. 2020) (addressing rights including parental right to child's upbringing in the bathroom assignment context), *and Whitaker by Whitaker v. Kenosha Unified School District No. 1 Board of Educ.*, 858 F.3d 1034, 1040-42 & 1044-54 (7th Cir. 2017), *with* in *Adams ex rel. Kasper v. School Board of St. Johns County*, 57 F.4th 791 (11th Cir. 2022).

[18] For example, the Opposition (at 7) contends that "[]those decisions include decisions regarding <u>mental health</u> care, even when the decisions are disagreeable to the children."  As courts have pointed out, the parents' decisional role regarding a child's mental health is subject to the control of the state through physicians at mental health facilities, as well as licensed private practitioners.

More importantly, however, there is no constitutional precedent for the proposition that parents have the right to change a child's sex, or gender, and the well-established consensus is that gender identity, like sexual-partner preference, <u>is not</u> a mental health issue.  Furthermore, it is not acceptable, as the Opposition (at 7) suggests, to generalize from the above-referenced faulty premise about mental health to a general right of parents to make totally unregulated decisions about the "upbringing" of their children.  Indeed, that sort of over-generalization is precisely what current precedents about fundamental rights forbid procedurally, by requiring that the asserted right be described with sufficient specificity to ensure that its assertion and evaluation are not the result of bias, and so they can be tested objectively before gaining status as a fundamental right.

desires.   Furthermore, no recognized transgender mental-health authority regards "gender transition" as such as a mental health issue.  Instead, the potentially related "mental health" issue – called "gender dystopia" – requires long-term evidence that discord between gender identity and natal birth identity is interfering emotionally with the individual's ability to grow and function.  As a result, if there is a clear constitutional question here, it is simply whether parents have a constitutional right to put their pre-existing preferences for congruence of natal sex with gender identity ahead of their child's right to be themselves.  For that clear question, at least in our society, there is only one right answer – and the child's right is decidedly more important.  Indeed, any other answer would make whatever purported moral basis was offered for overturning *Roe v. Wade* sheer hypocrisy.  If there is a "right to life" at conception, there must be a "right to be yourself" from birth.  Any argument against that syllogism would be arbitrary and capricious.

Secondarily, this case presents the questions of  (a)  whether, and to what extent, parents have a constitutional right to participate in helping their child deal with sex-gender incongruity issues that the parents are either unwilling or unable to acknowledge, and  (b)  how public school teachers, counselors and other public officials are supposed to navigate between fulfilling their primary duty to students without trampling the parents' right to be substantially involved and, in the best circumstances, objectively in control of lawful choices.[19]

The Opposition (at 7) nevertheless persists in offering false dichotomies, by throwing up

---

[19] Unfortunately, Plaintiff's Opposition (at 6-7) obstructs progress in this action by continuing to rely on clearly distinguishable precedents holding that sincerely moral parents have a right not to send their children to public school, at least  (a)  if they are willing to arrange private schooling and  (b)  if their religious or other traditional sect deserves some leeway in what kind of life they should raise their children to follow.  Likewise, the Opposition (at 7) relies on the general assertion that, "so long as a parent <u>adequately</u> cares for his or her children (*i.e.*, is <u>fit</u>), there will <u>normally</u> be no reason for the State to inject itself in the <u>private</u> realm of the family to <u>further</u> question the <u>ability</u> of that parent to make the <u>best</u> decisions concerning the <u>rearing</u> of that parent's children." As the underline words should alert the Court:  "Ay, there's the rub!"

the purported bright-line test of a parent's "fitness."   Sandwiched between the Opposition's

contentions in this regard is the concession that, in *White v. Chambliss*, 112 F.3 731, 733-34 (4th

Cir. 1997), the court "upheld a law that permitted child protective services to exercise emergency

protective custody over a child if there is probable cause for [finding] an imminent danger to the

child," and that apparently is good law <u>whether or not</u> the child has a "fit parent."  *See id*.  *White*

thus is just one example of various circumstances where public officials at schools or elsewhere –

especially where such personnel are acting *in loco parentis* – are called upon to deal with exigent

circumstances in a minor's childhood or adolescence, and where immediately contacting parents

is either not possible or not yet advisable.  Notably, as the Opposition (at 15-19) to the School

Board's dismissal Motion admits, the only potential flaws in the Board's conduct in 2021 was not

having or informal policies in place and related staff training that favored prompt contact with

parents <u>and</u>, where immediate parent contact was inadvisable or at least questionable, requiring

notification of school or public health personnel capable of investigating the home situation.

> **2.     *Dobbs* Has Rendered Parental Rights Very Unclear, and the Congress and the Virginia Legislature Now Have the Right to Regulate How Children Are Brought Up just as How They Are Brought into Being.**

Conveniently,  the Plaintiff quotes Justice Alito's precatory statements in the *Dobbs*

plurality opinion that "our decision concerns the constitutional right to abortion and no other right,"

and that "[n]othing in this opinion should be understood to cast doubt on precedents that do not

concern abortion."  (ECF No. 56 at 8.)   There is no related discussion of parental rights in *Dobbs.*

Instead, the axis of concern for Justice Alito involves rights to control reproduction, such as rights

of married people to use contraceptives (*Griswold v. Connecticut*), the right to engage privately in

consensual sex acts (*Lawrence v. Texas*), and the right to same-sex marriage (*Obergfell v. Hodges*).

