CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

6/25/2024

LAURA A. AUSTIN, CLERK
BY:  s/ ARLENE LITTLE
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

|  |  |
|---|---|
| MICHELE BLAIR, individually and as a Guardian and next friend of S.B., a minor, | CASE NO. 6:23-cv-47 |
| *Plaintiffs*, | |
| v. | MEMORANDUM OPINION |
| APPOMATTOX COUNTY SCHOOL BOARD, *et al.*, | JUDGE NORMAN K. MOON |
| *Defendants.* | |

This matter is before the Court on Defendants' Motions to Dismiss, Dkts. 12, 26, 28, 45. The Court will also dispose of Defendant Avery Via's Motion to Strike the Complaint's Verification, Dkt. 58.

Plaintiff Michelle Blair is the paternal grandmother and adoptive mother of S.B., a minor. Plaintiff brings suit on her own behalf and on behalf of S.B. against the Appomattox County School Board; its superintendent, Dr. Annette Bennett; and two guidance counselors who provided services at Appomattox County High School, Dena Olsen and Avery Via.

At the start of the 2021–2022 school year, S.B., who was a freshman at Appomattox County High School, adopted a male identity at school and began using the boys' restroom. School employees allegedly did not inform Plaintiff of this, despite gender-based bullying directed at S.B. The day that Plaintiff learned of S.B.'s male identity, S.B. ran away. Shortly after, S.B. fell prey to sex traffickers and ended up in the custody of the Maryland Department of Juvenile Services for two months. Then S.B. ran away again, once more falling victim to sexual exploitation.

1

As a result of these events, Plaintiff has brought claims against Defendants for interference with substantive due process rights to parental control and familial privacy; violation of Title IX; intentional interference with parental rights; and intentional infliction of emotional distress.

S.B. and Plaintiff undoubtedly suffered terrible events. However, the Court will grant Defendants' Motions to Dismiss in their entirety because Plaintiff does not adequately allege any of her claims. Generally, Plaintiff fails both to allege elements necessary for liability and to connect the acts of Defendants with the harms suffered by her and S.B. Because the Complaint will be dismissed in its entirety, the Court will deny as moot Via's Motion to Strike the Verification of the Complaint.

BACKGROUND[1]

Plaintiff's claims focus on events that occurred during the summer and fall of 2021. Prior to the start of the 2021-2022 school year, Plaintiff alleges that S.B. was "gender-nonconforming" in her dress and her interests, such as skateboarding,[2] Dkt. 1, ¶ 29. Plaintiff states that she supported S.B's "unconventional choices" and helped her buy "emo" style clothing. *Id.*

In June of 2021, S.B. was admitted to in-patient psychiatric care at CMG Piedmont Psychiatric Center in Lynchburg. ¶ 24. On August 5, 2021, S.B. returned to CMG for a psychiatric evaluation. ¶ 26. The resulting report, including a diagnosis of "severe gender dysphoria," was not available to any party at that time. ¶ 27.

On August 10, 2021, S.B. began her freshman year at Appomattox County High School

---

[1] The following facts are alleged in Plaintiff's Complaint, Dkt. 1, and are assumed true for purposes of resolving this motion. *See King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016).

[2] The Court has no information as to S.B.'s current gender identification, and so, consistent with briefing in this case, will refer to S.B. with female pronouns.

2

(ACHS). ¶ 28. The next day, August 11, S.B.'s science teacher overheard S.B. telling a friend she preferred a male name, "D.," and male pronouns. The teacher informed Defendant Dena Olsen, a school guidance counselor. ¶ 31. Olsen met S.B. in the hallway of ACHS, asked if she identified as male, and told her she could use the male restroom. ¶ 32.

On August 12, Olsen and Avery Via, another counsellor, met with S.B., who told them that she identified as a boy and wanted to use a male name and pronouns. ¶ 35. At this time, S.B. told Via and Olsen that she had been bullied and threatened by boys on her school bus on August 11. ¶ 36. S.B. reported that the boys on the bus had "directed profane epithets at her because she looked like a boy, threatened to sodomize her until she 'liked boys,' threatened to hold her out of the window of the bus by her hair until she apologized, and made other similar threats. Other students reportedly threatened to shoot her and told her they knew where she lived." *Id.* Olsen reviewed recordings from the bus that did not contain the behavior S.B. described, but she talked to students who confirmed S.B.'s version of events. ¶ 37. Olsen contacted Plaintiff to pick up S.B. However, S.B. asked Olsen to refer to S.B. by her given, female name when discussing the bus incident with Plaintiff because using the male name "might upset [Plaintiff]." ¶ 38. Accordingly, Olsen used the female name when she alerted Plaintiff to the bus incident. *Id.* Olsen omitted the information that the bullying stemmed from S.B.'s gender presentation. ¶ 39.

At some point "a few days" after August 11, Olsen told S.B. that some girls were uncomfortable with S.B. in the girls' restroom, and that S.B. should use the boys' restroom. ¶ 32. Between August 12 and 25, boys at school continued to harass, threaten, and assault S.B. in the hallways and bathrooms, including shoving her against the hallway wall and threatening knife violence and rape. ¶ 40. During this same time period, Olsen called S.B. to the counseling office some eight times to discuss S.B.'s gender identification issues. ¶ 41. Olsen allegedly encouraged

3

S.B. to "embrace" her male identity, and Via directed S.B. to trans-focused online platforms. ¶ 42.

On August 23, Olsen learned that administrators had received reports about "incidents" in the boys' restrooms during the time S.B. had been using them. ¶ 46. The following day, August 24, Olsen and another counselor who is not a party to this case met with S.B. to discuss concerns relating to her use of the boys' restroom. ¶ 48. S.B. reported that she was threatened, harassed, and sexually assaulted in the restroom. S.B. said "all the boys are rapists" and defined "rape" as inappropriate touching. ¶ 48. The counselors and S.B. agreed that going forward, S.B. would instead use the nurse's bathroom. *Id.*

On or around this day, Olsen asked School Resource Officer Daniel Gunter to review school surveillance tapes to check for safety concerns. ¶ 51. Plaintiff "believes that Officer Gunter contemporaneously reported that the tapes revealed several male students entering the boys' bathroom during times that S.B. was in there." ¶ 52.

On August 25, Olsen and Officer Gunter spoke with S.B. Recounting the events of the meeting, Plaintiff includes this quote, which appears to be taken from Olsen's notes.[3] ¶ 53.

> "There was some information you shared from the bus incident that was untrue and there were some parts that were true. When you report information to us it is important to tell us the entire story. You never want to falsify a report. Or when you said yesterday that every boy in the school was a rapist. It is not fair to label every boy in the school a rapist. That is considered defamation of character. If you walked out of here and said every boy is a rapist and a boy called his dad who had the money, he could sue you for defamation of character when you have no basis to call every boy in the school a rapist. I'm not

---

[3] Olsen filed her counseling notes regarding S.B. as an exhibit to her Motion to Dismiss. Dkt. 25. She subsequently submitted an affidavit attesting that the filed exhibit was an accurate copy of her notes from 2021, which had been previously provided to Plaintiff in response to a FOIA request. Dkt. 43-1.

A court may consider documents that are exhibits to a motion to dismiss when the document is integral to the complaint. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002). The Court concludes that Plaintiff's quotations from the notes indicate that the notes were integral to the Complaint and *could* have been considered. However, they are not necessary to the Court's resolution of the claims, which fail on other grounds.

> saying there is not an individual in this town that is not that. However, you cannot confidently say and I know and he knows that not every male in this school is a rapist. It is so important to know that you cannot say things because you are upset."

