IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

MICHELE BLAIR, individually,       )
SAGE BLAIR, individually           )         Civil Action No. 6:23-cv-00047-NKM-CKM
                                   )
            Plaintiffs.            )
v.                                 )         Second Amended Complaint
                                   )          for Damages
                                   )         (42 U.S.C. § 1983 Title IX)
APPOMATTOX COUNTY                  )
SCHOOL BOARD, DENA OLSEN,          )
AVERY VIA,                         )
            Defendants.            )
_____    )

Plaintiffs, Michele and Sage Blair, by and through their attorneys of record, file this Second

Amended Complaint against Appomattox County School Board, Dena Olsen, and Avery Via, and

in support thereof, allege as follows:

## INTRODUCTION

1.      Plaintiffs are bringing this action seeking damages under 42 U.S.C. § 1983 and 20

U.S.C. § 1681. Plaintiffs are also seeking attorneys' fees and costs under 42 U.S.C. § 1988.

## JURISDICTION AND VENUE

2.      This action is filed pursuant to 42 U.S.C. § 1983 seeking redress of injuries suffered

by Plaintiffs from deprivation, under color of state law, of rights secured by the First Amendment

to the United States Constitution and by the laws of the United States, including 20 U.S.C. § 1681.

Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a).

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and other applicable

law because the events and omissions giving rise to the claims in this action arose in Appomattox

County, which is situated within the Western District of Virginia and divisional boundaries of the

1

Lynchburg Division. Venue is also proper in this Court because Defendant Appomattox County School Board has its principal place of business in this District.

## PARTIES

4. Michele Blair is a resident of Appomattox County and is the paternal grandmother and adoptive mother of Sage Blair.

5. Sage Blair is age 18, a resident of Appomattox County, and is the daughter of Michele and Roger Blair. Sage Blair was denominated at S.B. in prior pleadings because she was a minor and her claims were brought by Michele Blair as her next friend. She is now bringing her claims in her own name since she has reached the age of majority.

6. Defendant Appomattox County School Board ("School Board") is a body corporate charged with the responsibility of overseeing all practices and policies that govern Appomattox County Public Schools and is vested with all the powers and charged with all the duties, obligations, and responsibilities imposed upon Appomattox County Public Schools, pursuant to Va. Code Ann. § 22.1-28. Pursuant to Va. Code Ann. § 22.1-71, the School Board has the power to sue and be sued.

7. Defendant Dena Olsen is employed by Defendant School Board as a Guidance Counselor at Appomattox County High School. She is sued in her individual capacity.

8. Defendant Avery Via is employed by FIVE18 Counseling Services, formerly Hope for Tomorrow, as a counselor. At all times relevant to this Complaint, Via worked full time as a counselor at Appomattox County High School pursuant to a contract between FIVE18 Counseling Services and the School Board to provide counseling services at district schools. He therefore was acting as an agent for the School Board and under color of state law. He is sued in his individual capacity.

**FACTUAL ALLEGATIONS**

9.  Michele Blair is a Christian for whom the Christian worldview grounded in Scripture and sincerely held religious beliefs, permeate all aspects of her life and inform how she has raised Sage.

10.  Michele Blair's sincerely held religious beliefs, which she has instilled into Sage since childhood, include that biological sex reflects Divine creation of human beings as man and woman, and that there is not a separable "gender identity" based on feelings.

11.  Michele Blair's sincerely held religious beliefs, which she has instilled into Sage since childhood, also include that because biological sex is Divinely created and inseparable. Children should be encouraged to accept their biological sex as created by God and to live their lives in the reality of their sex, regardless of any cultural constructs regarding stereotypical appearances, gender, behaviors, or interests.

12.  Michele Blair's sincerely held religious beliefs are also based on the tenets of the Ten Commandments, including that a person shall not bear false witness about [lie or misrepresent] another person's name, biological sex, beliefs, or other attributes.

13.  Michele Blair's sincerely held religious beliefs that she has imparted to Sage include a belief in modesty and sexual purity of the human body which means that members of each biological sex are not to be in public shared spaces, such as bathrooms or locker rooms,  in which they can view the body of a non-family member of the opposite sex in a state of full or partial nudity.

14.  Sage Blair was adopted by Michele and Roger Blair at age 2 after her father died and her mother was unable to care for her. She had spent many months in the foster care system and suffered trauma before being adopted by the Blairs.

15.     Sage Blair has a history of mental health issues arising from early childhood trauma and later trauma. With the onset of puberty in 2019, she began experiencing distress about her body. She was also experiencing depression, eating disorders, engaging in self-harm, and hallucinations.

16.     Prior to enrolling in Appomattox County Public Schools, Sage Blair was enrolled in private Christian schools from pre-kindergarten through seventh grade, most recently at Desmond Doss Junior Academy in Lynchburg. Sage's academic history was part of her educational records obtained and maintained by the Board.

17.     Sage Blair was enrolled in eighth grade in Appomattox County Middle School, part of Appomattox County Public Schools, during the 2020-2021 school year.