In another *Dobbs* opinion, however, Justice Thomas calls out Justice Alito's limit-suggesting

statements  as  lacking  in  principle  and  expresses  the  belief  that  all  such  rights  related  to

reproduction were actually on the firing line, ready for execution on the very same grounds used to overrule *Roe v. Wade*.  Thus, fundamental rights of parents <u>should not</u> be taken for granted in situations where state regulation is presumptively appropriate, and their proper protection requires careful articulation and appropriately focused application.

### B.    Plaintiff Has Failed to Allege Violations of a Right to Familial Privacy.

Following the same pattern, the Opposition's defense of Plaintiff's familial rights claim (*id.* at 9-10) attempts to get past the dismissal motion hurdle with generalities.  Familial rights, as articulated by Plaintiffs, cannot be regarded as constitutionally secure either, because the *Dobbs* plurality decision undermines the concept of substantive due process generally.  Indeed, *Dobbs* suggests that traditional forms of prejudice are likely more entitled to respect than contrary values that are of more recent development, unless federal statutes protect them directly.

Therefore, this Court <u>is not</u> required to accept Plaintiff's conclusory contention that "Via's actions as alleged in the Complaint were a form of 'sabotage' that was "aimed directly at the parent-child relationship."  Indeed, as has noted above in the context of the parental rights claim, the fact that Via responded professionally to S.B.'s request for counseling during her gender-transition quest <u>did not</u> invade familial privacy at all.[20]  The standard goal of family counselors is to stabilize, inform, validate and otherwise improve the client's situation, which with understanding parents is more likely to improve or restore a good family relationship than pressuring the transgender student to relinquish such feelings and submit to the parent's express

---

[20] The floor on the cognizable degree of interference is much higher than what the Complaint alleges here.  *See Bohn v. Dakota County*, 772 F.2d 1433, 1436 & n.4 (8th Cir. 1985) (discussing state action that "drove a wedge into [a] family" in the context of an unsubstantiated finding by the state that a father was a "child abuser"); *Duchesne v. Sugarman*, 566 F.2d 817, 821-24 (2d Cir. 1977) (discussing the "coercive power of the state" in the context of a state's nonconsensual removal of two children from their mother's custody and subsequent retention of those children for over two years without a hearing or court order).

or implicit demand that the child pretend to be someone "they" are not.

Furthermore, as the Complaint implicitly admits, the real issue here is whether the Constitution allows Ms. Blair to wield essentially absolute power over her natal daughter's preference to identify as male in gender.  Notably, the precedents Plaintiff cites involve instances of extreme misconduct, such as facilitating perjury from a bitter wife and suborned perjury from her daughter to facilitate the wife's efforts to get the father out of their life (*see Nelson v. Green*, 965 F. Supp. 2d 732, 737-39 & 743-48 (W.D. Va. 2013) (Moon, J.).  Even in that outrageous situation, however, the Court held that defendant officials were entitled to qualified immunity, because the right asserted there <u>was not</u> well established, and that is certainly the case here too. *See id*. at 748-49.  In contrast, in *Murphy v. Goff,* 2010 U.S. Dist. LEXIS 56119, at *24-*28, 2010 WL 2292130 (W.D. Va. Jun. 7, 2010), the Court explained that constitutional protection for familial privacy – in the sense of the relationship between parent and child – is triggered only when wrongful conduct terminates or otherwise severs the parent-child relationship.  There is no such situation, as Via and his colleagues <u>did not</u> take custody of S.B., <u>did not</u> interfere with her returning home, and <u>did not</u> play any cognizable part in her unfortunate decision to run away from home.

Likewise, the fact that Via and Ms. Olsen were drawn into the role of witnesses in the Maryland custody proceedings – which they neither precipitated nor could have foreseen during their counseling efforts at the Appomattox County High School – <u>cannot</u> implicate them personally in any effort to tortiously interfere with Ms. Blair's right to maintain the relationship with S.B.

### C.    Plaintiff's Effort to Meet the "Shocks the Conscience" Test Is Unavailing.

### 1.    Where Only Executive Action Is Directly at Issue, Courts Properly Following *Lewis* First Apply the "Shocks the Conscience" Test and Then, Only If That Test Is Met, Consider asserted Fundamental Rights.

As addressed in Via's dismissal Memorandum (ECF No. 46 at 10-15), as well as in the Olsen dismissal Reply Brief (ECF No. 43 at 2-6), the Opposition's effort (ECF No. 56 at 10-13)

to contort the nature of the constitutional-review process where the alleged misconduct is executive action, rather than legislative or administrative policy, is unavailing.  Via chooses to reply in this regard by directing the Court to the relevant portions of the Massachusetts federal court's 2022 Order on Defendants' Motion to Dismiss in *Foote v. Town of Ludlow*, Civ. No. 22-30041-MGM (at 17-28), just some of which are set forth below (*id*. at 17-20 (most case citations omitted)):

> "To be cognizable, a substantive due process claim under 42 U.S.C. § 1983 must allege facts so extreme and egregious as to shock the contemporary conscience." . . .  ("[T]he shocks-the-conscience test . . . governs all substantive due process claims based on executive, as opposed to legislative, action.").  "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."  *Lewis*, 523 U.S. at 849.
>
> . . .  Generally, courts first determine whether the alleged conduct was sufficiently egregious because it is "[o]nly after 'show[ing] a constitutionally significant level of culpability' [that] a plaintiff [may] 'turn to establishing that a protected right was offended'."[21] . . .
>
> *             *             *
>
> There is no precise definition for conscience-shocking behavior that can be applied mechanistically to Plaintiffs' allegations. . . .  However, a "stunning" level of arbitrariness that goes beyond "[m]ere violations of state law" is required. . . .  Bad faith may help tip the scale, but "the contemporary conscience is much more likely" to be shocked by conduct that was "intended to injure in some way unjustifiable by any government interest." . . .  The nature of the right violated and the government's competing interests, if any, may inform the determination of whether particular behavior shocks the conscience. . . .  "Indeed, '[a] hallmark of successful challenges is an extreme lack of proportionality, . . .