Officer Gunter advised S.B. that she could face a civil suit if she continued to accuse innocent boys of having threatened her. ¶ 54. S.B. responded: "I didn't want to tell you anything about this. Any time you have called me in here for something, I didn't want to tell you about any of it. … I think you are here to uphold the law because that's the way it is. You are supposed to keep your students safe. If you hear something about rape, you have to do something."[4] ¶ 55.

Later that day, Olsen informed Plaintiff that S.B. had been using the boys' restroom and that there were safety concerns. Olsen said nothing about S.B.'s pronoun use or gender identification provided no specifics about S.B.'s experience of harassment, threats, or assaults. ¶ 58.

Olsen also told Plaintiff that she had noticed self-harm injuries on S.B., which she had previously been unaware of. ¶ 60. Plaintiff alleges that documentation of S.B.'s self-harm was included in the records provided to the high school from S.B.'s middle school. *Id.* At home after school, Plaintiff found a hall pass with S.B.'s preferred, male name on it. ¶ 61. S.B. told Plaintiff that she was identifying as a boy at school. *Id.* Plaintiff asserts that this was the first she learned of S.B. adopting a male identity at school. *Id.* S.B. told Plaintiff that a group of male students had "jacked" her up against the wall of the boys' bathroom and threatened her with violence, and that she was afraid of what they would do. *Id.* S.B. said she would not have used the boys' bathroom without Olsen's instruction to do so. *Id.* Plaintiff told S.B. that she did not have to go back to school and they would "figure it out in the morning." ¶ 62.

The night of August 25, Plaintiff alleges that S.B., still afraid, suffered a psychotic

---

[4] This statement also appears to be directly copied from Olsen's notes.

breakdown and decided to run away. ¶ 63. S.B. departed through her bedroom window that night, leaving a note including the statements "You've done your job, Jesus loves you"; "I'm afraid of what is to come if I stayed. Be on your guard. There are bad people around here" and "All my love." ¶ 65.

Following S.B.'s departure, Plaintiff alleges that S.B. was abducted by an adult male stranger who raped her and then trafficked her in Washington, D.C., to two brothers who also drugged and raped her. ¶¶ 64, 66. The brothers then trafficked S.B. to another individual in Baltimore, who was a registered sex offender. ¶ 66. He likewise drugged and raped her. *Id*. On September 2*,* Baltimore law enforcement and the F.B.I. found S.B. at the sex offender's home. ¶ 66.

At this point, two months of juvenile court proceedings as to whether S.B. would be returned home commenced in Maryland; for the interim, S.B. remained in the temporary custody of the Maryland Department of Juvenile Services and was placed in a boys' group home. ¶¶ 80, 94. Aneesa Khan, a public defender, was assigned to represent S.B.[5] ¶ 73. On September 9, Khan communicated with Olsen regarding S.B. ¶ 85. Plaintiff alleges that Khan, Via, and Olsen communicated further at an unspecified point after this to plan false testimony accusing Plaintiff of abuse and aiming to deprive her of custody. ¶ 85. At some point, Olsen and Via appeared virtually before the juvenile court and allegedly provided "false" and "incomplete and inaccurate" testimony. ¶ 196. Via provided Khan with S.B.'s mental health records, including the diagnosis of gender dysphoria that resulted from her evaluation at CMG Piedmont Psychiatric Center. ¶ 86.

---

[5] Plaintiff named Khan as a defendant in her Complaint. This Court already granted Khan's Motion to Dismiss based on lack of personal jurisdiction. Dkt. 97. At the same time, the Court dismissed Plaintiff's claim against Khan, Olsen, and Via based on alleged conspiracy to violate her civil rights. *Id.*

Eventually, while the question of whether or not she would be returned to Virginia was being litigated, S.B. ran away once more. S.B. traveled to Texas to meet up with an individual she had met online, who turned out to be an adult male rather than a teen. ¶ 104. This adult "was intercepted by law enforcement" but S.B. was abducted by another adult male "who sexually abused, drugged, starved and tortured her." ¶ 104. She was finally rescued by law enforcement in January of 2022. *Id.* S.B. has been diagnosed with Complex PTSD from her multiple traumas. ¶ 105.

In her Complaint, Plaintiff makes three allegations as to the School District's policies. First, she alleges that District Policy JFHA/GBA required that reports of sexual harassment, which includes "unwelcome sexual physical contact, unwelcome ongoing or repeated sexual flirtation or propositions, or remarks sexual slurs, leering, epithets, threats, verbal abuse, derogatory comments or sexually degrading descriptions, and graphic comments about an individual's body," had to be reported to the District's Title IX compliance officer and investigated. ¶ 56.

Plaintiff also pleads the existence of "District Policy IJ," which provided that school counselors should not use counseling techniques "which are beyond the scope of the professional certification or training of counselors, including hypnosis, or other psychotherapeutic techniques that are normally employed in medical or clinical settings and focus on mental illness or psychopathology." ¶ 44.

Finally, Plaintiff alleges on information and belief that the District had a protocol or guideline "that directed staff to not inform parents when their children expressed a discordant gender identity and asked to be treated as the opposite sex, using opposite sex names and pronouns and use opposite sex privacy facilities, unless the minor child agrees to disclosing the

information." ¶ 59. Plaintiff alleges that Bennett and the School Board knew of, adhered to, and implemented this policy. *Id*.

**LEGAL STANDARD**

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a complaint to determine whether a plaintiff has properly stated a claim. The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), with all its allegations taken as true and all reasonable inferences drawn in a plaintiff's favor, *Rubenstein*, 825 F.3d at 212. A motion to dismiss "does not, however, resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Id.* at 214.

Although the complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. A court need not "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United Mortg. & Loan Inv.*, *LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (internal quotation marks omitted). This is not to say that Rule 12(b)(6) requires "heightened fact pleading of specifics," instead a plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (providing that "only a complaint that states a plausible claim for relief survives a motion to dismiss").

**DISCUSSION**

1. *Plaintiff's constitutional claims (Counts One, Two, and Three)*

    a. *The directive to avoid unnecessary constitutional decisions*

8

In addressing the Motions to Dismiss, the Court bears in mind "the maxim that courts should not 'pass upon a constitutional question ... if there is also present some other ground upon which the case may be disposed of.'" *B.P.J. by Jackson v. W. Virginia State Bd. of Educ.*, No. 23-1078, 2024 WL 1627008, at *5 (4th Cir. Apr. 16, 2024) (quoting *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)).

Therefore, the Court resolves Plaintiff's constitutional claims by applying the doctrine of qualified immunity and by assessing whether Plaintiff adequately alleges municipal liability under *Monell v. Department of Soc. Svcs.*, 436 U.S. 658 (1978). As explained below, her constitutional claims fail on these grounds.

> b. *The Defendants sued in their individual capacity have qualified immunity because the rights which Plaintiff asserts were not clearly established.*

Local officials sued in their individual capacities[6] for violations of federal constitutional or statutory rights are entitled to qualified immunity if the right was not clearly established at the time of the violation. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether qualified immunity applies, a court must ask (1) whether the facts "make out a violation of a constitutional" or statutory right and (2) "whether that right was 'clearly established' at the time of [Defendants'] alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). A right is "clearly established" if the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

The protection of qualified immunity is "ample" for "all but the plainly incompetent or

---

[6] Plaintiff originally named Olsen, Via, and Bennett in both their official and individual capacities. However, Plaintiff later conceded that the official capacity claims against Olsen and Via should be dismissed. Dkt. 36 at 26; Dkt. 56 at 26. The Court will address the official capacity claim against Bennett below.

those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 335 (1986). The Fourth

Circuit has stated that qualified immunity protects officials who make "bad guesses in gray

areas" about the constitutionality of their actions, while "transgressing bright lines" creates

liability. *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir.1992).