18.     During the 2020-2021 school year, middle school staff regularly communicated with Michele Blair when they noticed that Sage was having difficulties, including noticing evidence of self-harm. Mrs. Blair was able to act on that information and work with Sage's private licensed counselors to therapeutically address the issues in keeping with the family's Christian worldview and values.

19.     Toward the end of the 2020-2021 school year, Sage's symptoms grew worse, and she was admitted for in-patient psychiatric care at CMG Piedmont Psychiatric Center from June 1-8, 2021, in Lynchburg.

20.     When Sage was enrolled for her freshman year at Appomattox County High School ("ACHS") in early August 2021, Mrs. Blair provided the school with information from Sage's medical and mental health history, including the history of eating disorders, childhood trauma, diagnoses of "major depressive disorder, recurrent episode" and "intentional self-harm by sharp object" and her recent inpatient hospitalization for treatment of those diagnoses.

21.     On August 5, 2021, Sage underwent a psychiatric evaluation at CMG Piedmont Psychiatric Center at the request of Mrs. Blair.

22.     The results of Sage's psychiatric evaluation were prepared on August 11, 2021. However, Mrs. Blair did not receive a copy of the report and was not aware of the diagnosis until several months later, when she read it in a court filing. She was scheduled to meet with Sage's psychiatric treatment team on August 27, 2021, to review the evaluation, but was unable to because of the events of August 25, 2021, which is when Sage ran away. Upon receiving a copy of the evaluation, Ms. Blair learned the psychiatric evaluation included a diagnosis of "severe gender dysphoria" and related symptoms.

23.     When Sage started her freshman year at ACHS on August 10, 2021, school officials had information related to Sage's mental health diagnoses and her very recent history of self-harm and in-patient psychiatric hospitalization. However, neither Mrs. Blair nor the school had any knowledge of Sage's psychiatric diagnosis of gender dysphoria until after Sage ran away on August 25, 2021.

24.     Sage was a "tom boy" in her dress and interests, liking "emo" style dress featuring band shirts and board shorts, and skateboarding. Mrs. Blair supported the unconventional choices and helped Sage buy "emo" style clothes for school.

25.     Sage's peers were not so accepting of her choices and, beginning the second day of school, August 11, 2021, boys began sexually harassing her and threatening her with sexual and physical assault while on the school bus.

26.     At about the same time, Sage's science teacher told Mrs. Olsen that she overheard Sage telling a friend that Sage wanted to be referred to by a male name and pronouns.

27.    Mrs. Olsen, acting in the course and scope of her employment, intervened proactively, approaching Sage in the hallway and asking Sage if she "identified" as a boy or a girl. Sage indicated that she "identified" as a boy.

28.    Mrs. Olsen did not ask Sage for any further information about her answer or contact Mrs. Blair. Instead, she immediately told a petite 14-year-old girl that if she "identified as a boy" she should use the boys' restrooms. Sage had not asked to use the boys' restroom. Shortly thereafter, Ms. Olsen told Sage that her female classmates were uncomfortable with Sage using the girls' bathroom and instructed Sage could only use the boys' bathroom.

29.    Ms. Olsen did not review Sage's mental health records provided to the school showing a history of sexual assault trauma, diagnoses of depression, self-harm and recent hospitalization before directing Sage to use only male privacy facilities at the high school.

30.    On August 12, 2021, Sage's third day of school, the school counselors, Ms. Olsen and Mr. Via, acting in the course and scope of their employment with ACSB, scheduled a meeting with Sage.  When asked how she "identified," Sage said that she "identified" as a boy and wanted to use a male name, "Draco," and he/him pronouns.

31.    Sage asked Mrs. Olsen and Mr. Via to look at her records and at her diagnoses to be aware of her history of trauma and of her mental health diagnoses. Mrs. Olsen stated that there were many student files to review, and they could not review all of them.

32.    Mr. Via responded to Sage's request to review her records by stating that he had not and would not look at her records. He said, "I promise you that I will not look at your records. I am not interested in your records.  I'm going to look at you."

33.    Since Mrs. Olsen and Mr. Via did not review Sage's mental health records, even after Sage requested it, they were unaware of Sage's history of sexual assault and other trauma

6

when they interacted with her due to their intentional and purposeful decision not to review the records, despite their professional duty and responsibility to do so as employees of Appomattox County Public Schools.

34.     Neither Mrs. Olsen nor Mr. Via informed Mrs. Blair about the reported sexual harassment on the bus, Sage saying she identified as a "boy" or Sage being directed by Mrs. Olsen, the school counselor, to use only the boys' bathroom.

35.     Sage did not want to believe she was a girl because she did not want to be sexually harassed or assaulted and wanted to be seen as a "boy" to avoid further trauma. She knew she was not a boy but was scared of being hurt or even killed if she were treated as a girl.