In applying this test to the case before it, which was strikingly like what Ms. Blair's Complaint alleged here, the *Foote* opinion states (*id*. at 20-21):

> Often, "an exact analysis of circumstances" is needed "before any abuse of power [can be] condemned as conscience shocking."  *Lewis*, 523 U.S. at 850.  Here, the circumstances certainly include the facts Plaintiffs have alleged about the conduct of various defendants.  These include:  inviting students to provide their preferred pronouns as part of a personal biography project; sharing information about gender identity with B.F.; failing to respond to Silvestri's December 2020 email; engaging in

---

[21] As the *Foote* opinion (at 11, n.3) states, "as the Supreme Court explained in *Lewis*, courts do not need to determine whether "to recogniz[e] a substantive due process right to be free of [the alleged] executive action" unless they first determine the "necessary condition of egregious behavior" has been satisfied.  *Id.*, 523 U.S. at 847 n.8.

<u>supportive discussions with B.F. about gender identity; facilitating B.F.'s and G.F.'s use of their preferred names and pronouns while at school; deciding not to notify Plaintiffs when B.F. and G.F. began using different preferred names and pronouns; and publicly describing the views of individuals, including parents, who oppose Ludlow Public School policies for supporting transgender and gender nonconforming students, as intolerant and hateful.</u>   The relevant circumstances also include Massachusetts laws and regulations regarding gender identity, which establish a significant government interest in providing students with a school environment in which they may safely express their gender identities regardless of their ages or the preferences of their parents. Plaintiffs have not challenged the constitutionality of these laws.

The circumstances alleged in the *Blair* Complaint appear even less problematic than those in this case, the *Foote* court's paragraph would remain apt if *Blair* facts were inserted instead.

The *Foote* opinion's discussion is precise, objective and comprehensive, stating *inter alia* that "it is disconcerting that school administrators or a school committee adopted and implemented a policy requiring school staff to actively hide information from parents about something of importance regarding their child."  (*See id*. at 21-22.)   However, the *Foote* court also duly acknowledged that "Massachusetts has identified a strong government interest in providing all students, regardless of age, with a school environment safe from discrimination based on gender identity."  (*See id*. at 24.)  The *Foote* court also relies on a "DESE Guidance" document, which, "[t]hough non-binding, the DESE Guidance related to gender identity also provides relevant context for Defendants' actions," and which "encourages schools to consult with students who assert a different gender identity at school before disclosing information about a student's gender identity to the student's family."  (*See id*. at 24-25.)

Turning to its resolution of the case, the *Foote* court rejected the plaintiff's contention that the way in which the policy of that school – even though a middle school rather than a high school – conditioned disclosure to parents on the student's prior consent (*id*. at 25-27):

The court agrees that the policy, as described by Plaintiffs, was based on a flawed interpretation of the DESE Guidance and ignored the plain language advising that parents be informed after the student is advised that such communication will occur.

. . . Students and parents would almost certainly be better served by a more thoughtful policy that facilitated a supportive and safe disclosure by the student, with support and education available for students and parents, as needed and when accepted.  But, currently, the topic may also evoke negative or harmful reactions, which also must be considered. This is especially true when, as in this case, the students are old enough to independently assert their transgender or gender nonconforming identity, but still many years away from adulthood. . . .

<u>However, even if Defendants' policy was imperfect and contrary to the non-binding DESE Guidance, the alleged policy was consistent with Massachusetts law and the goal of providing transgender and gender nonconforming students with a safe school environment. . . .  While the court is apprehensive about the alleged policy and actions of the Ludlow Public Schools with regard to parental notification, it cannot conclude the decision to withhold information about B.F. and G.F. from Plaintiffs was "so extreme, egregious, or outrageously offensive as to shock the contemporary conscience," given the difficulties this issue presents and the competing interests involved.</u> . . .

Thus, as the *Foote* opinion illustrates, the kind of allegations set forth in the Blair Complaint <u>do not</u> "shock the conscience," especially in the context of a transgender high school student's rights to equal protection in a school's *in loco parentis* environment.  The parents in *Foote* alleged precisely the same parental rights as the Blair Complaint does here, and therefore *Foote* should be persuasive authority here.  Furthermore, the *Foote* court is not alone in this view, and the court opinions in the *Littlejohn*, *John and Jane Parents I*, *Willey*, *Regino* and *Ricard* cases are clearly in accord.  Therefore, under the facts of the Blair Complaint, this Court should concur.