District courts are "permitted to exercise their sound discretion in deciding which of the

two prongs of the qualified immunity analysis should be addressed first in light of the

circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. The inquiry also ends "if

no right is transgressed … because government officials cannot have known of a right that does

not exist." *Porterfield v. Lott*, 156 F.3d 563, 567 (4th Cir. 1998) (citing *Jackson v. Long*, 102

F.3d 722, 728 (4th Cir.1996)).

Here, the Court will turn first to the question of whether the rights which Plaintiff asserts

were clearly established. In conducting this analysis, courts "first examine ... decisions of the

Supreme Court, this court of appeals, and the highest court of the state in which the case arose.

We ordinarily need not look any further than decisions from these courts." *Booker v. S.C. Dep't*

*of Corr.*, 855 F.3d 533, 538–39 (4th Cir. 2017) (citations and quotation marks omitted). "But

when there are no such decisions from courts of controlling authority, [courts] may look to 'a

consensus of cases of persuasive authority' from *other jurisdictions*, if such exists." *Id.*

(emphasis in original). In determining whether a right is clearly established, it is not required that

a case be directly on point. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft v. al–Kidd*,

563 U.S. 731, 741 (2011)). Rather, "existing precedent must have placed the statutory or

constitutional question beyond debate." *Id.* Clearly established rights "should not be defined at a

high level of generality" but must be "particularized to the facts of the case." *White v. Pauly*, 580

U.S. 73, 79 (2017) (citations omitted).

      i.   *Count One: Plaintiff's right to direct S.B.'s upbringing.*

Here, Plaintiff argues that the individual Defendants, by withholding information about S.B.'s alternate gender identity, violated her fundamental right to direct S.B.'s upbringing. ¶¶ 106–20. Specifically, Plaintiff asserts that she has a fundamental right to be notified by school officials that her troubled teenaged child has chosen to use a name and pronouns of a different gender and to use the restrooms of the other gender, even when that child requests that the school refrain from such notification.

Plaintiff does not cite, nor can the Court identify, Supreme Court, Fourth Circuit, or Supreme Court of Virginia precedent which clearly established the right which Plaintiff asserts. Nor is there a consensus of persuasive authority indicating the establishment of this right. In recent years, district courts have begun to wrestle with the difficult question of how schools should both protect the well-being of transgender students and respect the rights of parents.

These district court cases do not constitute a consensus that aids Plaintiff. *See, e.g., John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.,* 622 F. Supp. 3d 118, 130 (D. Md. 2022), *vacated and remanded on other grounds,* 78 F.4th 622 (4th Cir. 2023) (finding that there is no fundamental right for parents "to be promptly informed of their child's gender identity, when it differs from that usually associated with their sex assigned at birth, regardless of their child's wishes or any concerns regarding the detrimental effect the disclosure may have on that child"); *Littlejohn v. Sch. Bd. of Leon Cnty. Fla.*, 647 F. Supp. 3d 1271, 1284 (N.D. Fla. 2022) (finding no violation of the substantive due process rights to parental control and familial privacy because school actors did not shock the conscience when they met with a middle school student to develop a gender transition support plan at student's request, and withheld this fact from the student's parents); *Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trustees*, 680 F. Supp. 3d 1250, 1276–77 (D. Wyo. 2023) (stating that while it is unlikely that parents could show that their

fundamental right to direct a child's education encompasses an affirmative duty for school personnel to volunteer gender identification information, the right "would appear to be burdened if a parent was misinformed or the District or a teacher refused to respond to a parent's inquiry regarding their minor child's request to be called by a different name, absent a showing of some danger to the health or wellbeing of the student"); *Ricard v. USD 475 Geary Cnty., KS Sch. Bd.,* No. 5:22-cv-04015, 2022 WL 1471372, at *8 (D. Kan. May 9, 2022) (expressing skepticism that, other than in cases of danger to the child, a school could constitutionally withhold information about a child's gender expression information from his or her parents); *Regino v. Staley*, No. 2:23-cv-00032, 2023 WL 4464845, at *3 (E.D. Cal. July 11, 2023) (finding no substantive due process violation where a parent brought suit based on a school policy allowing school employees to adopt a student's preferred name and pronouns, where the school generally would not notify parents of the transition without the student's consent).

In short, the right which Plaintiff asserts was not clearly established at the start of the 2021-2022 school year. Consequently, the individual-capacity Defendants are entitled to qualified immunity on Count One because Plaintiff has not sufficiently alleged that they violated a clearly established right to which she was entitled.

*ii. Count Two: Plaintiff's right to familial privacy.*

Plaintiff also alleges that Olsen, Via, and Bennett violated her substantive due process right to familial privacy. Again, to determine whether qualified immunity applies, the Court looks to whether the acts of these Defendants violated a right that was clearly established at the time.

Plaintiff asserts that Olsen and Via's "concealment of personal information regarding S.B.'s health and well-being [] interfered with Plaintiff's intimate personal decisions in that

[Plaintiff] was denied the information necessary to … make personal family decisions." Dkt. 1 ¶ 125. She also alleges that this "erect[ed] a wall of secrecy" and "sow[ed] seeds of distrust regarding [S.B.'s] parents' love and concern for her, finally leading to a psychotic break[.]" ¶ 126. Defendants' actions, Plaintiff alleges, "altered the parent/child relationship … causing severe emotional distress, physical and psychological trauma, and significant financial hardships." ¶ 127.

As to Bennett, Plaintiff alleges that she failed to "adequately direct, train and/or supervise District administration and staff that the Constitution and Virginia law require that the right to familial privacy must be respected so that when critical personal issues involving children's mental health and emotional well-being such as a child's assertion of a discordant gender identity and request to be treated as an alternate sex, addressed by alternate names and pronouns, and use opposite-sex privacy facilities arise at school parents must be notified." ¶ 130.

When articulated with specificity, Plaintiff's asserted right in this claim is essentially the same as that in Count One, except that here it comes under the general heading of "family privacy" rather than "parental control." Plaintiff argues that she has a fundamental familial privacy *right to be notified* by school officials that her troubled child has chosen to use a name and pronouns of a different gender and to use the restrooms of the other gender, even when that child requests that the school refrain from such notification. Dkt. 1 ¶¶ 123–25.

Again, Plaintiff fails to cite—and the Court cannot identify—controlling precedent or persuasive consensus that shows this right was clearly established. Indeed, while familial privacy is protected by the Due Process Clause of the Fourteenth Amendment, the "concept of familial privacy has been restricted by the Supreme Court to (1) thwarting governmental attempts to interfere with particularly intimate family decisions, and (2) voiding government actions that

13

sever, alter, or otherwise affect the parent/child relationship." *Hodge v. Jones*, 31 F.3d 157, 163

(4th Cir. 1994). Courts "have strictly construed actionable violation of the familial privacy right"

to instances

> "where state officials' actions were directly aimed at the parent-child relationship, implicated the most essential and basic aspect of familial privacy—the right of the family to remain together without the coercive interference of the awesome power of the state, drove a wedge into [a] family and threatened its very foundation, or eroded the family's solidarity internally and impaired the family's ability to function."

*Id.* (cleaned up, citations omitted).