36.     At the August 12, 2021, meeting, Sage informed Mrs. Olsen and Mr. Via about the bullying and sexual harassment that occurred on the school bus on her second day of school, August 11, 2021. She reported that she was sitting in the back of the bus wearing earphones listening to music when a boy came to her and yelled "Are you a boy or a girl?" Sage responded "None of your business,' and the boy continued to harass her, asking her if she wanted to be his girlfriend, to which she said no. The boy and others directed profane epithets at her because she "looked like a boy," threatened to sodomize her until she "liked boys," threatened to hold her out of the window of the bus by her hair until she apologized, and made other similar threats. One boy body-slammed her when she began recording the incident on her phone and did not stop harassing her until she deleted the recording. Other students reportedly threatened to shoot her and told her they knew where she lived.

37.     After receiving this report from Sage, neither Mrs. Olsen nor Mr. Via notified Mrs. Blair. Mrs. Olsen and another staff member reviewed recordings from the bus on August 11, 2021,

and claimed to have not seen or heard threatening behavior. However, Mrs. Olsen said she interviewed other students who were on the bus who confirmed events as relayed by Sage.

38.    School staff had one of the boys who harassed Sage switch buses. No information was provided to Sage or Mrs. Blair regarding any action being taken related to the confirmed harassment and threats against Sage on the bus. Mrs. Blair received no communication from the District's Title IX officer nor any other information regarding what if any efforts were taken by school officials regarding the incident, including whether the boys responsible were disciplined or what steps, if any, were taken to protect Sage from further assaults or harassment.

39.    On August 12, 2021, after Sage reported the harassment, Mrs. Olsen called Mrs. Blair to pick Sage up from school. Mrs. Olsen did not tell Mrs. Blair about the reported harassment and assaults on the bus, that the incidents were related to the boys' perceptions that Sage was imitating a boy, that Sage was using the boys' bathroom at Mrs. Olsen's direction, or that school staff was treating Sage as a boy and using the name "Draco."  She only told Mrs. Blair that there was an incident on the bus and that Sage was not in any trouble.

40.    At the time that Sage reported the harassment and assault by male classmates to Mrs. Olsen and Mr. Via, Sage was, at Mrs. Olsen's direction, using the boys' bathroom frequented by those very classmates. Even after hearing about the incidents on the bus, Mrs. Olsen did not retract her instruction that Sage use the male restroom.

41.    Sage continued to follow Mrs. Olsen's instructions to use only the boys' bathroom. She was subjected to continuing sexual harassment, threats, and assaults in the boys' bathroom and in the hallways at the high school between August 12 and August 25, 2021. Boys were following behind her in a group, touching her, threatening her with knife violence and rape, and shoving her up against the hallway wall.

42.     In one incident, Sage was in a stall changing her clothes when a male classmate began banging on the door of the stall, saying, "You must want to get raped." Another said, "You're not going to be anyone's girlfriend."

43.     Sage's way was blocked while changing classes and boys yelled "watch your back tranny," and "you shouldn't be here" Boys were constantly publicly threatening her and joking with her in cruel ways.

44.     In light of her history of trauma and the continuous harassment at school, Sage was frightened. Since her previous report about harassment on the bus had not resulted in anything but a boy being assigned to another bus, Sage did not report every incident to Mrs. Olsen, Mr. Via, or other staff since she believed that speaking out would not stop the threats and harassment and might make it worse.

45.     Others observed the incidents in the hallway. Some of Sage's classmates who observed the incidents were concerned for her safety and reported to school staff that they were afraid for her.

46.     Sage was frequently called into the office by Mrs. Olsen or Mr. Via, who, acting in the course and scope of their employment, said that they had "heard reports" about her. Sage said she wasn't doing anything wrong. She was frightened because of the continuing trauma, which exacerbated the childhood trauma that Mrs. Olsen and Mr. Via willfully and intentionally refused to consider.

47.     Sage was called into the counseling office at least eight times in 12 days. Each time she met with Mr. Via he would talk about "affirming" her identity as a boy. While acting in the course and scope of his employment with ACSB, Mr. Via told her that "gender affirming" care was very important for her and he wanted her to be happy in her new "identity."

9

48.    Mr. Via told Sage that he could tell that she was different from other kids and he wanted her to get support for her new "identity." Acting in the course and scope of his employment, Mr. Via directed her to LGBTQ affirming websites and social media sites where she could get "support" and find "friends." After accessing the sites Via directed her to, Sage learned that those sites were frequented by adult sexual predators, including one who later abducted her.

49.    Sage had told the counselors that her mom was a Christian. In response, Mr. Via said that since her parents are religious it was better not to tell them about her asserted new "identity," because she would not be "safe." Sage was already scared of being harmed by classmates, thus hearing that she would also not be safe at home if she told her parents convinced her not to say anything to them initially.