> **2.    Even if Allegations of "Reckless" Executive Action Could Satisfy the "Shocks the Conscience" Test, No Such Recklessness Is Alleged Here.**

Although the Opposition (ECF No. 56, at 12) correctly refers to certain passages in the *Lewis* opinion, the Court's focus there was on the obligations of a prison warden or guard to avoid deliberate lapses in inmate care.  *See id.*, 523 U.S. at 851.  Although a High School staff has *in loco parentis* responsibilities, students are generally free to come and go absent emergencies.  Here, the School Board <u>did not</u> have a written policy limiting the right of teachers or counselors to contact parents about newly-disclosed transgender student intentions without the student's prior

consent.  Thus, there is nothing "deliberative" behind Via's alleged conduct during his two (2) interactions with S.B. before she ran away from home.  Accordingly, especially given existing federal and state law obligations not to discriminate against transgender students, there is simply no  basis  for  regarding  Via's  conduct  here  as  involving  "recklessness,  gross  negligence  or deliberate indifference."   Furthermore, the Complaint <u>does not</u> allege that Via had any role in connection with the switch in bathroom assignments attributed to Ms. Olsen, and no reasonable finder of fact could find any sort of proximate cause between Via's private counseling contacts with S.B. and the separately ensuing bathroom incidents, and he Complaint does not allege that the High School had a recent history of sexual assaults generally or harassment of transgender students in particular, and so the State-created hazard doctrine could not have been triggered here.

### D.   As Explained in the *Foote* Order, Via Is Entitled to Qualified Immunity.

As of August 2021, there <u>was not</u> any "clear" legal principle to the effect that high school counselors or supporting personal counselors could not lawfully provide services to transgender students  with  gender-identity  or  gender-transition  issues  without  first  notifying  parents. Furthermore, when the Complaint herein was filed, there were at least six (6) reported decisions around the country – from California (*Regino*), Florida (*Littlejohn*), Kansas (*Ricard*), Maryland (*John and Jane Parents I*), Massachusetts (*Foote*), and Wyoming (*Willey*) – holding that there was no constitutional right to such notice and/or that the defendant school-related personnel would have qualified immunity from such a claim.  (*See* pages 17-22, *supra*.)

The *Foote* opinion quoted above also addressed qualified immunity (*id.* at 28-30):

> Finally, having determined that Plaintiffs' Amended Complaint should be dismissed on  substantive  grounds,  it  is  not  necessary  for  the  court  to  address  Defendants' arguments regarding qualified immunity.  <u>However, the court briefly notes that had Plaintiffs' Amended Complaint survived the substantive analysis, qualified immunity would warrant dismissal of the claims asserted against all individual defendants.</u> *See id.* ("Individual  government  officials  may  be  sued  'for  federal  constitutional  or

statutory violations under § 1983,' though 'they are generally shielded from civil damages liability under the principle of qualified immunity.'"). <u>Qualified immunity shields individual government actors from liability unless</u> the plaintiff can demonstrate both that the "the defendant violated the plaintiff's constitutional rights" and that <u>"the right at issue was 'clearly established' at the time of the alleged violation."</u> . . .

<u>To satisfy the "clearly established" prong, a "plaintiff must 'identify either controlling authority or a consensus of persuasive authority sufficient to put [a state actor] on notice that his conduct fell short of the constitutional norm'."</u> . . . While "there need not be a case directly on point," a plaintiff must be able to identify "precedents existing at the time of the incident [that] establish[ed] the applicable legal rule with sufficient clarity and specificity" that the defendant was on notice that their conduct would violate the rule. . . . <u>Here, Plaintiffs would have to identify authority addressing sufficiently similar facts occurring where similar state laws applied.  That authority would either need to</u> be binding in Massachusetts or <u>demonstrate a consensus among persuasive authorities</u> such that the individual defendants should have known their actions violated Plaintiffs' parental rights protected by substantive due process.

The *Foote* opinion (*id.*) then correctly observed that there is no such "consensus among persuasive authorities," especially because "legal protections for gender identity are a recent development and a broad awareness of issues surrounding the topic of gender identity is still growing,"  Furthermore, the *Foote* opinion (*id.*) held that the defendants there <u>did not</u> provide mental healthcare to students by supporting their use of preferred names and pronouns.

To be clear, the six (6) recent court opinions on gender-identity issues in the parental rights context – including the above-quoted *Foote* opinion – expressed concern about the adequacy of parental notice policies in effect when the alleged cause of action arose.  Typically, however, the opinions recognized that providing gender-identity and other transgender services in the wake of transgender status getting protection under federal anti-discrimination laws was a relatively new thing, and that state and local governments were still working out the kinks in regulations or guidelines addressing such issues.  As a result, there is nothing sufficiently fact intensive here – given the extensive nature of the factual pleadings – for the Court to need discovery before reaching this easy-to-resolve issue.  *See* cases cited at 2 & nn. 2-3, *supra*.

Indeed, no court that addressed the qualified immunity issue in this gender-identity context

17

has held that its resolution should be put off until summary judgment.  The main reason is obvious: then-existing law regarding a parent's right to get notice more promptly than actually occurred <u>was not</u> at all clear, and several of these recent court decisions held that there was no constitutional right for parents to receive notice before commencement of such school counseling.[22]  Thus, the recent history of judicial protection for parental rights of children in public schools in no way supports the view that mistakes or lapses about parental notice could vitiate qualified immunity.[23]  Furthermore, nothing about the facts or claims at issue here presents any need to postpone a decision regarding qualified immunity.[24]

Therefore, consideration of Via's qualified immunity defense at the dismissal motion stage is clearly appropriate, and every pertinent judicial opinion on gender-identity issues to date further undermines any contention that it should be "'sufficiently clear that **every** <u>reasonable</u> **official** would have understood that what he is doing violates [Ms. Blair's asserted] right'."