Where courts have allowed claims to proceed based on interference with familial privacy,

the actions of the defendants involve *active interference. See, e.g., Words of Faith Fellowship,*

*Inc. v. Rutherford Cnty. Dep't of Soc. Servs.*, 329 F. Supp. 2d 675, 685 (W.D.N.C. 2004)

(allowing familial privacy claim to proceed where it was alleged that defendants "actually

enticed children to leave their parents' homes and to reject their parents' religion"); *Truelove v.*

*Hunt*, 67 F. Supp. 2d 569, 579–80 (D.S.C. 1999) (allowing familial privacy claim to proceed

based on allegations that "Defendants entered the Plaintiffs' home unlawfully, removed a child,

and gave that child to another based upon a patently false and forged order" without any

process).

In contrast to these cases of interference, the acts which Plaintiff points to as support for

her claim—as opposed to the conclusory labels which she applies to them—in fact show that

Defendants did *not* insert themselves or the coercive power of the state into the parent-child

relationship. Plaintiff makes no allegation that any of these Defendants removed S.B. from her

family; or that they pressured S.B. not to inform Plaintiff of her alternate gender identity; or that

they prevented S.B. from making any revelation about the bullying she suffered.

Indeed, in an unavailing effort to bolster her case, Plaintiff points to this Court's decision

in *Nelson v. Green,* 965 F. Supp. 2d 732 (W.D. Va. 2013). In that case, the plaintiff—a non-custodial father—sufficiently alleged a § 1983 violation by Green, the lead CPS case worker in an investigation as to whether the plaintiff had committed abuse. *Id.* at 745. The facts of that case are, however, far afield from those now before the Court. Green allegedly arranged for the plaintiff's then-four-year-old daughter to go to a social worker in Newport News for abuse evaluation, in violation of a court order regarding travel; Green provided the social worker with false information about the plaintiff and told the social worker not to talk to him; Green actively concealed prior evaluations which concluded that the plaintiff had not committed abuse; and, over an hour and a half, Green traumatized the four-year-old by pressuring her to say that her father, the plaintiff, had sexually abused her. *Id.* at 738. Green allegedly both failed to record the evaluation session and destroyed her notes in order to prevent plaintiff or the state court from examining its legitimacy. *Id.* at 745–46.

This alleged behavior is a far cry from those acts of Defendants which Plaintiff points to in support of her claim. Rather than coercing a four-year-old to make false reports of sexual abuse, Defendants are accused of allowing a teenager to decide when and how to disclose gender identity information to her parents. Neither controlling precedent nor a consensus of persuasive authority (let alone this Court's decision in *Nelson v. Green*) provided notice to Defendants that their acts intruded on a constitutional right. For this reason, the individual Defendants are entitled to qualified immunity on the Count Two.

    *iii. Count Three: S.B.'s right to familial privacy.*

In this count, Plaintiff brings another claim of violation of familial privacy against Olsen, Via, and Bennett, this time on behalf of S.B. Plaintiff asserts that that Olsen and Via "invaded the private realm of [S.B.'s] family" and "interfered with S.B.'s right to have intimate personal

decisions made by her parent[.]" Dkt. 1, ¶¶ 139–41. In essence, Plaintiff argues that Olsen and

Via should have been on notice that they were violating S.B.'s constitutional rights by refraining,

*at S.B.'s request*, from notifying Plaintiff of S.B.'s gender identification. Here, again, Plaintiff

does not cite, nor can the Court identify, controlling precedent or a consensus of authority that

would clearly establish that S.B. enjoys a constitutional right to have school counselors ignore

her expressed desire that they refrain from raising her gender identity issue with her parent.

Consequently, even if such a right existed, Olsen and Via did not have notice of it. They are,

thus, entitled to qualified immunity. After all, to "expect [non-jurist] Defendants to resolve what

reasonable jurists have long debated — namely the precise strictures of the penumbral right of

familial privacy" is to make demands well outside the Defendants' capacities. *Hodge*, 31 F.3d at

167–68.

    As to Bennett, Plaintiff alleges that she violated S.B.'s right to familial privacy "by

failing to adequately direct, train, and/or supervise District administration and staff that the

Constitution and Virginia law require" parental notification when a student adopts a different

gender identity at school. Dkt. 1, ¶ 146. She also alleges that Bennet acted with reckless

disregard of S.B.'s constitutional right by failing to "adequately train or supervise District staff"

with regards to District policies that prohibit engaging in psychotherapy without parental

notification and consent and require reporting and investigation of sexual harassment and assault.

*Id.* ¶¶ 149–50. In order for Bennett's acts to have placed her beyond the shield of qualified

immunity, she would have needed notice that her alleged acts of supervision or omission

infringed on S.B.'s clearly established constitutional right to parental notification or

implementation of District policies.

    Here, again, Plaintiff fails to identify controlling precedent or persuasive consensus

establishing that the right asserted on S.B.'s behalf was clearly established and "beyond debate." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)). In the absence of such authority, the Court cannot find that Bennett violated a clearly established right. Qualified immunity protects Bennett in her individual capacity.

  *c. The official-capacity claims against Bennett are redundant and will be dismissed.*

  Plaintiff alleges that Defendant Appomattox County School Board ("ACSB") "is a body corporate charged with the responsibility of overseeing all practices and policies that govern Appomattox County Public Schools" pursuant to VA. CODE § 22.1–28.  Dkt. 1 ¶ 15. ACSB is alleged to be "vested with all the powers and charged with all the duties, obligations, and responsibilities imposed upon Appomattox County Public Schools[.]" *Id.* Plaintiff states that Bennett "is the Superintendent and chief executive officer of Appomattox County Public Schools" with duties that include "oversight and control of Appomattox County Public Schools, authorizing, executing, enforcing, and implementing the School Board's policies and overseeing the operation and management of the District." *Id.* ¶ 16. Under VA. CODE § 22.1–60, a division superintendent is "appointed" by an "employing school board[.]" The Court therefore understands from the Complaint and from Virginia law that Bennett, in her official capacity as Superintendent of Appomattox County Public Schools, was employed by ACSB and implemented its policies.

  In contrast to personal-capacity suits, which "seek to impose personal liability upon a government official for actions [taken] under color of state law," official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quotations omitted). And "[a]s long as the government entity receives notice and an opportunity to respond, an official-capacity suit

is, in all respects other than name, to be treated as a suit against the entity." *Id.*

Here, ACSB is a party to the suit and has exercised its opportunity to respond to Plaintiff's claims. Dkts. 29, 54. Consequently, the official-capacity claims against Bennett are "in all respects other than in name" the same as the claims brought against ACSB. A judgment against Bennett would not afford any relief different from a judgment against ACSB. For these reasons, the Court will dismiss the official-capacity claims against Bennett. *See Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004) ("The district court correctly held that the § 1983 claim against Martin in his official capacity as Superintendent is essentially a claim against the Board [of Education] and thus should be dismissed as duplicative.")

> d.   *Plaintiff's allegations fail to support municipal liability.*

"Local governing bodies … can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where … the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision *officially adopted and promulgated* by that body's officers." *Monell*, 436 U.S. at 690 (emphasis added). Even assuming, without deciding, that Plaintiff's constitutional rights were violated, Plaintiff's claim against ACSB fails because her allegations fall far short of establishing municipal liability against that entity.[7]

Plaintiff frames her constitutional claims against ACSB as based an alleged policy (¶ 59) as well as on failure "to adequately direct, train, and/or supervise District administration and staff" regarding Plaintiff's rights. Dkt. 1 ¶ 114 (Count One); ¶ 130 (Count Two); ¶ 146 (Count Three). The Court turns first to the theory of liability based on the alleged policy.