50.    Mr. Via was aware that Sage was exclusively using the boys' bathroom at Mrs. Olsen's direction when he called Sage into the office following reports about harassment. While he encouraged her to "affirm" her new "gender identity" and explore LGBTQ Websites, he did not say that she should discontinue using the boys' bathroom. Neither did he report to Mrs. Blair that Sage was being harassed, let alone that she was using the boys' bathroom, or that Sage was being encouraged to explore this discordant identity or LGBTQ websites.

51.    Mrs. Olsen finally concluded that Sage should stop using the boys' bathroom when she received word from the central office on August 23, 2021 that other parents were now calling in concerned about ongoing incidents in the boys' bathroom involving Sage.

52.    Acting in the course and scope of her employment, Mrs. Olsen met with Sage the next day, August 24, 2021, and said that there were "concerns" about Sage using the boys' bathroom. Sage confirmed that since she began using the restroom at Mrs. Olsen's direction, she had been threatened, harassed, and sexually assaulted by male students. Having been subjected to

10

nearly two weeks of harassment, threats and assaults by much larger male students, which exacerbated the childhood trauma and recent mental health diagnoses of which Mrs. Olsen was aware but purposefully and intentionally chose to ignore, Sage blurted out "all boys are rapists," and qualified that she defined "rape" as inappropriate touching such as what she had been subjected to over the last several days.

53.     Finally, after more than two weeks of sexual harassment and threats. Mrs. Olsen told Sage to no longer use the boys' bathroom but to instead use the nurse's restroom.

54.     Mrs. Olsen still did not notify Mrs. Blair about the sexual harassment, threats and assaults against Sage, nor that Sage was using the male restroom at Mrs. Olsen's direction or that she was being treated as a boy named "Draco" at school. Notably, Mrs. Blair was notified and had to consent to her daughter receiving a Tylenol at school yet was never informed that Sage had been directed to use only the boys' bathroom at school, was being treated as a boy, and being harassed, threatened with rape, and sexually assaulted at school.

55.     Instead of contacting Mrs. Blair, Mrs. Olsen, acting in the scope and course of her employment, contacted School Resource Officer Daniel Gunter, a deputy with the Appomattox County Sheriff's Office, and asked him to review school surveillance footage (which did not include inside the restrooms) to see if the footage revealed any "safety concerns."

56.     On August 25, 2021, Ms. Olsen and Deputy Gunter, acting in the scope and course of their employment, interrogated Sage about the incidents. Again, Mrs. Blair was not notified about law enforcement interviewing her 14-year-old traumatized daughter. Sage was denied having her mother present while sitting in a room with a sheriff's deputy and school counselor being interrogated about the sexual harassment, assaults and violent threats she had undergone over the last two weeks while following Mrs. Olsen's direction to use only the boys' bathroom.

57. Mrs. Olsen and Deputy Gunter interrogated a 14-year-old girl with a documented history of childhood trauma, multiple mental health diagnoses and hospitalization without her parent even being notified and without having even reviewed the medical and mental health records detailing that history that Sage had urged Mrs. Olsen and Mr. Via to review.

58. In the interrogation, Mrs. Olsen and Deputy Gunter pressured Sage to recant her story, telling her that she had lied. Ms. Olsen told Sage:

> There was some information you shared from the bus incident that was untrue and there were some parts that were true. When you report information to us it is important to tell us the entire story. You never want to falsify a report. Or when you said yesterday that every boy in the school was a rapist. It is not fair to label every boy in the school a rapist. That is considered defamation of character. If you walked out of here and said every boy is a rapist and a boy called his dad who had the money, he could sue you for defamation of character when you have no basis to call every boy in the school a rapist. I'm not saying there is not an individual in this town that is not that. However, you cannot confidently say and I know and he knows that not every male in this school is a rapist. It is so important to know that you cannot say things because you are upset.

59. Deputy Gunter advised Sage, the 14-year-old victim of harassment with a history of trauma and mental health issues, that some of the boys she said were harassing her had very rich fathers who could sue her for lying about their sons.

60. Sage told Deputy Gunter and Mrs. Olsen that sexual harassment is a crime and that they were failing to uphold the law by not investigating and disciplining the boys who were threatening and harassing her. "You are supposed to keep your students safe. If you hear something about rape, you have to do something."

61. As of June 29, 2021, Appomattox Public Schools District Policy JFHA/GBA provided that reports of sexual harassment, which includes, "unwelcome sexual physical contact, unwelcome ongoing or repeated sexual flirtation or propositions, or remarks sexual slurs, leering, epithets, threats, verbal abuse, derogatory comments or sexually degrading descriptions, and

graphic comments about an individual's body," all of which Sage reported to Ms. Olsen, Mr. Via

and Deputy Gunter, must be reported to the District's Title IX compliance officer and be

investigated.

62.    Instead of alerting the Title IX compliance officer about Sage's reports of sexual

harassment and beginning an investigation (which would have included notifying Mrs. Blair), as

required under Policy JFHA/GBA, Ms. Olsen, and Deputy Gunter interrogated, intimidated and

threatened Sage, who was the sexual harassment victim.