> **E.  The Promulgation of Virginia's Model Transgender Policies Is a Significant Factor for the Court to Consider, Especially in Deciding Whether Via and the Other Individual Appomattox Defendants Have Qualified Immunity.**

The Opposition (at 13) makes various arguments intended to sway the Court into ignoring the 2021 VDOE Model Transgender Policies, including a Supremacy Clause argument and an "equal dignities" argument – that is, that the Policies only constituted recommended wording for local policies and related general guidance.  (ECF No. 56, at 13.)   However, those arguments are

---

[22] *See Littlejohn*, 2022 U.S. Dist. LEXIS 238141, at *11 n.1 & 16 (situation presented there made qualified immunity defense ripe for resolution at the dismissal motion stage); *Foote*, 2022 U.S. Dist. LEXIS 236102, at *28-*30 (if plaintiff's substantive claims had survived dismissal, individual defendants would have been entitled to qualified immunity).

[23] *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) ("Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted.").

[24] The Opposition (ECF No. 56, at 17-19) cites *Bhattacharya v. Murray*, 515 F. Supp. 436 (W.D. Va. 2023) (Moon, J.), but its First Amendment claims and facts are simply not comparable here.

18

clearly of no consequence in assessing whether Via or the other Appomattox Defendants improperly disregarded Ms. Blair's asserted constitutional rights. Furthermore, the fact that the current Virginia Administration earlier during 2023 chose to rescind the 2021 Policies and replaced them with a new set of Policies is not relevant here. Indeed, as explained in the *Grimm* litigation about transgender bathroom rights,[25] where the Supreme Court expressly endorsed introduction of policy documents and agency opinion letters into evidence to address retrospective relief, the 2021 Policies are admissible evidence here, while considering the 2023 Policies for purposes of relief sought here would violate various constitutional provisions including the *ex post facto* clause.

The 2021 Model Transgender Policies – by their very terms – directed local school boards to formally adopt Local transgender Policies of their own, but as of August 2021 the defendant School Board presumably had not had the time to hold the requisite hearings and determine whether to adopt the 2021 Model Policies as is or to adopt a version of their own that met all the requirements of the Model Policies from a Title IX standpoint. Therefore, if there had been time to adopt Local Transgender Guidelines in 2021, they presumably would have had to meet all the requirements of Title IX, even if the School Board took a different approach in some regards. In any event, if the School Board, the Superintendent, and its personnel at the High School in August

---

[25] *See Grimm v. Gloucester County School Board*, 822 F.3d 709, 715, 717-19, 20-26 (4th Cir. Apr. 19, 2016) ("*Grimm I*") (considering Office for Civil Rights ("OCR") opinion letter stating – "When a school elects to separate or treat students differently on the basis of sex . . . a school generally must treat transgender students consistent with their gender identity" – to resolve ambiguity in OCR policies); *id.*, 580 U.S. 1168 (Mar. 6, 2017) (remanding in light of new 2017 OCR opinion letter and related change in policies, for purposes of prospective relief); *id.* on remand, 869 F.3d 286, 289 (4th Cir. Aug. 2, 2017) (*Grimm II*) (reckoning with potential mootness as to prospective relief, after plaintiff G.G. had graduated from high school); *id.*, on remand, 2017 U.S. Dist. LEXIS 1221975, at *3 & *7-*8, 2017 WL 9882602 (E.D. Va. Dec. 12, 2017) (limiting further proceedings to retrospective relief); *id.*, 400 F. Supp. 3d 444, 451-52, 456-64 (E.D. Va. 2019) (noting previous denial of dismissal motions on mootness and other grounds, and granting plaintiff G.G. summary judgment for nominal damages and correction of identity information in his high school transcript); *aff'd by id.*, 972 F.3d 586, 594-96, 601-02, 608, 616, 620 (4th Cir. 2020) ("*Grimm III*").

2021 had looked for Commonwealth of Virginia guidance in this regard, what they would have found would have included the 2020 statute and the 2021 Model Transgender Guidelines.

> **2.** **Virginia Code Section 54.1-2969 Governs Mental Health Services, and That Is What the Complaint Currently Alleges Were Provided to S.B.**

Because the Complaint alleges that Via and Ms. Olsen provided "mental health" services to S.B., Ms. Blair has opened the door to a potential Pandora's Box of contingent consequences, including impacts from Virginia's mental health statutes and regulations. *Inter alia*, the Court therefore may consider Va. Code section 54.1-2969(E) in deciding whether there was a problem with Via and Ms. Olsen honoring S.B.'s requests for gender-transition assistance at the High School, and S.B.'s pleaded consent becomes a material issue. Furthermore, because Via's alleged services for S.B. occurred in person at the High School or over the internet, it would have constituted "outpatient treatment" for "mental illness" if in fact it were "mental health" treatment.[26] *See* Va. Code § 54.1-2060(E). Thus, in reviewing Plaintiff's constitutional argument (ECF No. 56, at 16-17), the Court should consider references to "mental health" treatment as conclusory,[27] as well as contrary to what the Fourth Circuit held in *Grimm III,* 972 F.3d at 594-96 & 612.[28]

---

[26] The Opposition (at 16) persists in focusing on the "healthcare" path, and "mental health" in particular, using the factually inapposite *Matter of Baby K*, 832 F. Supp. 1022, 1030-31 (E.D. Va. 1993), where the court's strict construction of the EMTALA statute required doctors to resume ventilator treatment of a baby born with just a brain stem.