> i.   *Plaintiff does not adequately allege the existence of an unconstitutional policy or custom.*

---

[7] This assumption should by no means be understood as an indication that the Court has recognized the rights which Plaintiff asserts.

A municipality "is liable under § 1983 if it follows a custom, policy, or practice by which local officials violate a plaintiff's constitutional rights." *Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014) (citing *Monell*, 436 U.S. at 690–91). Policy can be found in written ordinances and regulations or the decisions of individual policymaking officials. *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999).

Plaintiff makes the conclusory allegation, on information and belief, that the District had a protocol or guideline "that directed staff to not inform parents when their children expressed a discordant gender identity and asked to be treated as the opposite sex, using opposite sex names and pronouns and use opposite sex privacy facilities, unless the minor child agrees to disclosing the information." ¶ 59. Plaintiff also alleges generally, on information and belief, that Bennett and members of ACSB knew of, adhered to, and implemented this policy. *Id*. The Complaint is otherwise devoid of any alleged facts specific to ACSB's decisions or policies as to parental notification regarding children's gender identity.[8]

To survive a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), as here, Plaintiff must "provide the 'grounds' of [her] 'entitle[ment] to relief'"—an undertaking in which "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation").

Here, Plaintiff does not allege enough to support her assertion that a promulgated policy

---

[8] The only individual allegation as to Bennett is that she "was aware" of incidents, reported by parents, of S.B. being bullied in the boys' bathroom, but that she "did not direct Ms. Olsen, Mr. Via, or any other ACHS staff to follow the Appomattox County Public School's anti-harassment/bullying policies." ¶ 47. District policy, per Plaintiff's allegations, required that incidents of sexual harassment "be reported to the District's Title IX compliance officer and investigated." ¶ 56. It is not clear to the Court how this would intersect with Plaintiff's asserted constitutional right to be informed of S.B.'s gender identity.

or policymaker decision to refrain from notifying parents about student gender identity can be traced to ACSB. In other words, Plaintiff does not support her *Monell* policy liability claims with anything other than a conclusory statement that there was such a policy. Consequently, her claims against ACSB cannot proceed on a theory of policy-based liability.[9]

*ii. Plaintiff fails to adequately plead notice or deliberate indifference, which are elements of supervisory liability.[10]*

As was recently noted in this District, it is unclear that the Fourth Circuit has established that supervisory liability applies to municipalities.[11] *Doe 1 v. Roanoke Cnty. Sch. Bd.*, No. 7:22-CV-00163, 2023 WL 2674864, at *12 (W.D. Va. Mar. 29, 2023), citing *Moody v. City of Newport News*, 93 F. Supp. 3d 516, 540 (E.D. Va. 2015). Even if this theory of liability was available to Plaintiff against ACSB, however, her allegations would fail to support it.

Supervisory liability under § 1983 has three elements:

(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff;
(2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices[]; and

---

[9] *Monell* claims can also proceed based on municipal custom rather than explicit policy, but Plaintiff does not advance a custom liability theory—nor does the Complaint offer factual allegations that would support it. *See Carter*, 164 F.3d at 218 (stating that custom can "arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a custom or usage with the force of law'") (quoting *Monell*, 436 U.S. at 691) (some internal quotation marks omitted).

[10] In the Memoranda supporting their Motions to Dismiss, Bennett and ACSB noted the lack of distinction between "to adequately direct" and "to adequately supervise[.]" Dkt. 27 at 9; Dkt. 29 at 9. Plaintiff did not offer any differentiation between the two in her Briefs in Opposition, Dkts. 48, 50. Consequently—and because the Court does not see any meaningful difference between the two—the Court will not address "failure to direct" separately.

[11] In *Doe*, the Court explained that § 1983 does not have vicarious liability and that both failure-to-train and failure-to-supervise claims against municipalities are "governed by a deliberate indifference standard." This leaves no "daylight" between the two claims; the Court dismissed failure-to-supervise as duplicative.

(3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (quotations omitted).

In *Shaw*, the Fourth Circuit went on to explain that "to satisfy the requirements of the first element" a plaintiff must show "(1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the conduct poses a pervasive and unreasonable risk of constitutional injury to the plaintiff." *Id.*, citing *Slakan v. Porter,* 737 F.2d 368, 373 (4th Cir. 1984). As to the second element, deliberate indifference, the plaintiff must demonstrate the "supervisor's continued inaction in the face of documented widespread abuses." *Id.* (internal quotation omitted); *see also Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983) (*"*Generally, a failure to supervise gives rise to § 1983 liability … only in those situations in which there is a history of widespread abuse"). Finally, the third element requires an "affirmative causal link between the supervisor's inaction and the harm suffered by the plaintiff." *Id.* (internal quotation omitted). Plaintiff's allegations, taken as true and drawing all reasonable inferences in her favor, fail to satisfy the required elements.

Turning to the first element—notice—Plaintiff asserts that the failure of ACSB personnel to inform her of S.B.'s asserted gender identity infringed on her constitutional right to direct S.B.'s upbringing. She likewise asserts that this failure also violated both her and S.B.'s constitutional rights to familial privacy. Aside from the conclusory statement that ACSB and Bennett were to blame for a policy of parental non-notification, ¶ 59 discussed above, the Complaint lacks allegations which support the idea that ACSB or Bennett had notice that the constitutional rights Plaintiff asserts were at risk.

True, Plaintiff alleges on information and belief that "Superintendent Bennett was aware of" incidents of S.B. being bullied in the boy's restroom, which other parents brought to the

attention of the school and District administrators. Dkt. 1 ¶ 47. However, this allegation cannot show that Bennett, let alone her employer ACSB, was aware of *conduct by a subordinate* that posed a pervasive and unreasonable risk of constitutional injury to Plaintiff.[12] Such notice is a requirement for supervisory liability. *Shaw*, 13 F.3d at 799. Bennett's alleged knowledge of the bathroom bullying incidents diverges markedly from knowledge as to the *content of communications* between school personnel and the parent of the bullied child. The Complaint does not offer allegations that can satisfy the first element.[13]

The second element, deliberate indifference, is likewise lacking. Plaintiff alleges no continued inaction by ACSB in the face of widespread, documented abuse. All of the problematic events are alleged to have occurred between the beginning of the school year—August 11, 2021—and the date that S.B. ran away—August 25, 2021. Dkt. 1 ¶¶ 28, 63. This is a

---

[12] Plaintiff also alleges, and cites in support of her constitutional claims, that upon learning of the incidents Bennett "did not direct Ms. Olsen, Mr. Via, or any other ACHS staff to follow the Appomattox County Public School's anti-harassment/bullying policies." Dkt. 1 ¶ 47. The only harassment-related policy which Plaintiff lays out is "District Policy JFHA/GBA" which required harassing acts to "be reported to the District's Title IX compliance officer and be investigated." *Id.* ¶ 56. Plaintiff has not articulated how this policy—which, per her allegations, mandates *internal* reporting and investigation—connects with Plaintiff's constitutional claims. The Court will not advance a claim she did not see fit to make.