63.    Following the interrogation on August 25, 2021, while acting in the scope and

course of her employment, Ms. Olsen contacted Mrs. Blair to pick up Sage from school. Ms. Olsen

said that Sage had been using the boys' restroom and said only that there were "safety concerns."

Ms. Olsen still did not tell Mrs. Blair that school staff had been using a male name and pronouns

for Sage, had directed Sage to use the male restroom, or that Sage was the victim of harassment,

threats, and assaults.

64.    On August 25, 2021, Ms. Olsen also told Mrs. Blair that she noticed self-harm

injuries on S.B.'s body and claimed she was unaware of the injuries until then. That was likely

true because, while acting in the course and scope of her employment, Mrs. Olsen had purposefully

refused to review Sage's mental health records even after Sage asked her to. Those records

included Sage's history of trauma, more recent mental health diagnoses, and issues such as self-

harm for which Sage had been hospitalized immediately before the start of school.

65.    After returning home on August 25, 2021, Mrs. Blair found a hall pass with the

name "Draco" on it. It was then that Sage told Mrs. Blair that she was being treated as a boy at

school and using the name "Draco." This was the first time that Mrs. Blair learned that Sage was

being treated as a boy at school since Mr. Via had instructed Sage that her parents should not be

told because her parents were Christian and so she would not be safe at home if she said she was being treated as a boy.

66. That same day Sage told her mother that a group of male students had "jacked" her up against the wall of the boys' bathroom and threatened her with violence. Sage said that she was terrified of what the students would do to her and her family. Sage also told her mother that she would not have been using the boys' bathroom except for the fact that Ms. Olsen instructed her to do so.

67. Mrs. Blair told Sage that she did not need to return to school and they would "figure it out in the morning."

68. Sage was still traumatized and frightened that she and her family would be subjected to more threats or harm from the harassment that had not been addressed. Because of the stress, fright and fear of further harm, Sage suffered a psychotic breakdown and decided to run away.

69. Later that night of August 25, 2021, Sage left through her bedroom window and ran away. She was abducted and then raped by an adult male stranger whom she had met through one of the LGBTQ friendly sites that Mr. Via directed her to and subsequently taken across state lines to Washington DC and Maryland. There she was raped and drugged repeatedly by multiple men.

70. After Sage ran away, law enforcement found a good-bye note Sage left for her parents.  They provided Mrs. Blair with a copy. The note said, "You've done your job, Jesus loves you." She said "I'm afraid of what is to come if I stayed. Be on your guard. There are bad people around here" Sage signed the note "All my love."

14

71.    Sage was eventually rescued from the home of a sexual predator in Baltimore. Before her parents arrived in Baltimore to pick her up, Sage was placed into the juvenile court system in Maryland where the public defender assigned to represent her and a juvenile court judge denied her parents access to her, claiming that they failed to "affirm" her "male gender identity." Sage was placed in the emergemcy custody of Maryland's Department of Social Services for several months while juvenile court proceedings continued. Having received no medical or mental health care while placed in a male facility, Sage again ran away, was abducted by a sexual predator a second time and taken to Texas where she was again sexually abused before being rescued by law enforcement and returned to Mrs. Blair.

72.    Virginia law requires that parents receive notice of and be provided the opportunity to excuse their children from Family Life Education materials that address human sexuality. Under the statute, parents do not need to provide a reason for excusing their children from human sexuality materials. Va. Code Ann. § 22.1-207.2.

73.    Acting in the course and scope of their employment with the School Board, Ms. Olsen and Mr. Via were discussing issues related to human sexuality, including "gender identity," and were directing Sage to Websites and social media sites that are LGBTQ friendly, addressing many of the same topics addressed in Family Life Education, and in the case of the Websites and social media sites, with more explicit details than provided by Family Life Education materials. Mrs. Blair was not notified about the discussions that Ms. Olsen and Mr. Via were having with Sage regarding "gender identity." More particularly, Ms. Olsen and Mr. Via did not notify Mrs. Blair of the referral to sexually explicit materials on the Websites and social media sites and provide her with the opportunity to excuse Sage from viewing those materials. Therefore, Mrs. Blair was deprived of her right to excuse Sage from exposure to sexually explicit materials

15

addressing issues like those being addressed in Family Life Education. These materials contradicted the sincerely held religious beliefs she had instilled in Sage from childhood, but Mrs. Blair was deprived of the rights accorded parents, even those without religious convictions, to notice and an opportunity to excuse their child.

74.    At the time that Sage was enrolled in ACHS, school district staff were following the Virginia Department of Education's "Model Policies for the Treatment of Transgender Students in Virginia's Public Schools," ("Model Policies") which went into effect on March 4, 2021 in accordance with Virginia Code § 22.1-23.3. (Exhibit 2 to Avery Via Motion to Dismiss, Dkt. 46-2).[1] School staff understood that the Model Policies compelled them to "affirm" students in K-12 schools who asserted a discordant gender identity.

75.    "The key guiding principle of the model policies is that all children have a right to learn, free from discrimination and harassment." (Dkt. 46-2, at 8).