[27] In her Oppositions to the Bennett and School Board dismissal Motions, Ms. Blair relied on the opinion in *Grimm III* in arguing that an unattached document called District Policy I J would have precluded school counselors from engaging in transgender-accommodating activities in public schools, apparently on the theory that parental consent is a strict prerequisite for mental health counseling. That argument <u>does not</u> appear anywhere in the Opposition to Via's Motion, because Via's credentials are different from and broader than those of school counselors like Ms. Olsen.

[28] The Opposition (**at ___**) also errs in relying on the Supremacy Clause, which determines the relative roles of federal and state in dealing properly with asserted rights. Ms. Blair asserts that her "substantive due process" right to participate in S.B.'s "nurture and upbringing" is superior to S.B.'s Title IX rights, but that <u>is not</u> Supremacy Clause issue.

III.    **Plaintiff's Federal-Law Conspiracy Claim, Tortious Interference and IIED Claims Must Be Dismissed.**

Plaintiff asserts that her tortious interference and IIED allegations are legally sufficient, but neither such claim meets governing standards for proceeding on the merits.  Plaintiff also asserts that the Court should defer any decision on the civil-rights conspiracy claim pending completion of relevant discovery, but no such relief is appropriate here, and there are fatal defects her conspiracy claims on both the High School front[29] and the Maryland court proceedings front.

A.    **Plaintiff's Cited Precedent Does Not Justify Her Tortious Interference Claim.**

Plaintiff's tortious interference claim is meritless, and would be barred by the affirmative defenses of "justification" and judicial privileges, the bar to collateral attack and *res judicata*.

The Opposition cites *Wyatt v. McDermott*, 283 Va. 685 (2012), where the court held that Virginia common law should recognize a claim for tortious interference and related conspiracy, where one parent colluded with lawyers and other to exclude the other parent from any access to infant adoption proceedings.  *See id*. at 691-701 & n.1.  Nothing in the *Wyatt* case even remotely suggests support for a cause of action for tortious interference brought against lawyers, public officials, social service providers and other witnesses who merely took part in judicial proceedings addressing child custody issues in which the subsequently complaining parent – like Ms. Blair here – fully participated.  *See id*.  As the court explained, however, the new cause of action was carefully circumscribed to ensure that tort law "does not provide a means of escalating intra-familial warfare," where other parts of the judicial system are available to deal with custody issues. [30]  *See*

---

[29] As to any conspiracy between personnel at the High School, Plaintiff claim will have to deal with the intra-corporate conspiracy doctrine, under which employees and other agents of the a corporate or municipal entity that acts solely through such persons cannot be held guilty of conspiracy.  *See Copperweld Corp. v. Independence Tube Corp*., 467 U.S. 752, 770-71 (1984).

[30] Further, "in the interest of the child," the Virginia court noted with approval the affirmative defense of 'justification' as set forth in *Kessel v. Leavitt*, 204 W. Va. 95, 109-14 & 138-43 (1998),

*id*. at 701-03.  Thus, *Wyatt* <u>does not</u> provide support for the tortious interference claim herein.

**B.**  **The Opposition Ignores Cases Directly Adverse to Her Tortious Interference and IIED Claims, Which Also Undermine Her Conspiracy Allegations.**

In *Shelley v. Pyle*, 2020 U.S. Dist. LEXIS 203510 (W.D. Va. Nov. 10, 2020) (Dillon, J.), the court was asked to resolve the sufficiency of tortious interference claims wherein Ms. Pyle, a recently excused guardian *ad litem* ("GAL") in a partially resolved child custody case,  allegedly responded to an e-mail from the mother having custody of the child with advice that resulted in her "writ[ing the father] to cancel [the child's] coming up to PA [for a visit] . . . under the advice of [the mother's] attorney and the GAL."  *See id*. at *3.  In subsequent court proceedings, the court "re-appointed Pyle as guardian *ad litem* and put strict limitations on the other parent's right to see the child."  *Id*. at 5.  In a hearing on whether to loosen limitations on the father's visitation rights in light of an updated evaluation of his parental capacity, the court granted the mother full legal custody without visitation rights for the father.  The Circuit Court affirmed, with a proviso that the "minor child"[31] may "initiate any contact with [the father] as she sees fit."  *See id*. at 5-6.

Thereafter, the father sued Ms. Pyle for "tortious interference with his parental rights when she responded to [the mother's] email and advised the child not to visit her father if she felt unsafe," further asserting that the GAL's advice to the child's mother amounted to negligence and intentional infliction of emotional distress."  *Id*. at *6.  In addition, the father sued the law firm where Ms. Pyle worked, asserting vicarious liability.  *Id*.  The *Shelley* court held that "[t]ortious interference refers to '[o]ne who, with knowledge that the parent does not consent, <u>abducts</u> or otherwise compels or induces a minor child <u>to leave</u> a parent legally entitled to its custody <u>or not</u>

---

which held that a party <u>should not</u> be held liable "if he or she [had] a reasonable, good faith belief [1]  that interference with the parent's parental or custodial relationship was necessary to protect the child from . . . harm or  [2]  that the interference was [otherwise] proper . . . ."  *See id*. at 702.

[31] The opinion does not reveal the child's age, leaving the impression that even a pre-pubescent child has a right to request visitation with the non-custodial parent.