[13] In another reference to District policy, Plaintiff argues in support of her constitutional claims that ACSB and Bennett failed to "adequately … supervise District staff in the implementation of District Policy IJ and its prohibition on engaging in psychotherapy and requirements for parental notice and consent." Dkt. 1 ¶¶ 117, 133, 149. That policy, per the Complaint, provided that school counselors should not use counseling techniques "which are beyond the scope of the professional certification or training of counselors, including hypnosis, or other psychotherapeutic techniques that are normally employed in medical or clinical settings and focus on mental illness or psychopathology." ¶ 44. Again, Plaintiff has not articulated the connection between district policy and her constitutional claims; she does not allege that the policy required parental notification. Nor is the Court persuaded by Plaintiff's assertion that the actions of Olsen and Via, in affirming S.B.'s asserted gender identity, fall in the category of "psychotherapeutic techniques normally employed in medical or clinical settings[.]" ¶¶ 43–44. To credit that categorization would be to accept the astonishing conclusion that every time an individual encounters someone with gender dysphoria, greeting him or her in accordance with his or her presented name or gender is to engage in professional mental health intervention.

two-week timeframe. Plaintiff provides no allegation that any individuals other than herself and S.B. suffered violation of their constitutional rights, and cites no legal precedent for a finding of documented, widespread abuse based on such narrow facts. Given the extremely limited scope of events—less than two weeks, involving the rights of one family—the Court cannot conclude that Plaintiff plausibly alleges deliberate indifference on the part of ACSB to any of the constitutional rights asserted by Plaintiff in Counts One, Two, and Three.

The Court therefore concludes that the Complaint cannot support any of Plaintiff's claims against ACSB based on *Monell* liability for failure to supervise.

iii.   *Plaintiff does not adequately plead failure to train.*

A school board can incur liability under § 1983 for failure to train if its failure "in a relevant respect evidences a 'deliberate indifference' to" a person's constitutional rights. *Jordan v. Jackson*, 15 F.3d 333, 341 (4th Cir. 1994) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). "That is, '[o]nly where a failure to train reflects a deliberate or conscious choice by a municipality—a policy[]—can a city be liable for such failure under § 1983.'" *Doe v. Broderick*, 225 F.3d 440, 456 (4th Cir. 2000) (quoting *City of Canton*, at 389 (internal quotation marks omitted).

Here, again, the Complaint does not include factual allegations that adequately support deliberate indifference by ACSB as to any of the constitutional rights which Plaintiff asserts. Plaintiff offers a conclusory statement that ACSB issued a policy of parental non-notification, and, as described above, states that Bennett was aware of incidents of S.B. being bullied in the boys' bathroom. Dkt. 1 ¶¶ 47, 59. According to Plaintiff, this shows that ACSB failed to train District staff to respect constitutional rights to parental control and familial privacy. *Id*., ¶¶ 114, 130, 146. But as discussed above, these allegations are insufficient to show the required

deliberate indifference. Plaintiff alleges no pattern of constitutional wrongs that would have provided notice to ACSB, such that ACSB would be capable of making a deliberate choice not to train its staff with regard to the rights asserted.[14]

Indeed, deliberate indifference requires that a training deficiency be "obvious." *City of Canton*, at 390 n. 30, citing *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694 (1985) (stating that failing to train police on the use of deadly force can properly be characterized as deliberate indifference). As noted above in the Court's discussion of qualified immunity, the rights which Plaintiff asserts are not clearly established. Rather, they were—and are—contested and amorphous. Given all the deficiencies in Plaintiff's allegations, the Court concludes that claims premised on failure to train cannot proceed against ACSB.

2. *Plaintiff's Title IX claim (Count Four) cannot proceed because there is no basis for school liability.*

Plaintiff brought this claim against ACSB, Bennett, Olsen, and Via. However, in briefing, Plaintiff conceded that Title IX does not give rise to individual liability and the claim should be dismissed as to Olsen, Bennett, and Via. Dkt. 36 at 26; Dkt. 48 at 26; Dkt. 56 at 26. This leaves ACSB.

To establish a Title IX claim on the basis of sexual harassment, a plaintiff must show that:

> (1) she was a student at an educational institution receiving federal funds,
> (2) she was subjected to harassment based on her sex,
> (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity, and
> (4) there is a basis for imputing liability to the institution.

*Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007).

---

[14] As discussed in the prior footnotes, Plaintiff's allegations as to District Policies JFHA/GBA (harassment) and IJ (psychotherapy) miss the mark; they do not support her failure-to-train liability theory any more than failure-to-supervise.

Here, the primary issue is the fourth element: basis for school liability.

School boards are not liable under Title IX for the actions of students, "but only for what is effectively 'an official decision by [the school] not to remedy' student-on-student harassment. Thus, it is not enough that a school has failed to eliminate student-on-student harassment, or to impose the disciplinary sanctions sought by a victim." *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 76–77 (4th Cir. 2016) (quoting *Davis v. Monroe County Board of Education,* 526 U.S. 629, 642 (1999)). Liability of a school arises in cases of deliberate indifference, or, in other words, when its "response ... or lack thereof is clearly unreasonable in light of the known circumstances." *Davis,* 526 U.S. at 648. School administrators are entitled to substantial deference when calibrating a disciplinary response to bullying or harassment. *Id.*

Plaintiff alleges that ACSB failed to take corrective action and was deliberately indifferent to "severe, pervasive, and objectively offensive sexual harassment that S.B. suffered and reported to ACSB officials by deliberately refusing to affirmatively contact [Plaintiff] to inform her of the incidents, inform [Plaintiff] of her and S.B.'s rights under Title IX, provide a timely and equitable response, or take other corrective actions as required by District Policy JFHA/GBA and state and federal laws." ¶ 158.

Plaintiff does not adequately allege that ACSB was deliberately indifferent. Even as the Court looks only at the allegations contained in the Complaint and refrains from considering Olsen's contemporaneous counseling notes, Dkt. 25, there is simply not enough to support the conclusion that the response to harassment was clearly unreasonable.

On August 12, S.B. told Olsen and Via about being severely bullied on the bus the day before. ¶ 36. Olsen reviewed footage of the bus incident, which did not confirm S.B.'s statements, and spoke to students who allegedly *did* confirm S.B.'s version of events. ¶ 37. Olsen

further contacted Plaintiff about the bullying on the bus without going into the gender aspect, and got Plaintiff to pick S.B. up from school. ¶ 38. Over the following two weeks, Olsen and Via spoke with S.B. often about her gender identification issues. ¶ 41. Plaintiff frames this as Olsen failing to check on S.B.'s welfare despite knowing she was vulnerable to bullies. ¶ 40. But Plaintiff makes no allegation that, before August 24, S.B. reported the any ongoing harassment to Olsen or Via, or that she was prevented from doing so.

Plaintiff alleges that on August 23, Olsen "was informed that the school and District administrators had received reports from parents about incidents in the boys' restrooms[.]" ¶ 46. Plaintiff alleges on information and belief that "Bennett was aware of the reported incidents but did not direct … any ACHS staff to follow the Appomattox County Public School's anti-harassment/bullying policies." ¶ 47. The next day, on August 24, Olsen met with S.B. about the bathroom bullying and made a plan for S.B. to stop using the boys' bathroom and instead use the nurse's bathroom. ¶ 48. During that conversation, S.B. reported that she was "threatened, harassed, and sexually assaulted when she was using the restroom" and also stated that "all the boys are rapists." *Id.* She defined "rape" as inappropriate touching. *Id.* Olsen asked School Resource Officer Daniel Gunter to review school surveillance tapes to check for safety concerns. ¶ 51. Plaintiff alleges that the tapes "revealed several male students entering the boys' bathroom during times that S.B. was in there." ¶ 52.