76.    In failing to 1) properly respond to Sage's reports of sexual harassment and assault, 2) contact Mrs. Blair regarding the reports, 3) review Sage's records, 4) reverse the instruction that Sage use only the boys' restroom even after reports of sexual harassment, Defendants deprived Sage of the right to learn free from discrimination and harassment.

77.    The Model Policies provided: "School divisions are encouraged **to communicate openly**, albeit confidentially, with students **and families regarding the student's gender identity** to ensure that appropriate steps are taken to determine a student's needs and address any privacy concerns and associated risks to the student's well-being." (Dkt. 46-2, at 11) (Emphasis added).

78.    The Model Policies further advised educators that

---

[1]    The Model Policies were rescinded and replaced with "Model Policies On Ensuring Privacy, Dignity, And Respect For All Students And Parents In Virginia's Public Schools" effective July 19, 2023.

> School staff should be prepared to support the safety and welfare of transgender students when their families are not affirming. School staff should provide information and referral to resources to support the student in coping with the lack of support at home, provide information and resources to families about transgender issues, seek opportunities to foster a better relationship between the student and their family, and provide close follow-ups with the family and student. (Dkt. 46-2 at 14).

79. Mrs. Olsen and Mr. Via claimed to be following the Model Policies while interacting with Sage in the course and scope of their employment. Mrs. Olsen has claimed that she was required to direct that Sage use the boys' restroom, under existing Fourth Circuit precedent.

80. However, Mrs. Olsen and Mr. Via purposefully refused to review Sage's mental health records, even after she requested it, which would have fully informed them of a history of trauma, sexual assault and mental health diagnoses that would be exacerbated by having to use male privacy facilities where she would be exposed to boys who were fully or partially nude, and as occurred in this case, she would be harassed or assaulted. Therefore, while acting in the course and scope of their employment in communicating with Sage, they purposefully and intentionally remained "uninformed" about "associated risks" to Sage's well-being.

81. Even after receiving reports of sexual harassment, Mrs. Olsen and Mr. Via still did not review Sage's mental health records or speak with Mrs. Blair to obtain the information that should have affected how they interacted with Sage related to "gender identity."

82. While acting in the course and scope of their employment, Mrs. Olsen and Mr. Via did not "communicate openly" with Sage's family nor "seek opportunities to foster a better relationship between the student and their family, and provide close follow-ups with the family and student," opting instead to keep Mrs. Blair in the dark about what was occurring.

83.     While acting in the course and scope of their employment, Mrs. Olsen and Mr. Via did not "provide information and resources to Sage Blair's family about transgender issues," but chose instead to deprive Mrs. Blair of any notice about what was occurring with her traumatized daughter and any opportunity to work with the school or respond in a way in keeping with the family's sincerely held religious beliefs.

84.     Mrs. Olsen and Mr. Via knew that Mrs. Blair was a Christian whose sincerely held religious beliefs would oppose having her 14-year-old daughter use male privacy facilities, lie about her sex, or withhold information from her parents.  In fact, Mr. Via told Sage to conceal from her mother information regarding her use of a male name, pronouns, and the boy's restroom at school because Mrs. Blair's beliefs would make the home "unsafe" for Sage.

85.      Sage Blair has undergone and continues to undergo intensive in-patient and outpatient therapy to address the exacerbation of extant trauma and additional major trauma caused by Defendants' acts and omissions. On top of the prior mental health diagnoses which Mrs. Olsen and Mr. Via purposefully ignored, Sage has been diagnosed with Complex PTSD for which she will likely need therapy for the rest of her life.

86.     Michele Blair has also suffered significant injuries as a result of Defendants' actions and in particular as a result of Defendants' violation of Mrs.  Blair's right to direct the religious upbringing of her child. She has been diagnosed with PTSD as a result of Defendants' actions.

**FIRST CAUSE OF ACTION**
**42 U.S.C. § 1983**
**VIOLATION OF FIRST AMENDMENT RIGHT TO DIRECT RELIGIOUS**
**UPBRINGING OF CHILDREN**
**(By Mrs. Blair individually against All Defendants)**

18

87.     Plaintiff re-alleges the factual allegations in Paragraphs 1-86 by reference as if set forth in full.

88.     The Free Exercise Clause of the First Amendment of the United States Constitution protects Mrs. Blair's right to direct the religious upbringing of Sage Blair, including while Sage is attending public schools. *Mahmoud v. Taylor,* 145 S.Ct. 2332, 2351 (2025), *Espinoza v. Montana Dept. of Revenue*, 591 U.S. 464, 486 (2020).

89.     Government policies, including the Model Policies and similar administrative guidelines, that "substantially interfer[e] with the religious development" of children violate parents' rights to direct the religious upbringing of their children and in this case, substantially interfered with Sage's religious development and, so, violated Mrs. Blair's right to direct Sage's religious upbringing. *Mahmoud v. Taylor,* 145 S. Ct. 2332, 2350 (2025).