<u>to return</u> to the parent after it has been left him . . . ." *Id.* at \*8-\*11.  In discussing the *Padua-Wilson* case, the *Shelley* opinion explained:

> . . .  The court expressly "decline[d] to expand the scope of the tort of interference with parental rights by opening a new front for disappointed, angry, frustrated, or vindictive parents to renew battle." . . .  <u>The court explained that "dragging mental health professionals and guardians ad litem into court for their role in a custody and visitation case would be highly detrimental to the process."</u> . . .  "[N]o cause of action for tortious interference with a parental or custodial relationship may be maintained against a guardian ad litem . . . based upon his/her expert testimony and/or participation in a child custody and visitation proceeding."
>
> Here, *Padula-Wilson* applies even though Pyle was no longer the child's guardian ad litem at the time of the alleged tortious interference.  The appropriate remedy for [the mother's] violation of the visitation order was for Shelley [the father] to alert the juvenile court of the violation.  Shelley did alert the juvenile court of the violation, and the court held a hearing in which Shelley received full due process.  Thus, there is no need for Shelley to relitigate this issue through a collateral tortious interference claim.
>
> In addition, Pyle did not tortiously interfere with Shelley's parental rights.  <u>Pyle did not abduct the child, nor did she compel or induce the child not to visit her father.</u>  Rather, Pyle responded to an unsolicited email from [the mother] and advised the child not to visit her father *if she felt unsafe*.  Such a statement <u>does not</u> rise to the level of tortious interference.

On this basis, the *Shelley* court granted summary judgment for Ms. Pyle on Ms. Shelley's tortious interference claim, and further held that Shelley's claim for negligence was likewise defective.  *Id.* at \*11-\*12.  Via respectfully submits that the same conclusions in his favor are required here.[32]

Furthermore, after setting forth the elements of an IIED claim,[33] the *Shelley* court similarly

---

[32] Similarly, the court in *Qui v. Huang*, 77 Va. App. 304, 313-14, 320-22 (2023), held that, because one parent could not bring a tortious interference directly against another parent, an aggrieved parent could not sue the other parent indirectly, by suing a third party who allegedly attempted to influence that other parent's decision-making or otherwise participate in a related custody matter. The alleged role of Defendants Via and Olsen in this regard in connection with child-custody proceedings for S.B. in Maryland courts is congruent with the facts in *Qui* that resulted in the above-referenced holdings, and the discussion by the Court of Appeals is fully applicable here, even though the State of Maryland was the party allegedly adverse to Ms. Blair there.

[33] In an effort to provide a generic basis for her IIED claim, the Opposition relies principally on two cases, neither of which is apposite here.  *See Almy v. Grisham*, 273 Va. 68, 77, 81-82 (2007) (finding that plaintiff state an IIED claim, where the defendants conspired to publish false

dealt with the IIED claims against Ms. Pyle (*id*. at *12-*13):

> Here, Pyle's conduct <u>was far from</u> outrageous or intolerable.  Pyle responded to [the mother's] email that expressed concern over her daughter's safety.  Pyle advised the child that she need not visit her father if she felt unsafe.  This <u>is not</u> outrageous conduct, regardless of whether Pyle's appointment as guardian had expired.  It is <u>far from atrocious or intolerable</u> for Pyle to act out of concern for the child's safety.  On the contrary, one may expect a former guardian ad litem to respond to a parent's plea for assistance and to advise a child to act with concern for her own safety.

On that basis, the *Shelley* court granted the defendants summary judgment on the IIED claim.[34]

*Id*. at *13.  Via respectfully submits that the same conclusion in his favor is required here.

In light of those precedents, the Complaint fails to allege any basis – constitutionally or at common law – for substantive tort claims against Via and Ms. Olsen in connection with the Maryland custody proceedings.  Under both Maryland and Virginia law, any such claims against Via and Ms. Olsen are precluded by various preemptive defenses, including the bar against collateral attack, the justification doctrine, and *res judicata*.  And without any underlying common-law tort claim, any related conspiracy claim also must fail.

---

statements about the plaintiff and then back them up in court, but dismissed claims against to handwriting expert witnesses who were at most negligent in preparing their testimony; court also ruled that there is no Virginia claim for conspiracy to cause IIED); *Womack v. Eldridge*, 215 Va. 338 (1974) (like *Almy*, articulates high standards for alleging and proving IIED or NIED, but involves claims unlike the instant claims).

[34] Maryland law as well <u>does not</u> allow such collateral attacks on the *bona fides* of a former legal proceedings.  *See Klein v. Whitehead*, 40 Md. App. 1, 20-24, 389 A.2d 374, 385-87 (1978) (*res judicata* and the principle barring collateral attack on prior court judgments precluded judgment debtors, who became the subjects of an involuntary bankruptcy proceeding, were barred from suing the original creditors and their attorney for damages, even though the new suit alleged conspiracy, breach of fiduciary duties, fraud and deceit, misappropriate and legal malpractice).  This defense has repeatedly been used in Maryland cases complaining of misconduct in divorce proceedings and custody disputes.  This rule applies to custody proceedings.  *See Ghazzaoui v. Taylor*, 2015 Md. App. LEXIS 424, at *4-*8 (2015) (unreported opinion) (suits by disappointed parent against guardian *ad litem* and others, constituted an "impermissible collateral attack"); *accord, R.R. v. D.F.*, 2019 Md. App. LEXIS 586, at *8-*12, 2019 WL 3074038 (July 15, 2019) (unreported opinion) (filing new custody proceeding in a different court is "a blatant collateral attack in . . . proceedings pending in Juvenile Court").