The following day, August 25, Olsen and Gunter met with S.B. and emphasized both the need for accurate reporting and that calling every boy in the school a rapist could lead to legal trouble for S.B. ¶ 53. S.B. told Olsen and Gunter "I didn't want to tell you anything about this." ¶ 55. She also stated "You are supposed to keep your students safe. If you hear something about rape, you have to do something." *Id.* Given that Olsen and Gunter had worked to independently

verify that there had been times when S.B. was in the bathroom with boys, and that S.B. had shared her idiosyncratic definition of "rape," the Court does not consider this follow-up meeting to further discuss the bathroom incidents was inherently unreasonable.[15]

The same day, August 25, Olsen informed Plaintiff that S.B. had been using the boys' restrooms and that there were safety concerns. ¶ 58. Olsen provided no specifics about S.B.'s experience of gender-based harassment, threats, or assaults.

Plaintiff alleges that at the time of these events, District policy required that reports of sexual harassment, such as that suffered and reported by S.B., be reported to the District's Title IX compliance officer and investigated. ¶ 56. Olsen and Via allegedly did not alert the Title IX officer. ¶ 57.

Here, setting aside Plaintiff's expressions of displeasure with events, the allegations present a timeline in which school officials took action in response to alleged incidents of harassment. When S.B. reported bullying on the bus, Olsen spoke with S.B. and other students, reviewed footage, and alerted Plaintiff to the bullying. Then Olsen and Via checked in with S.B. repeatedly over the following weeks, at which point S.B. could have, but did not, report the ongoing harassment. When Olsen received reports of bullying and harassment in the boys' bathroom, Plaintiff alleges that *the very next day* Olsen met with S.B. and made a plan to remove S.B. from future exposure to harm in the boys' bathroom. And the day after that, Olsen alerted Plaintiff to the bathroom safety concerns.

As noted above, Title IX does not require that the school "eliminate student-on-student

---

[15] Plaintiff alleges generally that ACHS staff failed to "take appropriate action in response to the allegations of harassment and assault[,] aimed at investigating the incidents and preventing future incidents." Dkt. 1 ¶ 157. However, the Complaint lacks any allegations as to the consequences or lack thereof for boys who bullied S.B., once ACHS staff knew of the incidents, and the Complaint does not present disparity of treatment between S.B. and the bullies as an indication that ACSB's response was unreasonable.

harassment" or "impose the disciplinary sanctions sought by a victim." *S.B. ex rel. A.L.*, 819 F.3d at 77. Liability arises when the school's "response ... or lack thereof is clearly unreasonable in light of the known circumstances." *Davis,* 526 U.S. at 648. Here, where Plaintiff's allegations support a finding that school officials took prompt action to investigate each time harassment was reported, the school's response was not "clearly unreasonable[.]" *Id.* And the allegations do not show a "decision to remain idle" or "'official decision by [the school] not to remedy' known student-on-student harassment." *S.B. ex rel. A.L.*, *id.* (quoting *Davis,* 526 U.S. at 641–42). The alleged failure to follow policy and report to the Title IX compliance officer could perhaps be negligent, but in this context of other timely responses, it does not demonstrate deliberate indifference. Plaintiff does not cite any authority indicating that failure of a school to follow its own rules constitutes a per se violation of Title IX.

Consequently, Plaintiff does not adequately allege a violation of Title IX based on deliberate indifference to harassment. Count Four will therefore be dismissed.

3. *Plaintiff does not adequately plead the tort of Intentional Interference with Parental Rights (Count Seven).*

Plaintiff brings this claim against Olsen and Via. Dkt. 1 ¶ 191. In Virginia, a plaintiff bringing a claim for intentional interference with parental rights must allege:

> (1) the complaining parent has a right to establish or maintain a parental or custodial relationship with his/her minor child;
> (2) a party outside of the relationship between the complaining parent and his/her child intentionally interfered with the complaining parent's parental or custodial relationship with his/her child by removing or detaining the child from returning to the complaining parent, without that parent's consent, or by otherwise preventing the complaining parent from exercising his/her parental or custodial rights;
> (3) the outside party's intentional interference caused harm to the complaining parent's parental or custodial relationship with his/her child; and
> (4) damages resulted from such interference.

*Wyatt v. McDermott*, 725 S.E.2d 555, 562 (Va. 2012). In *Wyatt*, the Supreme Court of Virginia

also stated that "the harm lies in the physical interruption of the parent-child relationship, a concrete factor." 725 S.E.2d at 563.

The same court later "made clear that the tort of intentional interference with parental rights applies only to a tortious interference 'as that concept is summarized both in the text of and the comments to the [Second] Restatement.'" *Padula-Wilson v. Landry*, 841 S.E.2d 864, 870 (Va. 2020) (quoting *Coward v. Wellmont Health Sys.*, 812 S.E.2d 766, 771 (Va. 2018)). The Restatement frames the tort this way: "One who, with knowledge that the parent does not consent, abducts or otherwise compels or induces a minor child to leave a parent legally entitled to its custody or not to return to the parent after it has been left him, is subject to liability to the parent." *Restatement (Second) of Torts* § 700 (1997). The Supreme Court of Virginia cited to the Second Restatement and observed that "[t]he facts alleged … do not resemble an abduction or anything comparable[,]" when finding in *Padula-Wilson* that the tort was not applicable to the actions of various professionals involved in a custody determination process. 841 S.E.2d at 864. This authority establishes that in Virginia, the tort should not be broadly construed to include conduct that did not interrupt the physical proximity of parent and child. And under that concept of the tort, Plaintiff does not sufficiently allege conduct by Olsen and Via that satisfies the elements of intentional interference with parental rights.

First, Plaintiff alleges that Olsen and Via interfered with her parental rights by withholding information, and that because they prevented Plaintiff from addressing all the issues facing S.B., S.B. felt unsafe at school and ran away. Dkt. 1 ¶¶ 193–94. She further alleges that once S.B. was in Maryland, Via and Olsen's false testimony caused Plaintiff to be deprived of custody. *Id.* ¶ 196–97.

However—crucially—Olsen and Via's actions did not remove S.B. from Plaintiff's

custody or otherwise physically interfere with the parent-child relationship. Plaintiff asserts that their silence about gender issues prevented her from exercising full parental control over S.B.'s upbringing, but the requisite allegation of physical separation is missing. Olsen and Via followed S.B.'s request that they use her female name and pronouns when speaking to Plaintiff, but Plaintiff does *not* allege Olsen and Via gave S.B. the idea to hide her alternate gender identity from Plaintiff. And neither does Plaintiff allege that they compelled or induced S.B. to run away.

The allegation as to false testimony is also insufficient to maintain the tort. By remotely testifying to the Baltimore juvenile court, Olsen and Via did not "remove" or "detain" S.B. away from Plaintiff—they had no physical involvement in the situation. S.B. had run away weeks before, and had entered the temporary custody of the Maryland Department of Juvenile Services. In Virginia, the tort requires that the defendant "abducts or otherwise compels or induces a minor child to leave a parent legally entitled to its custody or not to return to the parent[.]" *Padula-Wilson,* 841 S.E.2d at 870 (quoting *Restatement (Second) of Torts* § 700). Olsen and Via's alleged false testimony did not include any coercive conduct directed *toward S.B.* that would "compel" or "induce" her to refrain from returning to Plaintiff. The party reacting to Olsen and Via's alleged falsehoods was, after all, the Baltimore juvenile court rather than S.B.

In short, Plaintiff fails to state a claim based on intentional interference with her parental rights. The Court will therefore dismiss Count Seven.

4. *Intentional Infliction of Emotional Distress.*

    a. *Plaintiff fails to plead several elements of the tort in the claim brought on her own behalf (Count Eight).*

Plaintiff brings a claim for intentional infliction of emotional distress ("IIED") against Olsen and Via. Dkt. 1 ¶ 208. Under Virginia law, the tort has four elements:

1) the wrongdoer's conduct was intentional or reckless;
2) the conduct was outrageous or intolerable;
3) there was a causal connection between the wrongdoer's conduct and the resulting emotional distress; and
4) the resulting emotional distress was severe.