90.     Defendants' implementation of the Model Policies and other administrative guidelines to direct Sage Blair to use male privacy facilities if she "identifies" as a boy undermines the religious beliefs that Michele Blair had instilled in Sage since childhood and desired to continue to instill during her high school years regarding the Divinely created order of male and female that cannot be changed and respect for modesty and sexual purity with regard to viewing and being viewed by members of the opposite sex in states of full or partial nudity.

91.     By requiring that Sage use only the male restroom and using a false male name and pronouns, Defendants are imposing values and beliefs that are hostile to Mrs. Blair's religious beliefs, *i.e.,* that it is permissible and even required that a young traumatized girl who says she wants to be treated as a boy must use only male privacy facilities in which she will be viewed and will view young males in states of partial and full nudity and be vulnerable to harassment in an isolated space with no cameras or adult supervision.

92.     By directing Sage Blair to use male privacy facilities, Defendants, who are adult authority figures, exerted psychological pressure upon Sage, who was a traumatized child with mental health issues, to conform to the viewpoints espoused in the Model Policies regarding use of opposite-sex bathrooms, concealing information from parents, presuming parents to be unsafe, and using names and pronouns contrary to biological reality, all of which contravene Mrs. Blair's religious beliefs regarding the nature of male and female, respect for authority, truth-telling, and prohibitions against intermingling of the sexes while in states of full or partial nudity. Such compelled conformance to contrary viewpoints and conduct created an educational environment hostile to Mrs. Blair's sincerely held religious beliefs in violation of the Free Exercise Clause. *Wisconsin v. Yoder*, 406 U.S. 205, 211, 218 (1972).

93.     Defendants' actions reflected hostility toward Mrs. Blair's sincerely held religious beliefs, including instructing Sage that her home would not be safe due to her parents' religious convictions and purposefully withholding information from Mrs. Blair regarding Sage's asserted gender identity and related school activities. Such conduct evidences a lack of neutrality and respect for religious objections.

94.     Defendants implemented the Model Policies and other administrative guidelines in a manner that substantially interfered with Mrs. Blair's right to direct the religious upbringing of Sage by, *inter alia,* 1) failing to notify Mrs. Blair about reports of sexual harassment and assault inflicted on Sage because of classmates' perceptions that she dressed and acted "like a boy," 2) falsely referring to Sage as a boy named "Draco" using male pronouns, which contradicted biological reality; 3) directing that Sage, a 14-year-old psychologically traumatized girl, use only the boys' restroom without notifying Mrs. Blair and thereby undermining Mrs. Blair's teaching about purity, modesty, and the Divine plan for male and female, 4) telling Sage that staff would

20

not and she should not tell Mrs. Blair, her own mother, about Sage's "gender identity" because Mrs. Blair's religious beliefs meant that Sage would not be safe at home if Mrs. Blair knew about the "gender identity;" 5) engaging in conversations with and counseling a traumatized 14-year girl about "affirming" a false gender identity without notifying her mother; 6) directing a traumatized 14-year-old girl to Websites and social media sites that discuss sexual orientation, gender identity and other sexually related topics like those addressed in Family Life Education without notifying her mother; 7) failing to notify Mrs. Blair before placing Sage in a room with a school counselor and law enforcement officer to be interrogated and accused of lying about classmates who harassed and assaulted her – all due to bias against and hostility towards Mrs. Blairs religious beliefs.

95.    Defendants' actions in: 1)f ailing to notify Mrs. Blair before treating her daughter as a boy named "Draco" with male pronouns, 2) directing Sage to use only the boys' bathroom, 3) directing Sage to Websites and social media sites that discuss sexual orientation, gender identity and similar sexual issues with no parental notice, and 4) telling Sage that she should not and staff would not  tell Mrs. Blair about Sage's "gender identity" because Mrs. Blair's religious beliefs meant that Sage would not be "safe" at home if Mrs. Blair knew about the "gender identity," violated Mrs. Blair's right to direct Sage's religious upbringing by preventing Mrs. Blair from making the decisions necessary to protect her right to direct Sage's religious upbringing before her free exercise rights were violated. *Mahmoud v. Taylor,* 145 S.Ct. at 2358.

96.    Defendants' actions in not notifying Mrs. Blair before 1) treating her daughter as a boy named "Draco" with male pronouns, 2) directing Sage to use only the boys' bathroom, 3) directing Sage to Websites and social media sites that discuss sexual orientation, gender identity and similar sexual issues for which notice is required under Va. Code Ann. § 22.1-207.2, and 3) telling Sage that staff would not and she should not tell Mrs. Blair about Sage's "gender identity"

because Mrs. Blair's religious beliefs meant that Sage would not be "safe" at home if Mrs. Blair knew about the "gender identity, exceeded recognized limits on Defendants' ability to interfere with a student's religious upbringing in a public school setting. *Mahmoud v. Taylor,* 145 S.Ct. at 2351.

97. Defendants cannot assert a compelling state interest for disregarding Mrs. Blair's long-established fundamental constitutional right to direct the religious upbringing of her daughter particularly in light of longstanding Virginia law protecting parental rights to excuse their children from sexual education materials for any reason or no reason. Va. Code Ann. § 22.1-207.2. If parents must receive notice and an opportunity to excuse their children from sexual information in "Family Life Education," there cannot be a compelling interest in denying parents such as Mrs. Blair notice regarding discussions related to "gender identity," referral to sexually explicit LGBTQ-promoting Websites, and access to opposite sex restrooms that violate sincerely held religious beliefs.

98. Defendants' actions are not narrowly tailored.

99. Defendants' violation of Mrs. Blair's fundamental constitutional rights has caused and continues to cause Mrs. Blair undue hardship and irreparable harm.

**SECOND CAUSE OF ACTION**
**VIOLATION OF TITLE IX (20 U.S.C. § 1681, et seq.)**
**(Deliberate Indifference to Sexual Harassment/ Hostile Environment by Sage Blair Against Appomattox County School Board)**

100. Plaintiff incorporates the factual allegations in paragraphs 1-99 by reference as if set forth in full.

101. Title IX of the Education Amendments of 1972 provides, with limited exceptions, that "[n]o person in the United States shall, on the basis of sex, be excluded from participating in,

22

be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

102.    Title IX damages liability arises against a Title IX recipient when school officials with authority to take corrective action are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victim of access to the educational opportunities or benefits provided by the school. The "deliberate indifference" must, at minimum, cause students to undergo harassment or make them "vulnerable" to it.

103.    Appomattox County Public Schools is a recipient of federal financial assistance for purposes of Title IX.  Defendant Appomattox County School Board ("ACSB") is the entity authorized to receive the federal funds and with authority to take corrective action.

104.    ACSB staff and officials with authority to take corrective action, and with prior knowledge, were deliberately indifferent to Sage's reports, reports by witnesses and other evidence of sexual harassment and assaults on school buses, in hallways and male restrooms causing her to undergo repeated acts of sexual harassment and assault, thereby creating an unsafe, sexually hostile environment that was severe, pervasive, and objectively offensive, in violation of Title IX in a variety of ways, including 1) failing to adhere to District Policy JFHA/GBA; 2) failing to take appropriate responsive action, including notifying Mrs. Blair of the initial acts of harassment on August 11, 2023; 3) failing to notify Mrs. Blair of the multiple instances of sexual harassment and assault occurring as a result of Defendants' actions in affirming Sage as a male and instructing her to use a male restroom; 4) failing to notify the Title IX coordinator: 5) failing to take appropriate responsive actions aimed at investigating the incidents and preventing future incidents; 6) interrogating Sage without her parents being notified or present so as to coerce Sage to recant her

23

allegations of sexual harassment; 7) threatening Sage with possible civil liability if she "falsely stated" that male peers harassed and/or assaulted her; 8) purposefully refusing to review Sage's mental health history and medical/mental health treatment records pertaining thereto before affirming her as a male and instructing her to use male restrooms which exacerbated her existing trauma.

105.    At all relevant times the School Board exercised substantial control over the response, and lack of response, to Sage's reports of being sexually harassed and assaulted at school.

106.    The sexual harassment of Sage consisting of repeated instances of sexual harassment, threats and assaults based on her "male" appearance and use of a male name, pronouns and privacy facilities, which went unaddressed by the District, was so severe, pervasive and objectively offensive that it deprived Sage of access to the educational opportunities and benefits provided by Defendant School Board, in that the environment was so unsafe for Sage that Sage feared returning to school, that students would harm her and/or her family, and had a psychotic breakdown causing her to run away to be abducted and sex trafficked by deviant strangers.

107.    As a direct and proximate result of Defendants' deliberate indifference to the severe, pervasive and objectively offensive sexual harassment suffered by Sage has suffered and will continue to suffer significant physical and psychological trauma, educational disruption, and emotional distress.

**PRAYER FOR RELIEF:**

WHEREFORE, Plaintiffs pray for relief as follows:

1.  Compensatory damages according to proof;

2.  Punitive damages;

3.  Attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

24

4. For such other and further relief that the Court should deem just and proper.


Dated: September 23, 2025.

/s/Mary E. McAlister
Mary E. McAlister (VA Bar No.76057)
CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
P.O. Box 637
Monroe, VA 24574
770.448.4525
mmcalister@childparentrights.org

Vernadette R. Broyles (GA Bar No. 593026)*
Ernest G. Trakas (MO Bar 33813)*
CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
5425    Peachtree    Pkwy,    Suite    110
Norcross, GA 30092
770.448.4525
vbroyles@childparentrights.org
etrakas@childparentrights.org
*admitted pro hac vice

Attorneys for Plaintiff

25

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of September, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification to all filers of record.

/s/Mary E. McAlister
Mary E. McAlister (VA Bar No.76057)