The Complaint's federal-law conspiracy allegations fail because Plaintiff has failed to allege any civil rights violation, and are merely conclusory in form.  They <u>do not</u> reveal sufficient information for an objective judge to determine whether the specifics of the claim are actually plausible or, instead are at best speculative and at worst defamatory.  *See A Society Without a Name v. Commonwealth of Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) ("ASWAN").[35]  The Court should therefore conclude without further ado that the Complaint fails to allege any proper, class-based case for discrimination or a related conspiracy.

In addition, in Maryland, the actions of counsel and witnesses during judicial proceedings take place under the protection of absolute judicial immunity and there is at least qualified immunity for actions outside the courthouse that take place in preparation for such proceedings.[36]

---

[35] As the Fourth Circuit stated in *ASWAN*: "Facts [pleaded]that are 'merely consistent with' liability are not sufficient. . . .  'Threadbare recitals of the elements of a causation, supported by mere conclusory statements, [similarly] do not suffice' . . . ."  Furthermore, the court explained: "[W]here a conspiracy is alleged, the plaintiff must plead facts amounting to more than 'parallel conduct and a bare assertion of conspiracy . . . .  Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Id.* (citations omitted).  In other words, "[t]he factual allegations must plausible suggest agreement, rather than being merely consistent with agreement." *Id*.

[36] *See, e.g., Smith v. Danielczyk*, 400 Md. 98, 120-21 (2007), *quoting Kennedy v. Cannon*, 229 Md. 921, 96-97, 182 A.2d 54, 57 (1962) ("This absolute immunity extends to . . .statements uttered in the course of a trial or contained in the pleadings, affidavits, depositions and other documents directly related to the case."); *Adams v. Peck*, 288 Md. 1, 7-9, 415 A.2d 292, 295-96 (1980) (absolute judicial privilege extended to reports prepared for use in judicial proceedings); *Korb v. Kowaleviocz*, 285 Md. 699, 702-03, 402 A.2d 897, 898-99 (1979).  In 2013, these privileges were held to apply regardless of the cause of action allegedly based on participation in judicial proceedings. *See O'Brien & Gere Engineers, Inc. v. City of Salisbury*, 222 Md. App. 492, 501-02, 113 A.3d 1129, 1140 (2012), *citing Mangold v. Analytic Services, Inc.*, 77 F.3d 1442, 1448-49 (4th Cir. 1996) (federal law as interpreted by federal court).

Virginia law principles of judicial immunity are similar.  *See, e.g., Phatisis v. Clark*, 2013 U.S. Dist. LEXIS 114267, at *10 (E.D. Va. Aug. 13, 2013), *citing Imbler v. Pachtman*, 424 U.S. 409, 430 n.32 (1976) ("out of court "effort to control the presentation of his witness' testimony" was entitled to absolute immunity because it was "fairly within [the prosecutor's] function as an advocate); *Murphy v. Goff*, 2010 U.S. Dist. LEXIS 56119, at *8-*14 (W.D. Va. June 7, 2010) (Moon, J.) (judges as well as other court functionaries – including guardians *ad litem* for minor children and lawyers or social service officials– have absolute judicial immunity in Virginia).

## <u>CONCLUSION</u>

For all of the foregoing reasons, as well as those set forth in Defendant Via's Dismissal Motion and supporting Memorandum, the Court should grant Via's Motion to Dismiss and thereupon dismiss the Verified Complaint against him in its entirety and with prejudice.

Dated:  November 10, 2023

Respectfully submitted,


*/s/ Andrew Butz*
Heather S. Deane (VSB No. 41895)
Andrew Butz (VSB No. 16280)
Charles Y. Sipe (VSB No. 31598)
Brandi R. Howell, Esq. (VSB No. 74110)
Kiernan Trebach LLP
1233 20th Street, NW, Eighth Floor
Washington, D.C. 20036
Tel: (202)712-7000
Fax: (202)712-7100
hdeane@kiernantrebach.com
abutz@kiernantrebach.com
csipe@kiernantrebach.com
bhowell@kiernantrebach.com

*Counsel to Defendant Avery Via*

26

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 17, 2023, a copy of the foregoing shortened Reply

Brief was served via the Court's CM/ECF system, upon:

Mary E. McAlister (VA Bar No. 76057)
Child & Parental Rights Campaign, Inc.
P.O. Box 637
Monroe, VA 24574
Email: mmcalister@childparentrights.org
*Attorney for Plaintiff*

Vernadette R. Broyles (GA Bar No. 593026)*
Ernest G. Trakas (MO Bar 33813)*
Child & Parental Rights Campaign, Inc.
5805 State Bridge Road, Suite G310
Johns Creek, GA 30097
vbroyles@childparentrights.org
etrakas@childparentrights.org
*Admitted pro hac vice
*Attorneys for Plaintiff*

Jeremy D. Capps (VSB No. 43909)
Melissa Y. York (VSB No. 77493)
Brian Peter Ettari (VSB No. 98800)
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, VA 23255
jcapps@hccw.com
myork@hccw.com
bettari@hccw.com
*Attorneys for Appomattox County School Board,*
*Dr. Annette A. Bennett, and Dena Olsen*

/s/ Andrew Butz
_____

Andrew Butz