*Almy v. Grisham*, 639 S.E.2d 182, 186 (Va. 2007), citing *Womack v. Eldridge,* 210 S.E.2d 145, 148 (Va. 1974). The tort "is not favored in the law." *Id.* at 187 (quotation omitted).

Plaintiff's claim is deficient for the following reasons. First, Plaintiff does not adequately allege a causal relationship between Defendants' conduct and the emotional distress. Liability for IIED arises where defendants perform acts that are either intentional or "reckless, such that they knew of should have known that their act [] likely would cause [a plaintiff] severe emotional distress." *Almy*, 639 S.E.2d at 187 (2007). Plaintiff bases her claim against Olsen and Via on their "concealment of information" about bullying and gender issues. Dkt. 1 ¶ 207. Her allegation as to causation is as follows:

"¶ 208. As a result of Defendants Olsen's and Via's extreme and outrageous conduct, [Plaintiff] was deprived of the ability to respond to S.B.'s difficulties and in particular to the harassment and threats before they escalated to the point that S.B. feared for her and her family's safety, ran away and was raped and sex trafficked into Maryland, separated from her family and home, causing [Plaintiff] significant emotional distress from not knowing if her daughter was alive or dead or whether she would ever see her again."

As pled, Plaintiff's distress arose from S.B.'s abduction and trafficking, combined with the attendant question of whether Plaintiff would ever see S.B. again. Plaintiff does not allege that Olsen or Via abducted S.B. The casual connection between Defendants' alleged acts and Plaintiff's distress is highly attenuated, at best.

Moreover, the timeline which Plaintiff herself lays out undermines the alleged causation. On August 11, S.B. was bullied on the bus. Dkt. 1 ¶ 36. Olsen learned about it on August 12. *Id.* She alerted Plaintiff to the bus incident the same day, without going into the gender-based aspect of the bullying. ¶ 38. On August 23, Olsen learned that S.B. suffered further bullying incidents in

31

the boys' restroom. ¶ 46. The next day, August 24, Olsen met with S.B. and made a plan for her

to use the nurse's bathroom. ¶ 48. And the day after that, August 25, Olsen informed Plaintiff

that S.B. had been using the boys' restroom. ¶ 58. That night S.B. ran away. ¶ 63.

So according to this timeline, Plaintiff had notice of *some* kind of bullying on August 12,

nearly two weeks before S.B. ran away. And when Olsen became aware of bullying taking place

specifically in the bathrooms, she informed Plaintiff within two days. Plaintiff tries to portray

Olsen and Via as recklessly withholding vital information from her and failing to respond to

bullying and harassment, ¶ 206, but the allegations do not support the proposition that if Plaintiff

had known what the counselors knew, S.B. would never have run away.

The causation that Plaintiff alleges also leaves her claim deficient as to the "intentional or

reckless" element of IIED. Liability for IIED arises where defendants perform acts that are either

intentional or "reckless, such that they knew of should have known that their act [] likely would

cause [a plaintiff] severe emotional distress." *Almy*, 639 S.E.2d at 187 (2007). Plaintiff does not

allege that Olsen and Via acted with the specific goal of causing her distress—or that the

intervention of criminal actors was, or should have been, foreseeable to them. And in the Court's

estimation, the acts that Olsen and Via performed—of withholding gender and bullying

information from Plaintiff—are not such that they knew or should have known that S.B. would

be sex trafficked.[16]

This is true even in light what they knew about S.B.'s troubled mental health history.

Plaintiff does not allege that Olsen and Via had any notice that S.B.'s troubles manifested in a

---

[16] Plaintiff does not cite Olsen and Via's alleged false testimony to the Baltimore juvenile court as a basis for her IIED claims. In order to take the Complaint as a whole and draw every reasonable inference in Plaintiff's favor, the Court considered whether the alleged testimony might carry the IIED claims. It cannot. The distress which Plaintiff alleges stems from S.B.'s abductions, and Plaintiff pleads no facts supporting the idea that either the first or the second incident of S.B. falling into criminal hands should have been foreseeable to Olsen and Via.

tendency to run away, let alone that events would unfold such that Plaintiff would suffer severe distress from "not knowing if her daughter was alive or dead or whether she would ever see her again." ¶ 208. In short, Plaintiff does not adequately allege that Olsen and Via acted in a way that was intentional or reckless as to the possibility of severe emotional distress.

Plaintiff's allegations as to the "intolerable" and "outrageous" nature of the conduct are also deficient. She alleges that at S.B.'s request, Olsen did not alert her to S.B.'s asserted gender identity when discussing bullying and bathroom use, and that Olsen and Via did not reveal that they were "counseling her daughter about transgender identities[.]" Dkt.1 ¶¶ 38, 45, 58.

Liability for IIED requires that the conduct has been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Harris v. Kreutzer*, 624 S.E.2d 24, 33 (Va. 2006), citing *Russo v. White,* 400 S.E.2d 160, 162 (Va. 1991). "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery ...." *Womack*, 210 S.E.2d at 148 (quoting Restatement (Second) of Torts, § 46, at 77).

Plaintiff herself alleges that S.B. *asked* Olsen not to use S.B.'s male name with Plaintiff because it might upset Plaintiff, Dkt. 1 ¶ 38. Consequently, the Court struggles to see how Olsen and Via's alleged actions were beyond all possible bounds of decency and utterly intolerable. Certainly, S.B. was a minor—but she was a teenager expressing a specific preference. She asked Olsen to keep something private in order to avoid creating conflict. Following this preference can hardly be considered hardly "intolerable," much less as a matter of law.

In conclusion, Plaintiff's IIED claim is deficient on multiple grounds, and so will be dismissed.

    *b.  Plaintiff's claim on behalf of S.B. (Count Nine) is likewise deficient.*

    Plaintiff brings this second IIED claim on behalf of S.B. against Olsen and Via. Plaintiff claims that their "failure to comply with policies and laws regarding reporting sexual harassment and abuse" and "intentionally concealing" the gender identity issue meant that "S.B. was deprived of her mother's care and decision-making regarding how to best respond to S.B.'s difficulties … before they escalated to the point that S.B. feared for her and her family's safety, ran away and was raped and sex trafficked, separated from her family and home, causing S.B. significant emotional distress." Dkt. 1 ¶¶ 219–22.

    As in Plaintiff's other IIED claim, the Court finds a lack of causation that is fatal to the claim. The distress, as alleged, stems from S.B. being sex trafficked. As discussed above, the Complaint does not assert that Olsen intended, or recklessly disregarded, the distress that stemmed from S.B.'s abduction. Nor does concealment of information from Plaintiff *at S.B.'s request*, or failure to follow reporting policies, approach the threshold of being "utterly intolerable in a civilized community." *Harris*, 624 S.E.2d at 33.

    Like Plaintiff's other IIED claim, this one fails in multiple respects and will be dismissed.

## CONCLUSION

    Because all of Plaintiff's claims fail, the Court will grant the Motions to Dismiss, Dkts. 12, 26, 28, 45, and will dismiss the Complaint in its entirety. This dismissal moots Via's Motion to Strike the Complaint's Verification, Dkt. 58, which will therefore be denied.

    The Court will issue an Order to this effect. The Clerk of Court is directed to send a copy of this Memorandum Opinion to all counsel of record.

    Entered this 25th   day of June, 2024.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE